1   Marcia Hofmann (SBN 250087)
    *marcia@eff.org*
2   ELECTRONIC FRONTIER FOUNDATION
    454 Shotwell Street
3   San Francisco, CA 94110
    Telephone: (415) 436-9333
4   Facsimile: (415) 436-9993

5   David L. Sobel (*pro hac vice pending*)
    *sobel@eff.org*
6   ELECTRONIC FRONTIER FOUNDATION
    1875 Connecticut Ave. NW
7   Suite 650
    Washington, DC  20009
8   Telephone: (202) 797-9009 x104
    Facsimile: (202) 707-9066

9
    Attorneys for Plaintiff
10  ELECTRONIC FRONTIER FOUNDATION

11

12                  **UNITED STATES DISTRICT COURT**

13          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14                    **SAN FRANCISCO DIVISION**

15  ELECTRONIC FRONTIER FOUNDATION,    )    NO. 08-1023 EDL
                                       )
16                         Plaintiff,  )    **DECLARATION OF MARCIA**
                                       )    **HOFMANN IN SUPPORT OF**
17       v.                            )    **PLAINTIFF'S MOTION FOR A**
                                       )    **PRELIMINARY INJUNCTION**
18  OFFICE OF THE DIRECTOR OF NATIONAL )
19  INTELLIGENCE                       )
                                       )
20     and                             )
                                       )
21  DEPARTMENT OF JUSTICE,             )
                                       )
22                        Defendants.  )
                                       )
23  ─────────────────────────────────

24          1.    I am an attorney of record for the plaintiff in this matter and a member in good

25  standing of the California State Bar, and am admitted to practice before this Court.  I have personal

26  knowledge of the matters stated in this declaration. If called upon to do so, I am competent to

27  testify to all matters set forth herein.

28

                                      -1-

2.      Plaintiff Electronic Frontier Foundation ("EFF") is a non-for-profit corporation established under the laws of California with its principal place of business in San Francisco.

3.      Attached hereto as Exhibit A is a true and correct copy of the following newspaper article: James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. TIMES, Dec. 16, 2005, available at http://www.nytimes.com/2005/12/16/politics/16program.html.

4.      Attached hereto as Exhibit B is a true and correct copy of the following webpage: President's Radio Address, Dec. 17, 2005, available at http://www.whitehouse.gov/news/releases/2005/12/20051217.html.

5.      Attached hereto as Exhibit C is a true and correct copy of the following newspaper article: Eric Lictblau, *Spy Agency Mined Vast Data Trove, Officials Report*, N.Y. TIMES, Dec. 24, 2005, available at http://www.nytimes.com/2005/12/24/politics/24spy.html.

6.      Attached hereto as Exhibit D is a true and correct copy of the following newspaper article: Leslie Cauley and John Diamond, *Telecoms Let NSA Spy on Calls*, USA TODAY, Feb. 6, 2006, available at http://www.usatoday.com/news/washington/2006-02-05-nsa-telecoms_x.htm.

7.      Attached hereto as Exhibit E is a true and correct copy of the following newspaper article: James Risen, *Bush Signs Law to Widen Reach for Wiretapping*, N.Y. TIMES, Aug. 5, 2007, available at http://www.nytimes.com/2007/08/06/washington/06nsa.html.

8.      Attached hereto as Exhibit F is a true and correct copy of the following presidential signing statement: *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007*, available at* http://www.whitehouse.gov/news/releases/2007/08/20070805.html.

9.      Attached hereto as Exhibit G is a true and correct copy of the following newspaper article: Chris Roberts, *Transcript: Debate on the Foreign Intelligence Surveillance Act*, EL PASO TIMES, Aug. 22, 2007 available at http://www.elpasotimes.com/news/ci_6685679.

10.     Attached hereto as Exhibit H is a true and correct copy of the following magazine

article: Mark Hosenball and Michael Isikoff, *Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About*, NEWSWEEK, updated Sept. 26, 2007, available at http://www.newsweek.com/id/41142.

11.    Attached hereto as Exhibit I is a true and correct copy of the following news article: Tim Starks, *House Allows FISA Law to Expire*, CONGRESSIONAL QUARTERLY, Feb. 17, 2008, available at http://www.cqpolitics.com/wmspage.cfm?docID=weeklyreport-000002672840 .

12.    Attached hereto as Exhibit J is a true and correct copy of the following transcript: Press Conference of the President, Feb. 28, 2008, available at http://www.whitehouse.gov/news/releases/2008/02/20080228-2.html.

13.    In letters sent by facsimile on December 21, 2007, to the Office of the Director of National Intelligence ("ODNI") and the Department of Justice ("DOJ") Office of the Attorney General, Office of Legislative Affairs, Office of Legal Policy, Office of Legal Counsel, and National Security Division, I requested all agency records from September 1, 2007 to December 21, 2007 concerning "briefings, discussions, or other exchanges" that agency officials

> have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities.  This request includes, but is not limited to, all email, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.[1]

---

[1] Each request contained the following footnote:

> The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies. According to *Newsweek*, these individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W.

A true and correct copy of these letters are attached hereto as Exhibits K, L, M, and N.

14.     In a letter dated December 28, 2007, the DOJ Office of Information and Privacy acknowledged that it had received EFF's December 21 FOIA requests to the Office of the Attorney General, Office of Legislative Affairs, and Office of Legal Policy, and informed EFF that its requests for expedited processing had been granted. A true and correct copy of this letter is attached hereto as Exhibit O.

15.     In a letter dated January 7, 2008, ODNI acknowledged that it had received EFF's December 21 FOIA request and informed EFF that its request for expedited processing had been granted. A true and correct copy of this letter is attached hereto as Exhibit P.

16.     In a letter dated January 9, 2008, the DOJ Office of Legal Counsel acknowledged that it had received EFF's December 21 FOIA request and informed EFF that its request for expedited processing had been granted. A true and correct copy of this letter is attached hereto as Exhibit Q.

17.     In a letter dated December 27, 2007, the DOJ National Security Division acknowledged receipt of EFF's December 21 FOIA request. A true and correct copy of this letter is attached hereto as Exhibit R.

18.     In a letter dated January 29, 2008 informed EFF that its request for expedited processing had been granted. A true and correct copy of this letter is attached hereto as Exhibit S.

19.     Notwithstanding ODNI and DOJ's purported decisions to grant expedited processing for EFF's December 21 FOIA requests, the agencies have neither completed the processing of the requests nor informed EFF of an anticipated date for the completion of such processing.

Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, *Case Dismissed?*, NEWSWEEK, updated Sept. 26, 2007.

-4-

20.     Unless ODNI and DOJ are ordered to process EFF's FOIA requests immediately, EFF's right to expedition under the FOIA will be irretrievably lost, resulting in irreparable injury to EFF.

21.     Any further delay in the processing of EFF's December 21 FOIA requests will irreparably harm EFF's ability, and that of the public, to obtain in a timely fashion information vital to the current and ongoing debate surrounding whether, and how, foreign intelligence surveillance law should be amended, especially with regard to providing legal immunity to telecommunications carriers for their past participation in unlawful government surveillance operations.

22.     Without expedited access to the information to which it is legally entitled, EFF's ability to engage in an urgent and current public debate will be irretrievably lost.

23.     On February 21, 27 and 28, 2008, I contacted counsel for Defendants ODNI and DOJ to explore the possibility of negotiating a processing schedule for EFF's FOIA requests to eliminate the need for further action in this case. I told opposing counsel that EFF planned to seek preliminary injunctive relief if the parties could not agree upon a mutually acceptable date by which to process EFF's requests. However, Defendants have been unwilling to commit to process the requests by a specific date.

24.     Attached hereto as Exhibit T is a true and correct copy of *Electronic Frontier Foundation v. Dep't of Justice*, No. 07-0656, slip op. (D.D.C. June 16, 2007).

25.     Attached hereto as Exhibit U is a true and correct copy of ODNI's most recent annual FOIA processing statistics: U.S. Office of the Director of National Intelligence, Freedom of Information Act Report for Fiscal Year 2007, Compliance with Time Limits/Status of Pending Requests, available at http://www.odni.gov/Annual_Report_Final.pdf.

26. Attached hereto as Exhibit V is a true and correct copy of DOJ's most recent annual

1  FOIA processing statistics: U.S. Department of Justice, Freedom of Information Act Report for

2  Fiscal Year 2007, Compliance with Time Limits/Status of Pending Requests, available at

3  http://www.usdoj.gov/oip/annual_report/2007/07foiapg7.pdf.

4

5  I declare under penalty of perjury of the laws of the State of California that the foregoing is true

6  and correct to the best of my knowledge and belief.  Executed February 29, 2008 in San Francisco,

7  California.

8

9                                                              /s/ Marcia Hofmann
                                                               Marcia Hofmann
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A



**The New York Times**          **Washington**          **More Articles in Washington >**

NYTimes.com    Go to a Section                                                    Welcome, mhof1218 - Member Center - Log Out

SEARCH
[                    ]   NYT Since 1981 ▾   [ Search ]

# Bush Lets U.S. Spy on Callers Without Courts

**By JAMES RISEN and ERIC LICHTBLAU**
Published: December 16, 2005

E-Mail This
Printer-Friendly
Reprints
Save Article

ARTICLE TOOLS SPONSORED BY
THE SAVAGES

### Correction Appended

Enlarge This Image



Doug Mills/Associated Press
In 2002, President Bush toured the National Security Agency at Fort Meade, Md., with Lt. Gen. Michael V. Hayden, who was then the agency's director and is now a full general and the principal deputy director of national intelligence.

WASHINGTON, Dec. 15 - Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds,

Advertisement

[                    ]

○ Yes  ○ No

○ Yes  ○ No

○ Yes  ● No

[ Get Quotes! ]

## Most E-Mailed Articles    The New York Times

**Past 24 Hours** | Past 7 Days

1. 1 in 100 U.S. Adults Behind Bars, New Study Says
2. Findings: The Advantages of Closing a Few Doors
3. Gail Collins: Hillary, Buckeye Girl
4. Facing Default, Some Walk Out on New Homes
5. Blood Thinner Might Be Tied to More Deaths

   Go to Complete List

ADVERTISEMENTS

All the news that's fit to personalize.

THREATS AND RESPONSES
▶ GO TO COMPLETE COVERAGE

### Related

[A Half-Century of Surveillance](#)
(December 16, 2005)

[In the Blogs: Reaction to Relaxed Restrictions on Domestic Spying](#)
(December 16, 2005)

### Readers' Opinions

[Forum: National Security](#)

perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said. The agency, they said, still seeks warrants to monitor entirely domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country without court approval was a major shift in American intelligence-gathering practices, particularly for the National Security Agency, whose mission is to spy on communications abroad. As a result, some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary

so that the agency can move quickly to monitor communications that may disclose threats to the United States, the officials said. Defenders of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

**Dealing With a New Threat**

While many details about the program remain secret, officials familiar with it say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands since the program began, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches. What appeared to be another Qaeda plot, involving fertilizer bomb attacks on

British pubs and train stations, was exposed last year in part through the program, the officials said. But they said most people targeted for N.S.A. monitoring have never been charged with a crime, including an Iranian-American doctor in the South who came under suspicion because of what one official described as dubious ties to Osama bin Laden.

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the nation's intelligence agencies were not poised to deal effectively with the new threat of Al Qaeda and that they were handcuffed by legal and bureaucratic restrictions better suited to peacetime than war, according to officials. In response, President Bush significantly eased limits on American intelligence and law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry from members of Congress, watchdog groups, immigrants and others who argue that the measures erode protections for civil liberties and intrude on Americans' privacy.

Opponents have challenged provisions of the USA Patriot Act, the focus of contentious debate on Capitol Hill this week, that expand domestic surveillance by giving the Federal Bureau of Investigation more power to collect information like library lending lists or Internet use. Military and F.B.I. officials have drawn criticism for monitoring what were largely peaceful antiwar protests. The Pentagon and the Department of Homeland Security were forced to retreat on plans to use public and private databases to hunt for possible terrorists. And last year, the Supreme Court rejected the administration's claim that those labeled "enemy combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside the United States - including American citizens, permanent legal residents, tourists and other foreigners - is based on classified legal opinions that assert that the president has broad powers to order such searches, derived in part from the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda and other terrorist groups, according to the

officials familiar with the N.S.A. operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's largest and most secretive intelligence agency, so intent on remaining out of public view that it has long been nicknamed "No Such Agency." It breaks codes and maintains listening posts around the world to eavesdrop on foreign governments, diplomats and trade negotiators as well as drug lords and terrorists. But the agency ordinarily operates under tight restrictions on any spying on Americans, even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11 attacks, as it looked for new tools to attack terrorism. The program accelerated in early 2002 after the Central Intelligence Agency started capturing top Qaeda operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March 2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone directories, said the officials familiar with the program. The N.S.A. surveillance was intended to exploit those numbers and addresses as quickly as possible, they said.

In addition to eavesdropping on those numbers and reading e-mail messages to and from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating an expanding chain. While most of the numbers and addresses were overseas, hundreds were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone calls or e-mail messages on foreign soil, even if the recipients of those communications are in the United States. Usually, though, the government can only target phones and e-mail messages in the United States by first obtaining a court order from the Foreign Intelligence Surveillance Court, which holds its closed sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most domestic eavesdropping. Until the new program began, the N.S.A. typically limited its domestic surveillance to foreign embassies and missions in Washington, New York and other cities, and obtained court

orders to do so.

Since 2002, the agency has been conducting some
warrantless eavesdropping on people in the United States
who are linked, even if indirectly, to suspected terrorists
through the chain of phone numbers and e-mail addresses,
according to several officials who know of the operation.
Under the special program, the agency monitors their
international communications, the officials said. The
agency, for example, can target phone calls from someone
in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely
domestic-to-domestic communications, those officials say,
meaning that calls from that New Yorker to someone in
California could not be monitored without first going to the
Federal Intelligence Surveillance Court.

**A White House Briefing**

After the special program started, Congressional leaders
from both political parties were brought to Vice President
Dick Cheney's office in the White House. The leaders, who
included the chairmen and ranking members of the Senate
and House intelligence committees, learned of the N.S.A.
operation from Mr. Cheney, Lt. Gen. Michael V. Hayden
of the Air Force, who was then the agency's director and is
now a full general and the principal deputy director of
national intelligence, and George J. Tenet, then the director
of the C.I.A., officials said.

It is not clear how much the members of Congress were
told about the presidential order and the eavesdropping
program. Some of them declined to comment about the
matter, while others did not return phone calls.

Later briefings were held for members of Congress as they
assumed leadership roles on the intelligence committees,
officials familiar with the program said. After a 2003
briefing, Senator Rockefeller, the West Virginia Democrat
who became vice chairman of the Senate Intelligence
Committee that year, wrote a letter to Mr. Cheney
expressing concerns about the program, officials
knowledgeable about the letter said. It could not be
determined if he received a reply. Mr. Rockefeller declined

to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the program's legality. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on," he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?' " he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

The standard of proof required to obtain a warrant from the Foreign Intelligence Surveillance Court is generally considered lower than that required for a criminal warrant - intelligence officials only have to show probable cause that someone may be "an agent of a foreign power," which includes international terrorist groups - and the secret court has turned down only a small number of requests over the years. In 2004, according to the Justice Department, 1,754 warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at

once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

The N.S.A. domestic spying operation has stirred such controversy among some national security officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses - including eavesdropping on Vietnam War protesters and civil rights activists - by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

**Concerns and Revisions**

Several senior government officials say that when the special operation began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge

prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping.

According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

Several national security officials say the powers granted the N.S.A. by President Bush go far beyond the expanded counterterrorism powers granted by Congress under the USA Patriot Act, which is up for renewal. The House on Wednesday approved a plan to reauthorize crucial parts of the law. But final passage has been delayed under the threat of a Senate filibuster because of concerns from both parties over possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to seek a F.I.S.A. warrant every time they want to eavesdrop within the United States. A recent agreement reached by Republican leaders and the Bush administration would modify the standard for F.B.I. wiretap warrants, requiring, for instance, a description of a specific target. Critics say the bar would remain too low to prevent abuses.

Bush administration officials argue that the civil liberties concerns are unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to target Americans. "Nothing could be further from the truth," wrote John Yoo, a former official in the Justice Department's Office of Legal Counsel, and his co-author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski, Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S. Mueller III, the director of the F.B.I., "Can the National Security Agency, the great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy or to gather information on American citizens."

President Bush did not ask Congress to include provisions for the N.S.A. domestic surveillance program as part of the Patriot Act and has not sought any other laws to authorize the operation. Bush administration lawyers argued that such new laws were unnecessary, because they believed that the

Congressional resolution on the campaign against terrorism provided ample authorization, officials said.

**The Legal Line Shifts**

Seeking Congressional approval was also viewed as politically risky because the proposal would be certain to face intense opposition on civil liberties grounds. The administration also feared that by publicly disclosing the existence of the operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a
November 2002 appeals court decision in an unrelated
matter. The decision by the Foreign Intelligence
Surveillance Court of Review, which sided with the
administration in dismantling a bureaucratic "wall" limiting
cooperation between prosecutors and intelligence officers,
cited "the president's inherent constitutional authority to
conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests
should not be grounds "to jettison the Fourth Amendment
requirements" protecting the rights of Americans against
undue searches. The dividing line, the court acknowledged,
"is a very difficult one to administer."

*Barclay Walsh contributed research for this article.*

**Correction:** *Dec. 28, 2005, Wednesday:*

*Because of an editing error, a front-page article on Dec. 16
about a decision by President Bush to authorize the
National Security Agency to eavesdrop on Americans and
others inside the United States to search for evidence of
terrorist activity without warrants ordinarily required for
domestic spying misstated the name of the court that would
normally issue those warrants. It is the Foreign - not
Federal -Intelligence Surveillance Court.*

**More Articles in Washington >**

**RELATED ARTICLES**

Big Brother Is Tracking You. Without a Warrant. (May 18, 2003)

THREATS AND RESPONSES: PRIVACY; Going Electronic, Denver
Reveals Long-Term Surveillance (December 21, 2002)

TRACES OF TERROR: CIVIL LIBERTIES; Echo of F.B.I. Abuses In
Queries on New Role (June 13, 2002)

AFTER THE ATTACKS: CIVIL LIBERTIES; Some Foresee A Sea
Change In Attitudes On Freedoms (September 15, 2001)

**RELATED SEARCHES**

Surveillance of Citizens By Government |
United States Politics and Government | Terrorism |

**INSIDE NYTIMES.COM**





Blog

**The**






Caucus

[Charles Taylor's Rise and Fall](#)

[The Ghost in the Baghdad Museum](#)

[Making of a Toddler Supergroup](#)






Kate Phillips and The Times's politics staff on the latest news from Washington and around the nation.

[Digital Composer](#)

Copyright 2005 The New York Times Company  |  [Home](#)  |  [Privacy Policy](#)  |  [Search](#)  |  [Corrections](#)  |  XML  |  [Help](#)  |  [Contact Us](#)  |  [Work for Us](#)  |  [Site Map](#)  |
[Back to Top](#)  |

# EXHIBIT B



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

For Immediate Release
Office of the Press Secretary
December 17, 2005

# President's Radio Address

The Roosevelt Room

In Focus: Homeland Security
(en Español)



President's Remarks
view

10:06 A.M. EST

THE PRESIDENT: Good morning.

As President, I took an oath to defend the Constitution, and I have no greater responsibility than to protect our people, our freedom, and our way of life. On September the 11th, 2001, our freedom and way of life came under attack by brutal enemies who killed nearly 3,000 innocent Americans. We're fighting these enemies across the world. Yet in this first war of the 21st century, one of the most critical battlefronts is the home front. And since September the 11th, we've been on the offensive against the terrorists plotting within our borders.



One of the first actions we took to protect America after our nation was attacked was to ask Congress to pass the Patriot Act. The Patriot Act tore down the legal and bureaucratic wall that kept law enforcement and intelligence authorities from sharing vital information about terrorist threats. And the Patriot Act allowed federal investigators to pursue terrorists with tools they already used against other criminals. Congress passed this law with a large, bipartisan majority, including a vote of 98-1 in the United States Senate.

Since then, America's law enforcement personnel have used this critical law to prosecute terrorist operatives and supporters, and to break up terrorist cells in New York, Oregon, Virginia, California, Texas and Ohio. The Patriot Act has accomplished exactly what it was designed to do: it has protected American liberty and saved American lives.

Yet key provisions of this law are set to expire in two weeks. The terrorist threat to our country will not expire in two weeks. The terrorists want to attack America again, and inflict even greater damage than they did on September the 11th. Congress has a responsibility to ensure that law enforcement and intelligence officials have the tools they need to protect the American people.

The House of Representatives passed reauthorization of the Patriot Act. Yet a minority of senators filibustered to block the renewal of the Patriot Act when it came up for a vote yesterday. That decision is irresponsible, and it endangers the lives of our citizens. The senators who are filibustering must stop their delaying tactics, and the Senate must vote to reauthorize the Patriot Act. In the war on terror, we cannot afford to be without this law for a single moment.

To fight the war on terror, I am using authority vested in me by Congress, including the Joint Authorization for Use of Military Force, which passed overwhelmingly in the first week after September the 11th. I'm also using constitutional authority vested in me as Commander-in-Chief.

In the weeks following the terrorist attacks on our nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations. Before we intercept these communications, the government must have information that establishes a clear link to these terrorist networks.

This is a highly classified program that is crucial to our national security. Its purpose is to detect and prevent terrorist attacks against the United States, our friends and allies. Yesterday the existence of this secret program was revealed in media reports, after being improperly provided to news organizations. As a result, our enemies have learned information they should not have, and the unauthorized disclosure of this effort damages our national security and puts our citizens at risk. Revealing classified information is illegal, alerts our enemies, and endangers our country.

As the 9/11 Commission pointed out, it was clear that terrorists inside the United States were communicating with terrorists abroad before the September the 11th attacks, and the commission criticized our nation's inability to uncover links between terrorists here at home and terrorists abroad. Two of the terrorist hijackers who flew a jet into the Pentagon, Nawaf al Hamzi and Khalid al Mihdhar, communicated while they were in the United States to other members of al Qaeda who were overseas. But we didn't know they were here, until it was too late.

## ARCHIVES

### ↓ Radio Address

- 2006
- 2005
- 2004
- 2003
- 2002
- 2001

The authorization I gave the National Security Agency after September the 11th helped address that problem in a way that is fully consistent with my constitutional responsibilities and authorities. The activities I have authorized make it more likely that killers like these 9/11 hijackers will be identified and located in time. And the activities conducted under this authorization have helped detect and prevent possible terrorist attacks in the United States and abroad.

### ↓ Radio Interviews

- 2005
- 2004

The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the Attorney General and the Counsel to the President. I have reauthorized this program more than 30 times since the September the 11th attacks, and I intend to do so for as long as our nation faces a continuing threat from al Qaeda and related groups.

The NSA's activities under this authorization are thoroughly reviewed by the Justice Department and NSA's top legal officials, including NSA's general counsel and inspector general. Leaders in Congress have been briefed more than a dozen times on this authorization and the activities conducted under it. Intelligence officials involved in this activity also receive extensive training to ensure they perform their duties consistent with the letter and intent of the authorization.

This authorization is a vital tool in our war against the terrorists. It is critical to saving American lives. The American people expect me to do everything in my power under our laws and Constitution to protect them and their civil liberties. And that is exactly what I will continue to do, so long as I'm the President of the United States.

Thank you.

END 10:13 A.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/12/20051217.html

CLICK HERE TO PRINT

# EXHIBIT C



The New York Times

# Washington

**More Articles in Washington >**

**NYTimes.com**   Go to a Section

Welcome, **mhof1218** - Member Center - Log Out

SEARCH

[                    ]   NYT Since 1981 ▾   Search

# Spy Agency Mined Vast Data Trove, Officials Report

By **ERIC LICHTBLAU** and **JAMES RISEN**
Published: December 24, 2005

E-Mail This
Printer-Friendly
Reprints
Save Article

ARTICLE TOOLS
SPONSORED BY

THE SAVAGES

WASHINGTON, Dec. 23 - The National Security Agency has traced and analyzed large volumes of telephone and Internet communications flowing into and out of the United States as part of the eavesdropping program that President Bush approved after the Sept. 11, 2001, attacks to hunt for evidence of terrorist activity, according to current and former government officials.

Advertisement





## Related

Bush Lets U.S. Spy on Callers Without Courts (December 16, 2005)

Daschle Says Congress Never Authorized Program

Alito Wrote on Wiretaps

The volume of information harvested from telecommunication data and voice networks, without court-approved warrants, is much larger than the White House has acknowledged, the officials said. It was collected by tapping directly into some of the American telecommunication system's main arteries, they said.

As part of the program approved by President Bush for domestic surveillance without warrants, the N.S.A. has gained the cooperation of American telecommunications companies to obtain backdoor access to streams of domestic and international communications, the officials

## Most E-Mailed Articles   The New York Times

**Past 24 Hours** | Past 7 Days

1. 1 in 100 U.S. Adults Behind Bars, New Study Says
2. Findings: The Advantages of Closing a Few Doors
3. Gail Collins: Hillary, Buckeye Girl
4. Facing Default, Some Walk Out on New Homes
5. Blood Thinner Might Be Tied to More Deaths

   Go to Complete List

ADVERTISEMENTS

All the news that's fit to personalize.

said.

The government's collection and analysis of phone and Internet traffic have raised questions among some law enforcement and judicial officials familiar with the program. One issue of concern to the Foreign Intelligence Surveillance Court, which has reviewed some separate warrant applications growing out of the N.S.A.'s surveillance program, is whether the court has legal authority over calls outside the United States that happen to pass through American-based telephonic "switches," according to officials familiar with the matter.

"There was a lot of discussion about the switches" in conversations with the court, a Justice Department official said, referring to the gateways through which much of the communications traffic flows. "You're talking about access to such a vast amount of communications, and the question was, How do you minimize something that's on a switch that's carrying such large volumes of traffic? The court was very, very concerned about that."

Since the disclosure last week of the N.S.A.'s domestic surveillance program, President Bush and his senior aides have stressed that his executive order allowing eavesdropping without warrants was limited to the monitoring of international phone and e-mail communications involving people with known links to Al Qaeda.

What has not been publicly acknowledged is that N.S.A. technicians, besides actually eavesdropping on specific conversations, have combed through large volumes of phone and Internet traffic in search of patterns that might point to terrorism suspects. Some officials describe the program as a large data-mining operation.

The current and former government officials who discussed the program were granted anonymity because it remains classified.

Bush administration officials declined to comment on Friday on the technical aspects of the operation and the N.S.A.'s use of broad searches to look for clues on terrorists. Because the program is highly classified, many

details of how the N.S.A. is conducting it remain unknown, and members of Congress who have pressed for a full Congressional inquiry say they are eager to learn more about the program's operational details, as well as its legality.

Officials in the government and the telecommunications industry who have knowledge of parts of the program say the N.S.A. has sought to analyze communications patterns to glean clues from details like who is calling whom, how long a phone call lasts and what time of day it is made, and the origins and destinations of phone calls and e-mail messages. Calls to and from Afghanistan, for instance, are known to have been of particular interest to the N.S.A. since the Sept. 11 attacks, the officials said.

This so-called "pattern analysis" on calls within the United States would, in many circumstances, require a court warrant if the government wanted to trace who calls whom.

The use of similar data-mining operations by the Bush administration in other contexts has raised strong objections, most notably in connection with the Total Information Awareness system, developed by the Pentagon for tracking terror suspects, and the Department of Homeland Security's Capps program for screening airline passengers. Both programs were ultimately scrapped after public outcries over possible threats to privacy and civil liberties.

But the Bush administration regards the N.S.A.'s ability to trace and analyze large volumes of data as critical to its expanded mission to detect terrorist plots before they can be carried out, officials familiar with the program say. Administration officials maintain that the system set up by Congress in 1978 under the Foreign Intelligence Surveillance Act does not give them the speed and flexibility to respond fully to terrorist threats at home.

A former technology manager at a major telecommunications company said that since the Sept. 11 attacks, the leading companies in the industry have been storing information on calling patterns and giving it to the federal government to aid in tracking possible terrorists.

"All that data is mined with the cooperation of the government and shared with them, and since 9/11, there's been much more active involvement in that area," said the former manager, a telecommunications expert who did not want his name or that of his former company used because of concern about revealing trade secrets.

Such information often proves just as valuable to the government as eavesdropping on the calls themselves, the former manager said.

"If they get content, that's useful to them too, but the real plum is going to be the transaction data and the traffic analysis," he said. "Massive amounts of traffic analysis information - who is calling whom, who is in Osama Bin Laden's circle of family and friends - is used to identify lines of communication that are then given closer scrutiny."

Several officials said that after President Bush's order authorizing the N.S.A. program, senior government officials arranged with officials of some of the nation's largest telecommunications companies to gain access to switches that act as gateways at the borders between the United States' communications networks and international networks. The identities of the corporations involved could not be determined.

The switches are some of the main arteries for moving voice and some Internet traffic into and out of the United States, and, with the globalization of the telecommunications industry in recent years, many international-to-international calls are also routed through such American switches.

One outside expert on communications privacy who previously worked at the N.S.A. said that to exploit its technological capabilities, the American government had in the last few years been quietly encouraging the telecommunications industry to increase the amount of international traffic that is routed through American-based switches.

The growth of that transit traffic had become a major issue for the intelligence community, officials say, because it had not been fully addressed by 1970's-era laws and

regulations governing the N.S.A. Now that foreign calls were being routed through switches on American soil, some judges and law enforcement officials regarded eavesdropping on those calls as a possible violation of those decades-old restrictions, including the Foreign Intelligence Surveillance Act, which requires court-approved warrants for domestic surveillance.

Historically, the American intelligence community has had close relationships with many communications and computer firms and related technical industries. But the N.S.A.'s backdoor access to major telecommunications switches on American soil with the cooperation of major corporations represents a significant expansion of the agency's operational capability, according to current and former government officials.

Phil Karn, a computer engineer and technology expert at a major West Coast telecommunications company, said access to such switches would be significant. "If the government is gaining access to the switches like this, what you're really talking about is the capability of an enormous vacuum operation to sweep up data," he said.

**More Articles in Washington >**

**RELATED ARTICLES**

Spying Program Snared U.S. Calls (December 21, 2005)

Bush Again Defends Spy Program (January 2, 2006)

Defense Lawyers in Terror Cases Plan Challenges Over Spy Efforts (December 28, 2005)

DOMESTIC SURVEILLANCE: THE WHITE HOUSE; Defending Spy Program, Administration Cites Law (December 23, 2005)

DOMESTIC SURVEILLANCE: CONGRESSIONAL LEADERS; Among Those Told of Program, Few Objected (December 23, 2005)

**RELATED SEARCHES**

National Security Agency | Terrorism | Bush, George W | Privacy |

**INSIDE NYTIMES.COM**


Charles Taylor's Rise and Fall


The Ghost in the Baghdad Museum


Making of a Toddler Supergroup

Blog

**The Caucus**



[Digital Composer](#)

Kate Phillips and The Times's politics staff on the latest news from Washington and around the nation.

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map |
Back to Top |

EXHIBIT D


Advertisement

A new outlook on adventure
Open Air Magazine available inside USA TODAY on March 7th
Click here for more information
usatoday.com

 Classifieds:   Marketplace 

Home
News
Travel
Money
Sports
Life
Tech
Weather

Search

powered by Yahoo! GO

**Wash/Politics**
Washington home
Washington briefs
Government guide
**Health&Behavior**
H&B home
Medical resources
Health information
Opinion
Opinion home
Columnists
Cartoons
**More News**
Top news briefs
Nation briefs
World briefs
States
Lotteries
By the numbers
Special reports
Day in pictures
Snapshots
Offbeat
Video
Talk Today
Marketplace
Real estate
Arcade
Newspaper
Classifieds

# Washington/Politics

- E-MAIL THIS    - PRINT THIS    - SAVE THIS    - MOST POPULAR    - SUBSCRIBE    - REPRINTS & PERMISSIONS
.
Posted 2/5/2006 11:26 PM    Updated 2/6/2006 12:12 AM

## Telecoms let NSA spy on calls

By Leslie Cauley and John Diamond, USA TODAY

The National Security Agency has secured the cooperation of large telecommunications companies, including AT&T, MCI and Sprint, in its efforts to eavesdrop without warrants on international calls by suspected terrorists, according to seven telecommunications executives.



Michael Hayden, former head of the NSA, during a hearing last week on Capitol Hill.

Alex Wong, Getty Images

The executives asked to remain anonymous because of the sensitivity of the program. AT&T, MCI and Sprint had no official comment.

The Senate Judiciary Committee begins hearings today on the government's program of monitoring international calls and e-mails of a domestic target without first obtaining court orders. At issue: whether the surveillance is legal, as President Bush insists, or an illegal intrusion into the lives of Americans, as lawsuits by civil libertarians contend. (**Related:** Committee chief says program violates law)

In domestic investigations, phone companies routinely require court orders before cooperating.

A majority of international calls are handled by long-distance carriers AT&T, MCI and Sprint. All three own "gateway" switches capable of routing calls to points around the globe. AT&T was recently acquired by SBC Communications, which has since adopted the AT&T name as its corporate moniker. MCI, formerly known as WorldCom, was recently acquired by Verizon. Sprint recently merged with Nextel.

*The New York Times*, which disclosed the clandestine operation in December,

Advertisement

All the best brands, all in one place. We'll help find the best one for you.
COMPARE NOW
BEST BRANDS. BEST HELP.™
BEST BUY

**Related Advertising Links**    What's This?

**Hot Stock Alert - GFET**
Green Energy, Cellulose Ethanol. Growth Stock…
www.GulfEthanolCorp.com

**Hot Stock Alert - TMDI**
Telemedicine Medical Technology & Mini Medical…
www.Telemedicus.com

**E-Mail Newsletters**

Sign up to receive our free **Daily Briefing e-newsletter** and get the top news of the day in your inbox.

E-mail:    [        ]    Go

Select one:    ⦿ HTML    ◯ Text

**Breaking News E-Mail Alerts**

- Get breaking news in your inbox as it happens

previously reported that telecommunications companies have been cooperating with the government, but it did not name the companies involved. (**Related:** Bush says NSA program is legal)

Decisions about monitoring calls are made in four steps, according to two U.S. intelligence officials familiar with the program who insisted on anonymity because it remains classified:

• Information from U.S. or allied intelligence or law enforcement points to a terrorism-related target either based in the United States or communicating with someone in the United States.

• Using a 48-point checklist to identify possible links to al-Qaeda, one of three NSA officials authorized to approve a warrantless intercept decides whether the surveillance is justified. Gen. Michael Hayden, the nation's No. 2 intelligence officer, said the checklist focuses on ensuring that there is a "reasonable basis" for believing there is a terrorist link involved.

• Technicians work with phone company officials to intercept communications pegged to a particular person or phone number. Telecommunications executives say MCI, AT&T and Sprint grant the access to their systems without warrants or court orders. Instead, they are cooperating on the basis of oral requests from senior government officials.

• If the surveillance yields information about a terror plot, the NSA notifies the FBI or other appropriate agencies but does not always disclose the source of its information. Call-routing information provided by the phone companies can help intelligence officialseavesdrop on a conversation. It also helps them physically locate the parties, which is important if cellphones are being used. If the U.S. end of a communication has nothing to do with terrorism, the identity of the party is suppressed and the content of the communication destroyed, Hayden has said.

The government has refused to publicly discuss the precise number of individuals targeted.

*The Times* and *The Washington Post* have said thousands have had communications intercepted.

The two intelligence officials said that number has been whittled down to about 600 people in the United States who have been targeted for repeated surveillance since the Sept. 11 attacks.

Sponsored Links

**Hot Stock Alert - TMDI**
Telemedicine Medical Technology & Mini Medical Clinics. Growth Stock.
www.Telemedicus.com

**Hot Stock Alert - GFET**
Green Energy, Cellulose Ethanol. Growth Stock Investment.
www.GulfEthanolCorp.com

**Do You Know Your Credit Score?**
The average U.S. credit score is up to 692. See yours for $0.
www.freecreditreport.com

Get listed here

**Newspaper Home Delivery - Subscribe Today**
Advertisement



Free Samples    Grocery Coupons    Baby Coupons    Pet Coupons    Free Stuff    View All    CoolSavings

USATODAY.com partners: <u>USA WEEKEND</u> ● <u>Sports Weekly</u> ● <u>Education</u> ● <u>Space.com</u>

<u>Home</u> ● <u>Travel</u> ● <u>News</u> ● <u>Money</u> ● <u>Sports</u> ● <u>Life</u> ● <u>Tech</u> ● <u>Weather</u>

Resources: <u>Mobile news</u> ● <u>Site map</u> ● <u>FAQ</u> ● <u>Contact us</u> ● <u>E-mail news</u>
<u>Jobs with us</u> ● <u>Internships</u> ● <u>Terms of service</u> ● <u>Privacy policy/Your California Privacy Right</u>
<u>Media kit</u> ● <u>Media Lounge</u> ● <u>Press room</u> ● <u>Electronic print edition</u> ● <u>Reprints and Permissions</u>

<u>Add USATODAY.com RSS feeds</u>   XML

The Nation's Homepage

Copyright 2008 USA TODAY, a division of <u>Gannett Co. Inc.</u>

EXHIBIT E

| HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS | | Get Home Delivery | Welcome, mhof1218 | Member Center | Log Out |

The New York Times

# Washington



U.S.  All NYT    [Search]

Ameriprise Financial

| WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | **JOBS** | REAL ESTATE | AUTOS |

POLITICS  **WASHINGTON**  EDUCATION

## Bush Signs Law to Widen Reach for Wiretapping

By JAMES RISEN
Published: August 6, 2007

WASHINGTON, Aug. 5 — President Bush signed into law on Sunday legislation that broadly expanded the government's authority to eavesdrop on the international telephone calls and e-mail messages of American citizens without warrants.

**Related**

Blogtalk: Debating the FISA Bill

Congressional aides and others familiar with the details of the law said that its impact went far beyond the small fixes that administration officials had said were needed to gather information about foreign terrorists. They said seemingly subtle changes in legislative language would sharply alter the legal limits on the government's ability to monitor millions of phone calls and e-mail messages going in and out of the United States.

They also said that the new law for the first time provided a legal framework for much of the surveillance without warrants that was being conducted in secret by the National Security Agency and outside the Foreign Intelligence Surveillance Act, the 1978 law that is supposed to regulate the way the government can listen to the private communications of American citizens.

"This more or less legalizes the N.S.A. program," said Kate Martin, director of the Center for National Security Studies in Washington, who has studied the new legislation.

Previously, the government needed search warrants approved by a special intelligence court to eavesdrop on telephone conversations, e-mail messages and other electronic communications between individuals inside the United States and people overseas, if the government conducted the surveillance inside the United States.

Today, most international telephone conversations to and from the United States are conducted over fiber-optic cables, and the most efficient way for the government to eavesdrop on them is to latch on to giant telecommunications switches located in the United States.

By changing the legal definition of what is considered "electronic surveillance," the new law allows the government to eavesdrop on those conversations without warrants — latching on to those giant switches — as long as the target of the government's surveillance is "reasonably believed" to be overseas.

For example, if a person in Indianapolis calls someone in London, the National Security Agency can eavesdrop on that conversation without a warrant, as long as the N.S.A.'s

**ARTICLE TOOLS SPONSORED BY**
THE SAVAGES

E-MAIL
PRINT
REPRINTS
SAVE
SHARE

More Articles in Washington »

**Circuits E-Mail**

Sign up for David Pogue's exclusive column, sent every Thursday. See Sample
mchofman@hotmail.com    [Sign Up]
Change E-mail Address  |  Privacy Policy



1 out of 7 isn't just a statistic.

**MOST POPULAR**

| E-MAILED | BLOGGED | SEARCHED |

1. 1 in 100 U.S. Adults Behind Bars, New Study Says
2. Findings: The Advantages of Closing a Few Doors
3. Gail Collins: Hillary, Buckeye Girl
4. Facing Default, Some Walk Out on New Homes
5. Blood Thinner Might Be Tied to More Deaths
6. He Listens. He Cares. He Isn't Real.
7. Op-Ed Contributor: I'm Not Running for President, but ...
8. Personal Best: Does Weight Lifting Make a Better Athlete?
9. David Brooks: Remembering the Mentor
10. Near Arctic, Seed Vault Is a Fort Knox of Food

Go to Complete List »



The New York Times    REAL ESTATE
nytimes.com/realestate

target is the person in London.

Tony Fratto, a White House spokesman, said Sunday in an interview that the new law went beyond fixing the foreign-to-foreign problem, potentially allowing the government to listen to Americans calling overseas.

But he stressed that the objective of the new law is to give the government greater flexibility in focusing on foreign suspects overseas, not to go after Americans.

"It's foreign, that's the point," Mr. Fratto said. "What you want to make sure is that you are getting the foreign target."

The legislation to change the surveillance act was rushed through both the House and Senate in the last days before the August recess began.

The White House's push for the change was driven in part by a still-classified ruling earlier this year by the special intelligence court, which said the government needed to seek court-approved warrants to monitor those international calls going through American switches.

The new law, which is intended as a stopgap and expires in six months, also represents a power shift in terms of the oversight and regulation of government surveillance.

The new law gives the attorney general and the director of national intelligence the power to approve the international surveillance, rather than the special intelligence court. The court's only role will be to review and approve the procedures used by the government in the surveillance after it has been conducted. It will not scrutinize the cases of the individuals being monitored.

The law also gave the administration greater power to force telecommunications companies to cooperate with such spying operations. The companies can now be compelled to cooperate by orders from the attorney general and the director of national intelligence.

Democratic Congressional aides said Sunday that some telecommunications company officials had told Congressional leaders that they were unhappy with that provision in the bill and might challenge the new law in court. The aides said the telecommunications companies had told lawmakers that they would rather have a court-approved warrant ordering them to comply.

In fact, pressure from the telecommunications companies on the Bush administration has apparently played a major hidden role in the political battle over the surveillance issue over the past few months.

In January, the administration placed the N.S.A.'s warrantless wiretapping program under the Foreign Intelligence Surveillance Act, and subjected it for the first time to the scrutiny of the FISA court.

Democratic Congressional aides said Sunday that they believed that pressure from major telecommunications companies on the White House was a major factor in persuading the Bush administration to do that. Those companies were facing major lawsuits for having secretly cooperated with the warrantless wiretapping program, and now wanted greater legal protections before cooperating further.

But the change suddenly swamped the court with an enormous volume of search warrant applications, leading, in turn, to the administration's decision to seek the new legislation.



**What you get for ... $12.5 million**

Also in Real Estate:
Homes for $12.5 million or less in New Jersey
Homes for $12.5 million or less in Westchester
Homes for $12.5 million or less in Manhattan

ADVERTISEMENTS

**Amtrak Acela**

Acela. Watch your productivity skyrocket. Book now at Amtrak.com.



All the news that's fit to personalize.

The New York Times STORE

    JFK and RFK, May - 1961
Buy Now

*More Articles in Washington »*

**Need to know more? 50% off home delivery of The Times.**

Ads by Google                                                                what's this?

**CREDO Says No to Spying**
We fight laws that make it easier for the government to spy on you.
www.credomobile.com

**Security Gps Spy hidden**
Gps tracking and hidden cameras AudioTel cel Digital spy recorders
spybase.com

**Telephone Security**
Is Your Telephone Tapped? Learn How to get Complete Telephone Security
www.counter-surveillance.com

**Tips**

To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Past Coverage**

New U.S. Law Credited in Arrests Abroad (September 11, 2007)
Senator Threatens to Charge White House With Contempt (August 21, 2007)
Reported Drop In Surveillance Spurred a Law (August 11, 2007)
In Surveillance Law Fight, A Spy Chief's Education (August 8, 2007)

**Related Searches**

Law and Legislation
Wiretapping and Other Eavesdropping Devices and Methods
Surveillance of Citizens by Government
National Security Agency

**INSIDE NYTIMES.COM**

ESCAPES »



A Tiny, Beloved Home That Was Built for Spite

SPORTS »



With an Iron Will, He Finds a Way

OPINION »



Campaign Stops: Those Comeback Clintons

ART & DESIGN »



Gustave Courbet was a Rebel Who Kept It Real

OPINION »

**Editorial: Time and Time Again**

As Congress weighs in on the budget, financing for the American Time Use Survey must be restored.

N.Y. / REGION »



Modern Pool for Public Is Opening in Flushing

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2007 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

EXHIBIT F

**THE WHITE HOUSE**

PRESIDENT GEORGE W. BUSH

For Immediate Release
Office of the Press Secretary
August 5, 2007

## President Bush Commends Congress on Passage of Intelligence Legislation

Fact Sheet: The Protect America Act of 2007
Fact Sheet: Combating Terrorism Worldwide
In Focus: National Security

When our intelligence professionals have the legal tools to gather information about the intentions of our enemies, America is safer. And when these same legal tools also protect the civil liberties of Americans, then we can have the confidence to know that we can preserve our freedoms while making America safer.

The Protect America Act, passed with bipartisan support in the House and Senate, achieves both of these goals by modernizing the Foreign Intelligence Surveillance Act. Over the past three decades this law has not kept pace with revolutionary changes in technology. As a result, our intelligence professionals have told us that they are missing significant intelligence information that they need to protect the country.

S.1927 reforms FISA by accounting for changes in technology and restoring the statute to its original focus on appropriate protections for the rights of persons in the United States - and not foreign targets located in foreign lands.

Today we face a dynamic threat from enemies who understand how to use modern technology against us. Whether foreign terrorists, hostile nations, or other actors, they change their tactics frequently and seek to exploit the very openness and freedoms we hold dear. Our tools to deter them must also be dynamic and flexible enough to meet the challenges they pose. This law gives our intelligence professionals this greater flexibility while closing a dangerous gap in our intelligence gathering activities that threatened to weaken our defenses.

We know that information we have been able to acquire about foreign threats will help us detect and prevent attacks on our homeland. Mike McConnell, the Director of National Intelligence, has assured me that this bill gives him the most immediate tools he needs to defeat the intentions of our enemies. And so in signing this legislation today I am heartened to know that his critical work will be strengthened and we will be better armed to prevent attacks in the future.

I commend members of Congress who supported these important reforms, and also for acting before adjourning for recess. In particular, I want to thank Mitch McConnell and John Boehner

for their strong leadership on this issue, and Senators Kit Bond and Dianne Feinstein for coming together in the Senate on an effective bipartisan solution. In the House of Representatives, Pete Hoekstra and Heather Wilson were instrumental in securing enactment of this vital piece of legislation before the August recess, and I thank them for their leadership.

While I appreciate the leadership it took to pass this bill, we must remember that our work is not done. This bill is a temporary, narrowly focused statute to deal with the most immediate shortcomings in the law.

When Congress returns in September the Intelligence committees and leaders in both parties will need to complete work on the comprehensive reforms requested by Director McConnell, including the important issue of providing meaningful liability protection to those who are alleged to have assisted our Nation following the attacks of September 11, 2001.

# # #

# EXHIBIT G

 
Find the best deals **Online** and In-Store Today! **Shop Now**

Now 68°F
High 76°F
Low 46°F
5 DAY FORECAST

[                    ] **search**
○ Site ○ Web Search powered by YAHOO! SEARCH

El Paso Times | Inside El Paso | Southwest Parent

**Jobs | Cars | Classifieds | Real Estate | Apartments | Shopping**

News | New & Updated | Military | Communities | Business | Opinion | Sports | Entertainment | Living | Obits | Español | Customer Service

# NEWS 

■ del.icio.us  Digg  Reddit  YahooMyWeb  Google  Facebook  What's this?

## Transcript: Debate on the foreign intelligence surveillance act
By Chris Roberts / ©El Paso Times
Article Launched: 08/22/2007 01:05:57 AM MDT

The following is the transcript of a question and answer session with National Intelligence Director Mike McConnell.

Question: How much has President Bush or members of his administration formed your response to the FISA debate?

Answer: Not at all. When I came back in, remember my previous assignment was director of the NSA, so this was an area I have known a little bit about. So I came back in. I was nominated the first week of January. The administration had made a decision to put the terrorist surveillance program into the FISA court. I think that happened the 7th of Jan. So as I come in the door and I'm prepping for the hearings, this sort of all happened. So the first thing I want to know is what's this program and what's the background and I was pretty surprised at what I learned. First off, the issue was the technology had changed and we had worked ourselves into a position that we were focusing on foreign terrorist communications, and this was a terrorist foreigner in a foreign country. The issue was international communications are on a wire so all of a sudden we were in a position because of the wording in the law that we had to have a warrant to do that. So the most important thing to capture is that it's a foreigner in a foreign country, required to get a warrant. Now if it were wireless, we would not be required to get a warrant. Plus we were limited in what we were doing to terrorism only and the last time I checked we had a mission called foreign

_____

Advertisement

_____

intelligence, which should be construed to mean anything of a foreign intelligence interest, North Korea, China, Russia, Syria, weapons of mass destruction proliferation, military development and it goes on and on and on. So when I engaged with the administration, I said we've gotten ourselves into a position here where we need to clarify, so the FISA issue had been debated and legislation had been passed in the house in 2006, did not pass the Senate. Two bills were introduced in the Senate, I don't know if it was co-sponsorship or two different bills, but Sen. (Dianne Feinstein, D-Calif.) had a bill and Sen. Specter had a bill and it may have been the same bill, I don't know, but the point is a lot of debate, a lot of dialogue. So, it was submitted to the FISA court and the first ruling in the FISA court was what we needed to do we could do with an approval process that was at a summary level and that was OK, we stayed in business and we're doing our mission. Well in the FISA process, you may or may not be aware ...

Q: When you say summary level, do you mean the FISA court?

A: The FISA court. The FISA court ruled presented the program to them and they said the program is what you say it is and it's appropriate and it's legitimate, it's not an issue and was

**More headlines**
Police say 11-year-old among those arrested
Killer resentenced to death
Police investigate 3 incidents involving men with guns
Lawyer says candidate Caballero broke law
Electric Co. earnings drop 12% despite strong sales
Suit blames El Paso doctor for child's vision failure
Tuesday caucuses vital to candidates
Suspect says he was told to leave SUV with cash in Juárez
Marchers decry slow process for citizenship
43,876 so far cast ballots in primary



**Top Jobs**

Retail COSTCO WHOLESALE ATTEN

Healthcare ATTENTION CNA'S!

Security Akal Security is lo

Customer Service F/T, Bil., o

Healthcare

**ALL LISTINGS**

Mike Cassar, grad student in Marine Biology and Access Group student loan borrower.

access group

**Most Viewed   Most Emailed**

(From the last 12 hours)                    RSS

1. Police say 11-year-old among those arrested
2. Killer resentenced to death

had approval. But the FISA process has a renewal. It comes up every so many days and there are 11 FISA judges. So the second judge looked at the same data and said well wait a minute I interpret the law, which is the FISA law, differently. And it came down to, if it's on a wire and it's foreign in a foreign country, you have to have a warrant and so we found ourselves in a position of actually losing ground because it was the first review was less capability, we got a stay and that took us to the 31st of May. After the 31st of May we were in extremis because now we have significantly less capability. And meantime, the community, before I came back, had been working on a National Intelligence Estimate on terrorist threat to the homeland. And the key elements of the terrorist threat to the homeland, there were four key elements, a resilient determined adversary with senior leadership willing to die for the cause, requiring a place to train and develop, think of it as safe haven, they had discovered that in the border area between Pakistan and Afghanistan. Now the Pakistani government is pushing and pressing and attempting to do something about it, but by and large they have areas of safe haven. So leadership that can adapt, safe haven, intermediate leadership, these are think of them as trainers, facilitators, operational control guys. And the fourth part is recruits. They have them, they've taken them. This area is referred to as the FATA, federally administered tribal areas, they have the recruits and now the objective is to get them into the United States for mass casualties to conduct terrorist operations to achieve mass casualties. All of those four parts have been carried out except the fourth. They have em, but they haven't been successful. One of the major tools for us to keep them out is the FISA program, a significant tool and we're going the wrong direction. So, for me it was extremis to start talking not only to the administration, but to members of the hill. So from June until the bill was passed, I think I talked to probably 260 members, senators and congressmen. We submitted the bill in April, had an open hearing I May, and had a closed hearing in May, I don't remember the exact date. Chairman (U.S. Rep. Silvestre Reyes, D-Texas) had two hearings and I had a chance to brief the judiciary committee in the house, the intelligence committee in the house and I just mentioned the Senate, did not brief the full judiciary committee in the Senate, but I did meet with Sen. (Patrick Leahy, D-Vt.) and Sen. (Arlen Specter, R-Pa.), and I did have an opportunity on the Senate side, they have a tradition there of every quarter they invite the director of national intelligence in to talk to them update them on topics of interest. And that happened in (June 27). Well what they wanted to hear about was Iraq and Afghanistan and for whatever reason, I'm giving them my review and they ask questions in the order in which they arrive in the room. The second question was on FISA, so it gave me an opportunity to, here I am worrying about this problem and I have 41 senators and I said several things. The current threat is increasing, I'm worried about it. Our capability is decreasing and let me explain the problem.

Q: Can't you get the warrant after the fact?

A: The issue is volume and time. Think about foreign intelligence. What it presented me with an opportunity is to make the case for something current, but what I was really also trying to put a strong emphasis on is the need to do foreign intelligence in any context. My argument was that the intelligence community should not be restricted when we are conducting foreign surveillance against a foreigner in a foreign country, just by dint of the fact that it happened to touch a wire. We haven't done that in wireless for years.

Q: So you end up with people tied up doing paperwork?

A: It takes about 200 man hours to do one telephone number. Think about it from the judges standpoint. Well, is this foreign intelligence? Well how do you know it's foreign intelligence? Well what does Abdul calling Mohammed mean, and how do I interpret that? So, it's a very complex process, so now, I've got people speaking Urdu and Farsi and, you know, whatever, Arabic, pull them off the line have them go through this process to justify what it is they know and why and so on. And now you've got to write it all up and it goes through the signature process, take it through (the Justice Department), and take it down to the FISA court. So all that process is about 200 man hours for one number. We're going backwards, we couldn't keep up. So the issue was ...

Q: How many calls? Thousands?

A: Don't want to go there. Just think, lots. Too many. Now the second part of the issue was under the president's program, the terrorist surveillance program, the private sector had assisted us. Because if you're going to get access you've got to have a partner and they were being sued. Now if you play out the suits at the value they're claimed, it would bankrupt these companies. So my position was we have to provide liability protection to these private sector entities. So that was part of the request. So we went through that and we argued it. Some wanted to limit us to terrorism. My argument was, wait a minute, why would I want to limit it to terrorism. It may be that terrorists are achieving weapons of mass destruction, the only way I would know that is if I'm doing foreign intelligence by who might be providing a weapon of mass destruction.

Q: And this is still all foreign to foreign communication?

A: All foreign to foreign. So, in the final analysis, I was after three points, no warrant for a foreigner overseas, a foreign intelligence target located overseas, liability protection for the private sector and the third point was we must be required to have a warrant for surveillance against a U.S. person. And when I say U.S. person I want to make sure you capture what that means. That does not mean citizen. That means a foreigner, who is here, we still have to have a warrant because he's here. My view is that that's the right check and balances and it's the right protection for the country and lets us still do our mission for protection of the country. And we're trying to fend off foreign threats.

Q: So are you satisfied with it the way it is now?

3.  Gunman seen in Kern area surrenders
4.  Lawyer says candidate Caballero broke law
5.  UTEP tops Ponies, one win from 16-0 mark
6.  Police investigate 3 incidents involving men with guns
7.  Homicide suspect charged with battery for spitting
8.  El Paso ophthalmologist sued in infant blindness case
9.  Man told to drop nearly $2 million cash at Juárez mall
10. Mother of Sunland Park council candidate arrested

A: I am. The issue that we did not address, which has to be addressed is the liability protection for the private sector now is proscriptive, meaning going forward. We've got a retroactive problem. When I went through and briefed the various senators and congressmen, the issue was alright, look, we don't want to work that right now, it's too hard because we want to find out about some issues of the past. So what I recommended to the administration is, 'Let's take that off the table for now and take it up when Congress reconvenes in September.'

Q: With an eye toward the six-month review?

A: No, the retroactive liability protection has got to be addressed.

Q: And that's not in the current law?

A: It is not. Now people have said that I negotiated in bad faith, or I did not keep my word or whatever...

Q: That you had an agenda that you weren't honest about.

A: I'll give you the facts from my point of view. When I checked on board I had my discussion with the president. I'm apolitical figure. I'm not a Republican, I'm not a Democrat. I have voted for both. My job is as a professional to try to do this job the best way I can in terms of, from the intelligence community, protect the nation. So I made my argument that we should have the ability to do surveillance the same way we've done it for the past 50 years and not be inhibited when it's a foreigner in a foreign country. The president's guidance to me early in the process, was, 'You've got the experience. I trust your judgement. You make the right call. There's no pressure from anybody here to tell you how to do it. He did that again. He revisited with me in June. He did it again in July and he said it publicly on Friday before the bill was passed. We were at the FBI, it's an annual thing, we go to the FBI and do a homeland security kind of update. So he came out at noon and said, 'I'm requesting that Congress pass this bill. It's essential. Do it before you go on recess. I'm depending on Mike McConnell's recommendations. And that was the total sum and substance of the guidance and the involvement from the White House with regard to how I should make the call. Now, as we negotiated, we started with 66 pages, were trying to get everything cleaned up at once. When I reduced it to my three points, we went from 66 pages to 11. Now, this is a very, very complex bill. I had a team of 20 lawyers working. You can change a word in a paragraph and end up with some major catastrophe down in paragraph 27, subsection 2c, to shut yourself down, you'll be out of business. So when we send up our 11 pages, we had a lot of help in making sure we got it just right so it would come back and we'd say wait a minute we can't live with this or one of the lawyers would say, 'Wait we tried that, it won't work, here's the problem.' So we kept going back and forth, so we sent up a version like Monday, we sent up a version on Wednesday, we sent up a version on Thursday. The House leadership, or the Democratic leadership on Thursday took that bill and we talked about it. And my response was there are some things I can't live with in this bill and they said alright we're going to fix them. Now, here's the issue. I never then had a chance to read it for the fix because, again, it's so complex, if you change a word or phrase, or even a paragraph reference, you can cause unintended ...

Q: You have to make sure it's all consistent?

A: Right. So I can't agree to it until it's in writing and my 20 lawyers, who have been doing this for two years, can work through it. So in the final analysis, I was put in the position of making a call on something I hadn't read. So when it came down to crunch time, we got a copy and it had some of the offending language back in it. So I said, 'I can't support it.' And it played out in the House the way it played out in the House. Meantime on the Senate side, there were two versions being looked at. The Wednesday version and the Thursday version. And one side took one version and the other side took the other version. The Thursday version, we had some help, and I didn't get a chance to review it. So now, it's Friday night, the Senate's voting. They were having their debate and I still had not had a chance to review it. So, I walked over, I was up visiting some senators trying to explain some of the background. So I walked over to the chamber and as I walked into the office just off the chamber, it's the vice president's office, somebody gave me a copy. So I looked at the version and said, 'Can't do it. The same language was back in there.'

Q: What was it?

A: Just let me leave it, not too much detail, there were things with regard to our authorities some language around minimization. So it put us in an untenable position. So then I had another version to take a look at, which was our Wednesday version, which basically was unchanged. So I said, well certainly, I'm going to support that Wednesday version. So that's what I said and the vote happened in the Senate and that was on Friday. So now it rolled to the House on Saturday. They took up the bill, they had a spirited debate, my name was invoked several times, not in a favorable light in some cases. (laughs) And they took a vote and it passed 226 to 182, I think. So it's law. The president signed it on Sunday and here we are.

Q: That's far from unanimous. There's obviously going to be more debate on this.

A: There are a couple of issues to just be sensitive to. There's a claim of reverse targeting. Now what that means is we would target somebody in a foreign country who is calling into the United States and our intent is to not go after the bad guy, but to listen to somebody in the United States. That's not legal, if it's, it would be a breach of the Fourth Amendment. You can go to jail for that sort of thing. And If a foreign bad guy is calling into the United States, if there's a need to have a warrant, for the person in the United States, you just get a warrant.

And so if a terrorist calls in and it's another terrorist, I think the American public would want us to do surveillance of that U.S. person in this case. So we would just get a warrant and do that. It's a manageable thing. On the U.S. persons side it's 100 or less. And then the foreign side, it's in the thousands. Now there's a sense that we're doing massive data mining. In fact, what we're doing is surgical. A telephone number is surgical. So, if you know what number, you can select it out. So that's, we've got a lot of territory to make up with people believing that we're doing things we're not doing.

Q: Even if it's perception, how do you deal with that? You have to do public relations, I assume.

A: Well, one of the things you do is you talk to reporters. And you give them the facts the best you can. Now part of this is a classified world. The fact we're doing it this way means that some Americans are going to die, because we do this mission unknown to the bad guys because they're using a process that we can exploit and the more we talk about it, the more they will go with an alternative means and when they go to an alternative means, remember what I said, a significant portion of what we do, this is not just threats against the United States, this is war in Afghanistan and Iraq.

Q. So you're saying that the reporting and the debate in Congress means that some Americans are going to die?

A. That's what I mean. Because we have made it so public. We used to do these things very differently, but for whatever reason, you know, it's a democratic process and sunshine's a good thing. We need to have the debate. The reason that the FISA law was passed in 1978 was an arrangement was worked out between the Congress and the administration, we did not want to allow this community to conduct surveillance, electronic surveillance, of Americans for foreign intelligence unless you had a warrant, so that was required. So there was no warrant required for a foreign target in a foreign land. And so we are trying to get back to what was the intention of '78. Now because of the claim, counterclaim, mistrust, suspicion, the only way you could make any progress was to have this debate in an open way.

Q. So you don't think there was an alternative way to do this?

A. There may have been an alternative way, but we are where are ...

Q. A better way, I should say.

A. All of my briefs initially were very classified. But it became apparent that we were not going to be able to carry the day if we don't talk to more people.

Q. Some might say that's the price you pay for living in a free society. Do you think that this is necessary that these Americans die?

A. We could have gotten there a different way. We conducted intelligence since World War II and we've maintained a sensitivity as far as sources and methods. It's basically a sources and methods argument. If you don't protect sources and methods then those you target will choose alternative means, different paths. As it is today al-Qaida in Iraq is targeting Americans, specifically the coalition. There are activities supported by other nations to import electronic, or explosively formed projectiles, to do these roadside attacks and what we know about that is often out of very sensitive sources and methods. So the more public it is, then they take it away from us. So that's the tradeoff.

DIVERSITY IN THE INTELLIGENCE COMMUNITY

Q: I wanted to ask you about the diversity question. This has major ramifications here, we have this center of excellence program that's recruiting high school kids, many of whom wouldn't qualify if first generation American citizens weren't allowed.

A: So you agree with me?

Q: It does sound like something that would benefit this area that would also allow you to get people from here who are bicultural and have an openness to seeing things ...

A: You're talking about Hispanics?

Q: Yes.

A: Hispanics are probably the most under-represented group if you think of America, what the ethic makeup of America, Hispanics are the most under-represented group in my community. Now, that said, and should increase that Hispanic population and programs like this will do that. That's why the outreach. But also we need, particularly with the current problem of terrorism, we need to have speakers of Urdu and Farsi and Arabic and people from those cultures that understand the issues of tribes and clans and all the things that go with understanding that part of the world. Varying religions and so on. Because it is, it's almost impossible, I've had the chance to live in the Middle East for years, I've studied it for years, it's impossible to understand it without having some feel for the culture and so on. So while I'm all for increasing the diversity along the lines we talked about, I'm also very much in favor of first generation Americans from the countries that are causing issues and problems.

Q: What is the status of that program.

A: It is not in statue. It is not in policy. It has been habit. So we've stated, as a matter of policy, that we're not going to abide by those habits.

Q: And that's already the case?

A: Yes, and are we making progress? Not fast enough, but we will make progress over time.

Q: How do you measure that?

A: Very simple, you get to measure what are you and where are you trying go and are you making progress. I wrestled with this years ago when I was NSA ....

Q: You don't want quotas, though?

A: Quotas are forbidden so we set goals. My way of thinking about it is what is your end state? Now some would say that federal governments should look like America, whatever that is. OK, that sounded like a reasonable metric, so I said, 'Alright, what does America look like?' So I got a bunch of numbers. I said, 'Alright, what do we look like?' and it didn't match, and as I just told you, the one place where there's the greatest mismatch is Hispanic. It's much closer, as matter of fact, people would be surprised how close it is across, at least my community among the other minorities. Now, that said, numbers don't necessarily equal positioning in the organization. So that's another feature we have to work on, is placement of women and minorities in leadership positions.

Q: So, you're quantifying that as well?

A: Yes.

TERRORIST ACTIVITY ON THE NATION'S SOUTHWEST BORDER

Q: There seems to be very little terrorist-related activity on the Southwest border, which is watched very closely because of the illegal immigration issue. Can you talk about why it's important to be alert here?

A: Let me go back to my NIE, those are unclassified key judgements, pull them down and look at them. You've got committed leadership. You've got a place to train. They've got trainers and they've got recruits. The key now is getting recruits in. So if the key is getting recruits in. So, if you're key is getting recruits in, how would you do that? And so, how would you do that?

Q: I'd go to the northern border where there's nobody watching.

A: And that's a path. Flying in is a path. Taking a ship in is a path. Coming up through the Mexican border is a path. Now are they doing it in great numbers, no. Because we're finding them and we're identifying them and we've got watch lists and we're keeping them at bay. There are numerous situations where people are alive today because we caught them (terrorists). And my point earlier, we catch them or we prevent them because we've got the sources and methods that lets us identify them and do something about it. And you know the more sources and methods are compromised, we have that problem.

Q: And in many cases we don't hear about them?

A: The vast majority you don't hear about. Remember, let me give you a way to think about this. If you've got an issue, you have three potential outcomes, only three. A diplomatic success, an operational success or an intelligence failure. Because all those diplomatic successes and operations successes where there's intelligence contribution, it's not an intelligence success. It's just part of the process. But if there's an intelligence failure ...

Q: Then you hear about it.

A: So, are terrorists coming across the Southwest border? Not in great numbers.

Q: There are some cases?

A: There are some. And would they use it as a path, given it was available to them? In time they will.

Q: If they're successful at it, then they'll probably repeat it.

A: Sure. There were a significant number of Iraqis who came across last year. Smuggled across illegally.

Q: Where was that?

A: Across the Southwest border.

Q: Can you give me anymore detail?

A: I probably could if I had my notebook. It's significant numbers. I'll have somebody get it for you. I don't remember what it is. The point is it went from a number to (triple) in a single year, because they figured it out. Now some we caught, some we didn't. The ones that get in, what are they going to do? They're going to write home. So, it's not rocket science, word will move around. There's a program now in South America, where you can, once you're in South American countries, you can move around in South America and Central America without a visa. So you get a forged passport in Lebanon or where ever that gets you to South America. Now, no visa, you can move around, and with you're forged passport, as a citizen of whatever, you could come across that border. So, what I'm highlighting is that something ...

Q: Is this how it happened, the cases you're talking about?

A: Yes.

🖨 Print   ✉ Email   ↩ Return to Top

**POST YOUR COMMENTS:**

Type in your comments to post to the forum

**Name (appears on your post)**

**Comments**

Type the numbers you see in the image on the right:

[ Post Comment ]

topix

*Please note by clicking on "Post Comment" you acknowledge that you have read the Terms of Service and the comment you are posting is in compliance with such terms. Be polite. Inappropriate posts may be removed by the moderator. Send us your feedback.*

**New and Updated**
- Police investigate armed robbery at Wienerschnitzel's
- Sheriff's search for suspect in Socorro bar shooting
- Crews try to coax immigrant out of tunnel
- Wesley Clark speaks tonight at Clinton headquarters

**Nation / World**
- Kan. judge OKs abortion records plan
- Judge: Search of students' car was legal
- Students hauled after big fight in Miami
- Chaldean archbishop kidnapped in Iraq

**Free Credit Report with All 3 Scores**
Free 3-bureau Credit Report – includes Transunion,
FreeCreditReportsInstantly.com

**Refinance and Save $1,000S**
$150,000 Mortgage for $483/month.
Compare up to 4 free
www.pickamortgage.com

**Refinance $300,000 for Only $965/Month**
$300,000 Mortgage for only $965/month.
Save $1,000's - No
www.HomeLoanHelpLine.com

Ads by Yahoo!

Copyright © 2008 by the El Paso Times and MediaNews Group and/or wire services and suppliers.
None of the content on this site may be republished or reused in any way without the written permission of the copyright holder.

      

News Partners:  Alamogordo Daily News · Carlsbad Current-Argus · The Deming Headlight · Farmington Daily Times · Las Cruces Sun-News · Ruidoso News · Silver City Sun-News

El Paso Times Site Map

Privacy Policy  |  MNG Corporate Site Map  |  Copyright

EXHIBIT H

# Newsweek

# Case Dismissed?

**The secret lobbying campaign your phone company doesn't want you to know about**

By **Mark Hosenball** and **Michael Isikoff**
NEWSWEEK WEB EXCLUSIVE
Updated: 3:23 PM ET Sep 26, 2007

The nation's biggest telecommunications companies, working closely with the White House, have mounted a secretive lobbying campaign to get Congress to quickly approve a measure wiping out all private lawsuits against them for assisting the U.S. intelligence community's warrantless surveillance programs.

The campaign—which involves some of Washington's most prominent lobbying and law firms— has taken on new urgency in recent weeks because of fears that a U.S. appellate court in San Francisco is poised to rule that the lawsuits should be allowed to proceed.

If that happens, the telecom companies say, they may be forced to terminate their cooperation with the U.S. intelligence community—or risk potentially crippling damage awards for allegedly turning over personal information about their customers to the government without a judicial warrant.

"It's not an exaggeration to say the U.S. intelligence community is in a near-panic about this," said one communications industry lawyer familiar with the debate who asked not to be publicly identified because of the sensitivity surrounding the issue.

But critics say the language proposed by the White House—drafted in close cooperation with the industry officials—is so extraordinarily broad that it would provide retroactive immunity for all past telecom actions related to the surveillance program. Its practical effect, they argue, would be to shut down any independent judicial or state inquires into how the companies have assisted the government in eavesdropping on the telephone calls and e-mails of U.S. residents in the aftermath of the September 11 terror attacks.

"It's clear the goal is to kill our case," said Cindy Cohn, legal director of the Electronic Frontier Foundation, a San Francisco-based privacy group that filed the main lawsuit against the telecoms after The New York Times first disclosed, in December 2005, that President Bush had approved a secret program to monitor the phone conversations of U.S. residents without first seeking judicial warrants. The White House subsequently confirmed that it had authorized the National Security Agency to conduct what it called a "terrorist surveillance program" aimed at communications between suspected terrorists overseas and individuals inside the United States. But the administration has also intervened, unsuccessfully so far, to try to block the lawsuit from proceeding and has consistently refused to discuss any details about the extent of the program— rebuffing repeated congressional requests for key legal memos about it.

"They are trying to completely immunize this [the surveillance program] from any kind of judicial review," added Cohn. "I find it a little shocking that Congress would participate in the covering up of what has been going on."

But congressional staffers said this week that some version of the proposal is likely to pass—in

part because of a high-pressure lobbying campaign warning of dire consequences if the lawsuits proceed. Director of National Intelligence Mike McConnell seemed to raise the stakes recently when he contended in an interview with the El Paso Times that the private lawsuits could "bankrupt these companies."

Among those coordinating the industry's effort are two well-connected capital players who both worked for President George H.W. Bush: Verizon general counsel William Barr, who served as attorney general under 41, and AT&T senior executive vice president James Cicconi, who was the elder Bush's deputy chief of staff.

Working with them are a battery of major D.C. lobbyists and lawyers who are providing "strategic advice" to the companies on the issue, according to sources familiar with the campaign who asked not to be identified talking about it. Among the players, these sources said: powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T.

Because of the extreme secrecy surrounding the warrantless surveillance program, few if any of the lobbyists and lawyers are prepared to speak publicly about their role. "My client requires me not to talk to the press," said the normally loquacious Black when asked by NEWSWEEK about his lobbying for AT&T. Berman and Berenson also declined comment. Gorelick confirmed that she is providing "strategic advice," not lobbying for Verizon. Coats and Donilon did not respond to requests for comment.

But according to three industry sources, these and other players have been conferring with each other over legislative strategy and targeting key lawmakers and staffers, especially those on the House and Senate Intelligence and Judiciary Committees. The lobbyists have set up meetings and arranged conference calls, pressing the argument that failure to provide protection to the companies could interfere with the vital assistance they say the telecom industry has provided the intelligence community in monitoring the communications of Al Qaeda and other terrorist operations overseas.

The case for new legislation retroactively giving telecoms companies protection against private lawsuits—including lawsuits already pending—was outlined this week by Kenneth Wainstein, assistant attorney general for national security. At a House Judiciary Committee hearing chaired by Rep. John Conyers, a Michigan Democrat, Wainstein said that giving telecoms companies retroactive liability was a matter of "general fairness."

"I think it's sort of fundamentally unfair and just not right to—if a company allegedly assisted the government in its national-security efforts, in an effort to defend the country at a time of peril, that they then get turned around and face tremendously costly litigation and maybe even crushing liability for having helped the United States government at a time of need ... it's just not right," Wainstein testified.

Wainstein also claimed that "every time we have one of these lawsuits, very sensitive information gets discussed and gets leaked out, disseminated out in the public. And our adversaries are smart, both the terrorists who might be over in, you know, someplace in the Middle East are smart, and then the governments that might be our adversaries are tremendously sophisticated, and they're gleaning all this information that gets out." Wainstein also said that a telecom company's overseas assets could be threatened if its collaboration in U.S. espionage efforts were confirmed in a court case.

The campaign for industry protection was initially launched last summer when administration and industry officials first tried to get the immunity provision included in the Protect America Act—a measure passed by Congress and signed by President Bush on Aug. 5 that allowed the surveillance program to continue and temporarily gave the National Security Agency expanded eavesdropping powers. At the time, Democrats in Congress balked at including the kind of sweeping retroactive civil immunity protections that the industry sought.

But then, on Aug. 15, a three-judge panel of the Ninth Circuit Court of Appeals in San Francisco heard oral arguments in a Justice Department motion to block the Electronic Frontier Foundation lawsuit against AT&T. More than 40 other civil suits filed against the telecoms—many of them seeking billions of dollars in damages—had been consolidated with the EFF lawsuit. But the Justice Department had sought to block the lawsuits under the "state privilege" doctrine, which can require the dismissal of suits that might endanger national security.

The three-judge panel, made up entirely of Democratic appointees, seemed openly skeptical of the Justice Department's arguments, prompting many court observers to conclude that the panel was likely to issue a ruling permitting the lawsuits to proceed. At one point in the proceedings, one of the judges, Harry Pregerson, a Jimmy Carter appointee, appeared annoyed with the Justice Department lawyer, Gregory Garre. The judge wanted Garre to provide direct answers to questions about the scope of the just-passed surveillance law, according to press reports. When Garre tried to explain that the law was complicated, Pregerson shot back: "Can't be any more complicated than my phone bill."

The administration is keeping up pressure on Congress for quick action on the new version of the surveillance law—including an immunity provision for telecoms—which will take effect when the Protect America Act expires early next year. Congressional staffers say that Democrats are likely to go along with some version of the proposal. But Democratic leaders, who say they were stampeded into passing the law last summer, are insisting on having more thorough hearings and forcing the administration to turn over documents on the surveillance program. If the telecoms want immunity, some Democrats say, the White House should at least say what it is they need immunity for.

*Terror Watch, written by Michael Isikoff and Mark Hosenball appears online weekly*

URL: http://www.newsweek.com/id/41142

© 2007 Newsweek.com

# EXHIBIT I

 PRINT    Close

Sponsored by:

CQ WEEKLY – WEEKLY REPORT
INTELLIGENCE
Feb. 17, 2008 – 4:20 p.m.

# House Allows FISA Law to Expire

*By Tim Starks, CQ Staff*

Defying the White House, Republican lawmakers and conservative members of their own party, House Democrats chose last week to let a temporary electronic surveillance bill expire rather than surrender to threats of possible danger to national security.

The day after the Senate passed a six-year overhaul of the Foreign Intelligence Surveillance Act (FISA, PL 95-511), House leaders tried to push through a 21-day extension of a short-term law (PL 110-55, PL 110-182) that was scheduled to run out on Feb. 16. But Republicans and enough members of their own caucus blocked that effort, leaving Democrats facing the president head-on in a legislative version of the game of "chicken."

### B o x S c o r e

**Bills:**
HR 3773 — To overhaul for six years the Foreign Intelligence Surveillance Act (PL 95-511); HR 5349 — To extend for 21 days a temporary electronic surveillance law (PL 110-55, PL 110-182).

**Latest Action:**
Senate passed S 2248, 68-29, on Feb. 12, then substituted its text into HR 3773. House rejected HR 5349, 191-229, on Feb. 13.

**Next Likely Action:**
House-Senate negotiations on HR 3773.

**Reference:**
Senate debate, CQ Weekly, p. 392; 2007 legislation, p. 50; FISA, 1978 Almanac, p. 186.

Leaders of the House majority defended their decision to leave for the one-week Presidents Day recess without completing work on FISA legislation, saying they needed the extra time to reconcile differences between the Senate version of the bill (HR 3773) and the one the House passed in November.

"Is there an important reason to act? There is," Majority Leader Steny H. Hoyer , D-Md., said Feb. 14 in an impassioned floor speech. "Do we have every intention of acting? We do. But we will not be presented with a bill on Tuesday night and be asked to pass it on Wednesday afternoon without full and fair consideration. That is our duty; that is our responsibility; and that is what we will do."

Republicans did everything they could to force the House to accept the Senate bill, even walking out of the chamber as a group at one point. President Bush castigated Democrats and said he would delay the start of a planned trip to Africa over the weekend if it would help quickly clear long-term legislation.

Reading a statement on the South Lawn of the White House on Feb. 14, Bush warned that if the temporary law expired without a new one in place, "our ability to find out who the terrorists are talking to, what they are saying and what they are planning will be compromised. It would be a mistake if the Congress were to allow this to happen."

Hoyer responded that during the time it would take to negotiate a compromise between the two versions, the intelligence community would have all the tools it needed to defend against terror attacks, contrary to Republican accusations that the expiration of the temporary spying law — enacted in August — would create an intelligence gap.

"There is no urgency," Hoyer said. "That claim is a claim made to stampede this House and the American people."

At the urging of Speaker Nancy Pelosi , D-Calif., the top Democrat on the House Judiciary Committee, John Conyers Jr. of Michigan, and the leaders of the House and Senate Intelligence panels met Feb. 15 to begin discussing their differences. Senate Judiciary Chairman Patrick J. Leahy , D-Vt., was back in his home state of Vermont.

The Senate on Feb. 12 passed a comprehensive overhaul of the ground rules for electronic surveillance after rejecting a series of amendments that could have turned the White House against the carefully negotiated measure. The vote for passage was 68-29, with 19



Democrats and one independent joining 48 Republicans in support of the bill. Not a single GOP senator voted against it. *(Senate vote 20, p. 450)*

After passing the FISA bill, the Senate called up the House-passed bill and substituted the text of its own measure (S 2248), returning HR 3773 to the other chamber. Earlier, senators had voted, 69-29, to limit further debate on the bill. *(Senate vote 19, p. 450)*

The legislation would revamp FISA to establish new rules for electronic surveillance designed to collect foreign intelligence when it involves communications on U.S. soil. The Senate Select Committee on Intelligence, working with the administration, assembled it in October.

One of the main sticking points between the House and Senate versions of the bill is over how the bill would authorize surveillance. The Senate measure would allow warrantless surveillance of foreign targets even if they were communicating with someone in the United States, much like President Bush's program through the National Security Agency and the temporary spying law that expired over the weekend. But the secret court established under FISA would be able to approve procedures for such surveillance, and would have a greater role than under the temporary law.



Pelosi confers with Mike Sheehy, her national security adviser, at the Capitol as the debate rages on the House floor. (CQ \ SCOTT J. FERRELL)

The House bill would require the administration to apply to the FISA court for an order permitting spying on a large number of foreign targets that may be communicating with people in the United States.

## Immunity for Telecom Companies

An even more contentious debate has been over whether to provide retroactive legal immunity to companies being sued for their alleged assistance to the administration's warrantless surveillance program. The Senate version of the bill would provide it; the House version would not.

Senate Democrats tried repeatedly to remove the immunity language from the bill but to no avail. Before passing the bill, the Senate rejected, 31-67, an amendment by Christopher J. Dodd , D-Conn., that sought to strike the immunity provision from the bill. *(Senate vote 15, p. 449)*

The closest Senate amendment vote last week came on a proposal by Dianne Feinstein , D-Calif., to tighten language in the bill reaffirming that FISA is the "exclusive means" of conducting intelligence surveillance of Americans. The 57-41 vote was three votes short of the 60 required under a unanimous consent agreement governing consideration of amendments. *(Senate vote 13, p. 449)*

Feinstein, a member of the Senate Intelligence panel, said her language was designed to "prevent a chief executive, either now or in the future, from moving outside of this law."

The temporary law enacted in August expired Feb. 1, so on Jan. 29 Congress cleared an extension of that law, keeping it alive until Feb. 16. Even though Bush said he would not sign another extension, House leaders offered a bill (HR 5349) that would give the law 21 more days.

That effort failed, 191-229, as every House Republican who voted joined with a group of 34 liberal and conservative Democratic defectors Feb. 13 to reject the bill. *(House vote 54, p. 454)*

"We need to address this and get it over with. I want us to vote on the Senate bill," said Lincoln Davis , D-Tenn., one of 21 conservative "Blue Dog" Democrats who endorsed the Senate bill and several of whom voted against the short-term extension.

The defeat for Democratic leaders followed a parliamentary battle that raged all day on the floor. Earlier in the day they had closed ranks to kill, 222-196, a Republican move to replace the Democratic leaders'



PARTIES DIVIDED: House Republicans, above, led by Minority Leader Boehner, at the microphone, stage a walkout Feb. 14 over the Democrats' handling of the FISA bill. (GETTY IMAGES \ MARK WILSON)

short-term bill with the Senate bill. *(House vote 53, p. 454)*

Democrats blamed Republicans for the lapse of the August surveillance law, saying that if they saw it as endangering the country, they should have voted for the extension.

"The president says he won't sign an extension," Pelosi said. "That said to me the president knows he doesn't need an extension. He knows he has the authority" to continue current wiretaps and to launch new ones with a FISA court order.

## How Big of a Threat?

Republicans staged a walkout Feb. 14 to pressure Democrats into taking the Senate bill. The demonstration occurred before a floor vote on a rule (H Res 982) adopting a resolution (H Res 979) to cite White House Chief of Staff Joshua B. Bolten and former White House counsel Harriet Miers for contempt of Congress for refusing to comply with Judiciary Committee subpoenas. *(Contempt resolution, p. 442)*

"We have space on the calendar today for a politically charged fishing expedition, but no space for a bill that would protect the American people from terrorists who want to kill us," Minority Leader John A. Boehner , R-Ohio, said.

Republicans spent the week raising the specter of a hobbled intelligence community if the temporary surveillance law expired and the Senate bill did not become law.

But legal experts say the implications of any expiration are mixed. They note that any spying orders already in place would remain in effect long after the temporary law lapses.

At the same time, most experts agree that the administration would have to go back to the secret FISA court to obtain warrants in cases where foreign-to-foreign communications are routed through the United States' telecommunications infrastructure. That poses little immediate threat, they say, but if a backlog of warrant applications were to build, it could begin to cause problems.

Among experts in national security law, there is no agreement on whether telecommunications companies would continue to be compelled to comply with administration surveillance demands.

And because Bush administration officials have repeatedly claimed the president has all the authority he needs to conduct a surveillance program in the service of national security, some experts argue that the administration is likely to do as it pleases regardless of what happens in Congress.

CQ © 2007 All Rights Reserved | Congressional Quarterly Inc. 1255 22nd Street N.W. Washington, D.C. 20037 | 202-419-8500

EXHIBIT J

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
February 28, 2008

# Press Conference of the President

10:05 A.M. EST

THE PRESIDENT: Good morning. Laura and I, as you know, recently came back from Africa, where we saw firsthand how the Emergency Plan for AIDS Relief is saving lives. I had a chance to go to the -- speak to the Sullivan Foundation the other day about our trip, and the reason I did so was to remind the American people about how important it is for our nation to remain generous and compassionate when it comes to helping people overseas.

Video (Windows)
Presidential Remarks
Audio
Photos
En Español

I also, during my trip, urged Congress to reauthorize the Emergency Plan and increase our commitment, and they did. They approved a good, bipartisan bill, that maintains the principles that have made this program effective. And so I want to thank acting Chairman Howard Berman and Ranking Member Ileana Ros-Lehtinen, and all the members of the Committee for the action they took. This afternoon they're going to come down and I'll be able to thank them in person -- I'm going to brief them on the trip. Obviously, our hope is now that the House will act quickly and send the bill reauthorizing PEPFAR to the Senate, and I'd like to sign it into law as quickly as possible.



Members should also act on a very urgent priority, and that is to pass legislation our intelligence officials need to quickly and effectively monitor terrorist communications. At issue is a dispute over whether telecommunications companies should be subjected to class-action lawsuits because they are believed to have helped defend America after the attacks of 9/11. Allowing these lawsuits to proceed would be unfair. If any of these companies helped us, they did so after being told by our government that their assistance was legal and vital to our national security.

Allowing the lawsuits to proceed could aid our enemies, because the litigation process could lead to the disclosure of information about how we conduct surveillance, and it would give al Qaeda and others a roadmap as to how to avoid the surveillance. Allowing these lawsuits to proceed could make it harder to track the terrorists, because private companies besieged by and fearful of lawsuits would be less willing to help us quickly get the information we need. Without the cooperation of the private sector, we cannot protect our country from terrorist attack.

Protecting these companies from lawsuits is not a partisan issue. Republicans and Democrats in the United States Senate came together and passed a good bill, protecting private companies from these abusive lawsuits. And Republicans and Democrats in the House stand ready to pass the Senate bill, if House leaders would only stop blocking an up or down vote and let the majority in the House prevail.

Some in Congress have said we have nothing to worry about, because if we lose the cooperation of the private sector we can use the old FISA law. They're wrong. FISA was out of date. It did not allow us to track foreign terrorists on foreign soil quickly and effectively. And that is why a dangerous intelligence gap opened up last year, and that is why Congress passed legislation that reformed FISA -- but they did so only temporarily. The law expired; the threat to America has not expired.

Congress understood last year that FISA did not give our intelligence professionals the tools they needed to keep us safe. The Senate understands that the FISA -- old FISA didn't give us the tools needed to protect America. The bipartisan bill it passed provides those tools our



intelligence professionals need. Yet the House's failure to pass this law raises the risk of reopening a gap in our intelligence gathering, and that is dangerous.



Another vital priority for protecting the nation is prevailing in Iraq. Unfortunately, this week the Senate debated yet another bill that threatens to cut off funding and tie the hands of our commanders in Iraq. It seems that no matter what happens in Iraq opponents to the war have one answer: Retreat. When things were going badly in Iraq a year ago, they called for withdrawal. Then we changed our strategy, launched the surge and turned the situation around. Since the surge began, high-profile terrorist attacks are down, civilian deaths are down, sectarian killings are down, and our own casualties are down. U.S. and Iraqi forces have captured or killed thousands of extremists, including hundreds of key al Qaeda operatives and leaders. Reconciliation is taking place in local communities across the country. That reconciliation is beginning to translate into political progress in the capital city.

In the face of these changes on the ground, congressional leaders are still sounding the same old call for withdrawal. I guess you could say that when it comes for pushing for withdrawal, their strategy is to stay the course. It's interesting that many of the same people who once accused me of refusing to acknowledge setbacks in Iraq now are the ones who are refusing to acknowledge progress in Iraq. If we followed their advice a year ago, Iraq would be a far different and more dangerous place than it is today. And the American people would be at greater risk.

If we follow their advice now, we would put at risk the gains our troops have made over the past year. Congress does need to act when it comes to Iraq. What they need to do is stand by our brave men and women in uniform and fully fund the troops.

Finally, Congress needs to act to help homeowners avoid foreclosure. Unfortunately, the Senate is considering legislation that would do more to bail out lenders and speculators than to help American families keep their homes. The Senate bill would actually prolong the time it takes for the housing market to adjust and recover and it would lead to higher interest rates. This would be unfair to the millions of homeowners who make the hard choices every month to pay their mortgage on time and it would be unfair to future home buyers. Instead, Congress should move ahead with responsible legislation to modernize the Federal Housing Administration and Fannie Mae and Freddie Mac. By taking these steps we can help struggling homeowners and help our economy weather the difficult time in the housing market.

I'd be glad to take some questions. Terry.

Q Mr. President, bad economic news continues to pile up, the latest today with the GDP barely growing. Are you concerned about a sagging economy and hard times will help defeat John McCain, like it did your father in 1992? And how far are you willing to go to prevent that?

THE PRESIDENT: I'm concerned about the economy because I'm concerned about working Americans, concerned about people who want to put money on the table and save for their kids' education. That's why I'm concerned about the economy. I want Americans working.

And there's no question the economy has slowed down. You just cited another example of slowdown. I don't think we're headed to a recession, but no question we're in a slowdown. And that's why we acted, and acted strongly, with over $150 billion worth of pro-growth economic incentives -- mainly money going into the hands of our consumers. And some money going to incent businesses to invest, which will create jobs.

And so we acted robustly. And now it's time to determine whether or not this pro-growth package will actually work. Now, the checks will start going out in the second week of May. There are going to be letters out soon explaining who is eligible for the refunds. Credit will happen in the first week of May. In other words, some people will choose to have their bank accounts credited. And in the second week of May, we anticipate the checks start moving out of Washington.

And the purpose is to encourage our consumers. The purpose is to give them money -- their own to begin with, by the way -- but give them money to help deal with the adverse effects of the decline in housing value. Consumerism is a significant part of our GDP growth, and we want to sustain the American consumer, encourage the American consumer and, at the same time, we want to encourage investment. So we'll see how the plan works.

Q But the political context --

THE PRESIDENT: You're trying to get me to be the pundit again. Look, you all figure that out. I mean, we've -- what I'm dealing with is the situation at hand, and I appreciate that -- both Democrats and Republicans in the United States Congress and Senate for getting this bill done very quickly. And it's a substantial piece of legislation, and it's a good sign that we can figure out how to cooperate with each other at times.

And so we'll see the effects of this pro-growth package. I know there's a lot of -- here in Washington, people are trying to -- stimulus package two and all that stuff. Why don't we let stimulus package one, which seemed like a good idea at the time, have a chance to kick in?

Yes.

Q Mr. President, Turkey's ground offensive in northern Iraq is now a week old with no end in sight. How quickly would you like to see Turkey end its offenses, its incursion? And do you have any concerns about the possibility of protracted presence in northern Iraq causing further destabilization in the region?

THE PRESIDENT: A couple of points on that. One, the Turks, the Americans, and the Iraqis, including the Iraqi Kurds, share a common enemy in the PKK. And secondly, it's in nobody's interests that there be safe haven for people who are -- have the willingness to kill innocent people.

A second point I want to make to you, Matt, is that there is a special forces presence in northern Iraq -- in Kurdistan -- now, apart from what you're referring to. So there is a presence. And there has been a presence for a while.

Thirdly, I strongly agree with the sentiments of Secretary Gates, who said that the incursion must be limited, and must be temporary in nature. In other words, it shouldn't be long-lasting. But the Turks need to move quickly, achieve their objective, and get out.

Q But how quickly, sir, do they need to move out?

THE PRESIDENT: You know, as quickly as possible.

Q Days or weeks?

THE PRESIDENT: Well, as possible.

Q Sir, I'd like to ask you about Russia. The Democratic candidates, when asked about the new Russian leader, Dmitry Medvedev, didn't appear to know a great deal about him. I wonder what you can say about him, how much power you think he's really got, with Putin still in the picture? And critics would say you badly misjudged Vladimir Putin. So what would be your cautionary tale to your successor about the threat Russia poses, and how to deal with this new leader?

THE PRESIDENT: I don't know much about Medvedev either. And what will be interesting to see is who comes to the -- who represents Russia at the G8, for example. It will be interesting to see -- it will help, I think, give some insight as to how Russia intends to conduct foreign policy after Vladimir Putin's presidency. And I can't answer the question yet.

I can say that it's in our interests to continue to have relations with Russia. For example, on proliferation matters, it's in our interest to be able to make sure that materials that could cause great harm aren't proliferated. It's in our interest to work together on Iran. As I said I think in this room the last time I was here, I appreciated the fact that Vladimir Putin told the Iranians that they will provide -- they, Russia -- will provide enriched uranium to run the Bushehr power plant, thereby negating the need for the Iranians to enrich in the first place. I thought that was a constructive suggestion, and we need to be in a position to be able to work with Russia on Iran.

There's a lot of areas where -- yesterday, for example, with the Prime Minister of the Czech Republic, I talked about a missile defense system in Europe, but I believe it's in our interests to try to figure out a way for the Russians to understand the system is not aimed at them, but aimed at the real threats of the 21st century, which could be a launch from a violent regime -- a launch of a weapon of mass destruction.

So there's areas, David, where we need to cooperate and -- let me finish -- and so it's -- I'm going to try to leave it so

whoever my successor is will be able to have a relationship with whoever is running foreign policy in Russia. It's in the country's interest. That doesn't mean we have to agree all the time. I mean, obviously we didn't agree on Kosovo. There will be other areas where we don't agree. And yet it is in the interest of the country to have a relationship, leader to leader, and hopefully beyond that.

Q But first of all, are you suggesting, or are you worried that, in fact, Medvedev is a puppet for Vladimir Putin? And --

THE PRESIDENT: No, I wouldn't say that. That's your conclusion, not mine.

Q No, I'm asking the question about whether you're concerned. But isn't there something you took away that you can offer to your successor about how it's risky in the process of sizing up your Russian counterpart? Don't you think that you learned something from your time with Putin?

THE PRESIDENT: Here's what I learned -- here's what I learned: I learned that it's important to establish personal relations with leaders even though you may not agree with them -- certain leaders. I'm not going to have a personal relationship with Kim Jong-il, and our relationships are such that that's impossible.

But U.S.-Russian relations are important. It's important for stability. It's important for our relations in Europe. And therefore my advice is to establish a personal relationship with whoever is in charge of foreign policy in Russia. It's in our country's interest to do so.

Now, it makes it easier, by the way, when there's a trustworthy relationship, to be able to disagree and yet maintain common interests in other areas. And so we've had our disagreements. As you know, Putin is a straightforward, pretty tough character when it comes to his interests. Well, so am I. And we've had some head-butts, diplomatic head-butts. You might remember the trip to Slovakia. I think you were there at the famous press conference. But -- and yet, in spite of that, our differences of opinion, we still have got a cordial enough relationship to be able to deal with common threats and opportunities. And that's going to be important for the next President to maintain.

Yes, Jonathan.

Q Mr. President, do you believe if we have the kind of rapid pull-out from Iraq that Democrats are talking about, that we would be at greater risk of a terrorist attack here at home? And when Senator Obama was asked a similar question, he said, "If al Qaeda is forming a base in Iraq, then we will have to act in a way that secures the American homeland and our interests abroad." So I'm wondering if --

THE PRESIDENT: That's an interesting comment. If al Qaeda is securing a al Qaeda base -- yes, well, that's exactly what they've been trying to do for the past four years. That's their stated intention, was to create enough chaos and disorder to establish a base from which to either launch attacks or spread a caliphate. And the intent of the surge was to send more Marines into the area that -- where they had proclaimed their desire to set up a base. That was Anbar province. And so, yes, that's one of the challenges we face, is denying al Qaeda a safe haven anywhere. And their intentions -- that's what they said, that they would like to have a base or safe haven in Anbar province.

Yes, Bill.

Q But --

THE PRESIDENT: No, next turn.

Q But the question about --

THE PRESIDENT: Nice try. (Laughter.)

Q Mr. President --

THE PRESIDENT: You obviously haven't been here long. John, where have you been, Jonathan? (Laughter.)

Q Across the river.

THE PRESIDENT: Yes, okay, yes. Welcome to the other side. (Laughter.)

Q You can get the Congress to protect telecom companies from lawsuits, but then there's no recourse for Americans who feel that they've been caught up in this. I know it's not intended to spy on Americans, but in the collection process, information about everybody gets swept up and then it gets sorted. So if Americans don't have any recourse, are you just telling them, when it comes to their privacy, to suck it up?

THE PRESIDENT: I wouldn't put it that way, if I were you, in public. Well, you've been long been long enough to -- anyway, yes, I -- look, there's -- people who analyze the program fully understand that America's civil liberties are well protected. There is a constant check to make sure that our civil liberties of our citizens aren't -- you know, are treated with respect. And that's what I want, and that's what most -- all Americans want.

Now let me talk about the phone companies. You cannot expect phone companies to participate if they feel like they're going to be sued. I mean, it is -- these people are responsible for shareholders; they're private companies. The government said to those who have alleged to have helped us that it is in our national interests and it's legal. It's in our national interests because we want to know who's calling who from overseas into America. We need to know in order to protect the people.

It was legal. And now, all of a sudden, plaintiffs attorneys, class-action plaintiffs attorneys, you know -- I don't want to try to get inside their head; I suspect they see, you know, a financial gravy train -- are trying to sue these companies. First, it's unfair. It is patently unfair. And secondly, these lawsuits create doubts amongst those who will -- whose help we need.

I guess you could be relaxed about all this if you didn't think there was a true threat to the country. I know there's a threat to the country. And the American people expect our Congress to give the professionals the tools they need to listen to foreigners who may be calling into the United States with information that could cause us great harm. So, on the one hand, the civil liberties of our citizens are guaranteed by a lot of checks in the system, scrutinized by the United States Congress.

And secondly, I cannot emphasize to you how important it is that the Congress solve this problem. The Senate has solved the problem. And people say, would you ever compromise on the issue? The Senate bill is a compromise. And there's enough votes in the House of Representatives to pass the Senate bill. It's a bipartisan bill. And the House leaders need to put it on the floor, let the will of the House work. In my judgment, it happens to be the will of the people, to give the professionals the tools they need to protect the country.

Elaine.

Q Mr. President, you've stressed over and over in recent days particularly the importance of FISA reform to help keep America safe, and yet you have not yet filled a key national security post. Fran Townsend announced her resignation months ago, in November. What is the delay there, and what are Americans to make of that delay? Is America less safe because of it?

THE PRESIDENT: We got a fine man named Joel Bagnal working that office right now. He's a professional. I trust his judgment. He's a real good guy. And no, they shouldn't worry about Joel. He knows what he's doing.

John.

Q But, sir, the American --

THE PRESIDENT: John.

Q The Homeland Security Advisor is a key post. What's taking so long?

THE PRESIDENT: Joel Bagnal has occupied the position, Elaine. He's doing the job, and I've got confidence in him. And so should the American people have confidence in him. He's a fine professional. He knows what he's doing. And I'm very comfortable in saying, on your cameras, that our staff in the White House, led by Joel Bagnal, knows what they're doing when it comes to advising the President on matters of homeland security.

John.

Q Thanks, Mr. President. There's been a lot of criticism on the campaign trail of free trade policies and even talk about the U.S. opting out of NAFTA. And it doesn't seem that you want to discuss the prospects of Republican candidates on the campaign trail this year, but --

THE PRESIDENT: Not yet.

Q Not yet. But just given all the concerns about the economy that people have, do you feel like you could win in a state like Ohio if you were running again for President?

THE PRESIDENT: Landslide. (Laughter.) Look, I am a big believer in free trade. And the reason why is I firmly believe that free trade is essential to the formation of high-paying, quality jobs. In other words, people who work for industries that export goods to overseas are likely to be paid more than their -- other workers.

Secondly, if you look at the -- our economic growth recently, particularly last year, a major portion of that growth came as a result of exports. It's an essential part of our economic picture.

Yes, I heard the talk about NAFTA. One statistic I think people need to know is I think there's roughly like $380 billion worth of goods that we ship to our NAFTA partners on an annual basis. Now, $380 billion worth of goods means there's a lot of farmers and businesses, large and small, who are benefiting from having a market in our neighborhood. And the idea of just unilaterally withdrawing from a trade treaty because of trying to score political points is not good policy. It's not good policy on the merits, and it's not good policy as a message to send to our -- people who have, in good faith, signed a treaty and worked with us on a treaty.

Thirdly, those of us who grew up in Texas remember what the border looked like when we were kids, and it was really poor. And you go down to that border today, it is prosperous on both sides of the river, to the credit of those who proposed NAFTA, and to the credit of those who got NAFTA through the Congress. If you're worried about people coming into our country illegally, it makes sense to help a place like Mexico grow its economy. Most folks would rather be finding a job close to home; most folks would rather not try to get in the bottom of an 18-wheeler to come and put food on the table.

This agreement has meant prosperity on both sides of our borders, north and south. And I believe it's in the interests to continue to seek markets for our farmers, ranchers and businesspeople. I also know it's in our interest to insist that when people sell products into our countries [sic], that we get treated fairly. In other words, if we treat a country one way, people in a country one way, we expect to be treated the same way -- like Colombia.

The Colombia Free Trade vote is coming up. Many of their products come into our country much easier than our products go into theirs. It makes sense to be treated equally. But on this vote, there's an additional consequence. If the Congress rejects the Colombia Free Trade Agreement, it will sorely affect the national security interests of the United States. It will encourage false populism in our neighborhood. It will undermine the standing of courageous leaders like President Uribe. And I strongly urge the Congress, when they bring this -- when the Colombia Free Trade Agreement is brought to a vote, to seriously consider the consequences of rejecting this trade agreement.

Mike.

Q Mr. President, on FISA, do you worry that perhaps some House Democratic leaders are playing a high-stakes game of "wait and see," in terms of if we get attacked, we all lose; if we don't get attacked, then maybe that makes the case that you don't need all the powers in FISA?

THE PRESIDENT: No, I don't think so. I mean, I think that's -- that would be ascribing motives that are -- I just don't they're the motives of the House leaders to do that. I think they're really wrestling with providing liability protecting to phone companies. I don't think that's cynical or devious, Michael. That's just too risky.

A lot of these leaders understand that there is an enemy that wants to attack. The caucus, evidently, in the House -- the Democratic Caucus -- is, you know, concerned about exactly Plante's question, you know. And I just can't tell you how important it is to not alienate, or not discourage, these phone companies.

How can you listen to the enemy if the phone companies aren't going to participate with you? And they're not going to participate if they get sued. Let me rephrase -- less likely to participate. And they're facing billions of dollars of lawsuits,

and they have a responsibility to their shareholders. And yet they were told what they were going to do is legal.

And anyway, I'm going to keep talking about the issue, Mike. This is an important issue for the American people to understand. And it's important for them to understand that no renewal of the Patriot Act -- I mean, the Protect America Act -- is dangerous for the security of the country, just dangerous.

I'm sure people, if they really pay attention to the details of this debate, wonder why it was okay to pass the Protect America Act last summer, late last summer, and all of a sudden it's not okay to pass it now. And so I will keep talking about the issue, and talking about the issue.

Michael.

Q Thank you, Mr. President. I'd like to ask you about another issue that's kind of come up on the campaign trail, in terms of discussion, which is, this is a point of view that has been espoused, that we would be better off if we talked to our adversaries, in particular, Iran and Cuba, you know, without preconditions. And as President, you have obviously considered and rejected this approach. And I'm wondering if you can give us a little insight into your thinking about this, and just explain to the American people what is lost by talking with those when we disagree?

THE PRESIDENT: What's lost by embracing a tyrant who puts his people in prison because of their political beliefs? What's lost is it will send the wrong message. It will send a discouraging message to those who wonder whether America will continue to work for the freedom of prisoners. It will give great status to those who have suppressed human rights and human dignity.

I'm not suggesting there's never a time to talk, but I'm suggesting now is not the time -- not to talk with Raul Castro. He's nothing more than an extension of what his brother did, which was to ruin an island, and imprison people because of their beliefs.

I had these wives of these dissidents come and see me, and their stories are just unbelievably sad. And it just goes to show how repressive the Castro brothers have been, when you listen to the truth about what they say. And the idea of embracing a leader who's done this without any attempt on his part to release prisoners and free their society would be counterproductive and send the wrong signal.

Q No one is saying embrace him, they're just saying talk --

THE PRESIDENT: Well, talking to him is embracing. Excuse me. Let me use another word -- you're right, "embrace" is like big hug, right? You're looking -- I do embrace people. Mike, one of these days, I'm just thinking about -- (laughter.) Right, okay, good, thank you for reminding me to use a different word. Sitting down at the table, having your picture taken with a tyrant such as Raul Castro, for example, lends the status of the office and the status of our country to him. He gains a lot from it by saying, look at me, I'm now recognized by the President of the United States.

Now, somebody would say, well, I'm going to tell him to release the prisoners. Well, it's a theory that all you got to do is embrace and these tyrants act. That's not how they act. That's not what causes them to respond. And so I made a decision quite the opposite, and that is to keep saying to the Cuban people, we stand with you; we will not sit down with your leaders that imprison your people because of what they believe; we will keep an embargo on you; we do want you to have money from people here in the homeland, but we will stay insistent upon this policy until you begin to get free.

And so that's the way I've conducted foreign policy, and will continue to conduct foreign policy. I just remind people that the decisions of the U.S. President to have discussions with certain international figures can be extremely counterproductive. It can send chilling signals and messages to our allies; it can send confusion about our foreign policy; it discourages reformers inside their own country. And in my judgment, it would be a mistake -- on the two countries you talked about.

Sheryl.

Q Mr. President, thank you. I want to bring you back to Senator Obama's comment on Iraq. Do you believe that his comment was naive?

THE PRESIDENT: I believe Senator Obama better stay focused on his campaign with Senator Clinton, neither of whom

has secured their party's nominee yet -- nomination yet. And my party's nomination hasn't been decided yet either. And so there will be ample time to discuss whoever their candidate -- the positions of whoever their candidate is.

Nice try, Sheryl. Would you like to try another tact, another question?

Q Well, you said it was an interesting comment. Okay, I'll follow on it. About Iraq, you have said in the past -- (laughter) -- that you want to leave a sustainable policy --

THE PRESIDENT: Yes.

Q Wait a minute --

Q I'd like to have another question.

THE PRESIDENT: Okay.

Q You want to leave your --

THE PRESIDENT: Well, it was just -- give her -- should we vote on whether she gets another question? (Laughter.)

Q You've said, Mr. President, that you want to leave Iraq in a sustainable situation --

THE PRESIDENT: Yes, I do.

Q -- at the end of your administration. Can you describe for us specifically what do you mean by "sustainable"? Do you have specific goals and objectives that in your mind would meet the criteria of sustainability?

THE PRESIDENT: Yes, which is to keep enough troops there so we can succeed. And David Petraeus will -- for example, David Petraeus will come back, along with Ryan Crocker, here later on this spring and will make a recommendation as to what those troop levels ought to be.

The idea of having a request by the Iraqi government for a long-term security agreement is part of sustainability. And obviously we're going to be pushing hard at the same time to get the political process moving forward.

I don't know if you noticed yesterday, but it was a very interesting moment in Iraqi constitutional history, when part of the -- a member of the presidency council utilized his constitutional right to veto one of the three pieces of legislation recently passed. I understand the use of the veto, intend to continue to use it, but I thought it was a healthy sign that people are thinking through the legislation that's passed, and they're worrying about making sure that laws are constitutional. And I feel pretty good about the fact that they're, of course, going to continue to work to make sure that their stated objective of getting provincial elections done by October of 2008 will happen.

So there's going to be a lot of -- my only point is sustainability is political, economic and security.

Yes, Ed.

Q Good morning, sir.

THE PRESIDENT: Yes, thank you.

Q If I could get back to the economy. The GDP numbers today show that our economy is increasingly relying on U.S. exports to keep growing. How important is a competitive dollar in keeping U.S. exports strong?

THE PRESIDENT: We believe in a strong dollar policy, and we believe that -- and I believe that our economy has got the fundamentals in place for us to be a -- is to grow and continue growing more robustly, hopefully, than we're growing now. And the dollar, the value of the dollar will be reflected in the ability for our economy to be -- to grow economically. And so we're still for a strong dollar.

Q Can I follow up on that, sir?

THE PRESIDENT: Maybe.

Q The --

THE PRESIDENT: I guess you are -- I haven't said yes. (Laughter.)

Q What's your advice to the average American who is hurting now, facing the prospect of $4 a gallon gasoline, a lot of people facing --

THE PRESIDENT: Wait, what did you just say? You're predicting $4 a gallon gasoline?

Q A number of analysts are predicting --

THE PRESIDENT: Oh, yeah?

Q -- $4 a gallon gasoline this spring when they reformulate.

THE PRESIDENT: That's interesting. I hadn't heard that.

Q Yes, sir.

THE PRESIDENT: Yes. I know it's high now.

Q And the other economic problems facing people. Beyond your concern that you stated here, and your expectations for these stimulus checks, what kind of hope can you offer to people who are in dire straits?

THE PRESIDENT: Permanent tax -- keep the tax cuts permanent, for starters. There's a lot of economic uncertainty. You just said that. You just said the price of gasoline may be up to $4 a gallon -- or some expert told you that -- and that creates a lot of uncertainty if you're out there wondering whether or not -- you know, what your life is going to be like and you're looking at $4 a gallon, that's uncertain. And when you couple with the idea that taxes may be going up in a couple of years, that's double uncertainty. And therefore one way to deal with uncertainty is for Congress to make the tax cuts permanent.

Secondly, it's -- people got to understand that our energy policy needs to be focused on a lot of things -- one, renewables, which is fine, which I strongly support, as you know; two, conservation. But we need to be finding more oil and gas at home if we're worried about becoming dependent on oil overseas. And this -- I view it as a transitory period to new technologies that will change the way we live, but we haven't built a refinery in a long time. We're expanding refineries, but we haven't built a refinery in a long time. I strongly suggested to the Congress that we build refineries on old military bases, but, no, it didn't pass. But if you've got less supply of something, as demand continues to stay steady or grow, your price is going to go up.

Secondly, on oil, we -- the more oil we find at home, the better off we're going to be in terms of the short-run. And yet our policy is, you know, let us not explore robustly in places like ANWR. And there are environmental concerns, and I understand that. I also know there's technologies that should mitigate these environmental concerns. They got a bill up there in Congress now. Their attitude is, let's tax oil companies. Well, all that's going to do is make the price even higher. We ought to be encouraging investment in oil and gas close to home if we're trying to mitigate the problems we face right now.

And so, yes, there's a lot of uncertainty, and I'm concerned about the uncertainty. Hopefully this pro-growth package will help -- this, one hundred -- I think it's $147 billion that will be going out the door, starting electronically in the first week of May, and through check in the second week of May. And the idea is to help our consumers deal with the uncertainty you're talking about. But, yes, no question about it, it's a difficult period.

Yes, Ken.

Q Thank you, sir. Now that you've found a location for your presidential library, you've got to find the money to build it. Reports indicate that you may be trying to collect as much as $200 million. Is that figure accurate? Do you believe it's important for the American people to know who is giving that kind of money to their President? Will you disclose the contributions as they come in? And will you place any restriction on who gives money and how much they can give?

THE PRESIDENT: No, yes, no, yes. (Laughter.) Next question. (Laughter.) I haven't -- phew, man. You obviously haven't asked a question in a long time. It was like, you know, -- one, I haven't seen the final budget. Two, as Donnie Evans said, who is the chairman of the foundation, we'll look at the disclosure requirements and make a decision. You know, here's -- there's a lot of people -- or some people; I shouldn't say "a lot" -- some people who like to give and don't particularly want their names disclosed, whether it be for this foundation or any other foundation. And so we'll take that into consideration.

Thirdly -- and what was the other?

Q Any restrictions on who can give? Will you take foreign money for this?

THE PRESIDENT: Yes, I'll probably take some foreign money, but don't know yet, Ken. We just haven't -- we just announced the deal and I, frankly, have been focused elsewhere, like on gasoline prices and, you know, my trip to Africa, and haven't seen the fundraising strategy yet. So the answer to your question, really, I can't answer your question well.

Q Where does the people's right to know this fit into all that?

THE PRESIDENT: We're weighing, taking a look, taking consideration, giving it a serious consideration. Nice try, though.

Olivier.

Q Thank you, sir. In China a former factory worker who says that human rights are more important than the Olympics is being tried for subversion. What message does it send that you're going to the Olympics, and do you think athletes there should be allowed to publicly express their dissent?

THE PRESIDENT: Olivier, I have made it very clear, I'm going to the Olympics because it's a sporting event, and I'm looking forward to seeing the athletic competition. But that will not preclude me from meeting with the Chinese President, expressing my deep concerns about a variety of issues -- just like I do every time I meet with the President.

And maybe I'm in a little different position. Others don't have a chance to visit with Hu Jintao, but I do. And every time I meet with him I talk about religious freedom and the importance of China's society recognizing that if you're allowed to worship freely, it will benefit the society as a whole; that the Chinese government should not fear the idea of people praying to a god as they see fit. A whole society, a healthy society, a confident society is one that recognizes the value of religious freedom.

I talk about Darfur and Iran and Burma. And so I am not the least bit shy of bringing up the concerns expressed by this factory worker, and I believe that I'll have an opportunity to do so with the President and, at the same time, enjoy a great sporting event. I'm a sports fan. I'm looking forward to the competition. And each Olympic society will make its own decision as to how to deal with the athletes.

Yes, Mark.

Q Mr. President, back to the oil price -- tax breaks that you were talking about a minute ago. Back when oil was $55 dollars a barrel, you said those tax breaks were not needed; people had plenty of incentive to drill for oil. Now the price of oil is $100 a barrel and you're planning to threaten a plan that would shift those tax breaks to renewables.

THE PRESIDENT: I talked about some -- some of the breaks. And this is a -- this generally is a tax increase, and it doesn't make any sense to do it right now. We need to be exploring for more oil and gas. And taking money out of the coffers of the oil companies will make it harder for them to reinvest. I know -- they say, well, look at all of the profits. Well, we're raising the price of gasoline in a time when the price of gasoline is high.

Secondly, we've invested a lot of money in renewables. This administration has done more for renewables than any President. Now, we got a problem with renewables, and that is the price of corn is beginning to affect food -- cost of food, and it's hurting hog farmers and a lot of folks. And the best way to deal with renewables is to focus on research and development that will enable us to use other raw material to produce ethanol. I'm a strong believe in ethanol, Mark. This administration has got a great record in it. But it is a -- I believe research and development is what's going to make renewable fuels more effective.

Again, I repeat, if you look at what's happened in corn out there, you're beginning to see the food issue and the energy issue collide. And so, to me, the best dollar spent is to continue to deal with cellulosic ethanol in order to deal with this bottleneck right now. And secondly, the tax -- yes, I said that a while ago -- on certain aspects, but the way I analyze this bill is it's going to cost the consumers more money. And we need more oil and gas being explored for; we need more drilling; we need less dependence on foreign oil.

And as I say, we're in a period of transition here in America, from a time where we were -- where we are oil and gas dependent, to, hopefully, a time where we got electric automobiles, and we're spending money to do that; a time when we're using more biofuels, and we've taken huge investments in that; a time when we've got nuclear power plants and we're able to deal with the disposal in a way that brings confidence to the American people -- so we're not dependent on natural gas to fire up our -- a lot of our utilities, and a time when we can sequester coal.

That's where we're headed for, but we've got to do something in the interim. Otherwise, we're going to be dealing, as the man said, with $4 gasoline. And so that's why I'm against that bill.

I thank you. It's been a pleasure. Enjoyed being with you.

Q Sir, do you think Hillary Clinton will be the nominee?

THE PRESIDENT: Pardon me?

Q You still think Hillary Clinton will be the nominee?

THE PRESIDENT: I'm not talking about politics.

Q You said that before, though --

THE PRESIDENT: Trying to get me to be pundit-in-chief.

Q Are they qualified to be commander-in-chief?

THE PRESIDENT: I appreciate you doing that.

Jackson -- Jackson, nice to see you. (Laughter.) Glad to see you back. (Laughter.)

END 10:51 A.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2008/02/20080228-2.html

 CLICK HERE TO PRINT

# EXHIBIT K

 **Electronic Frontier Foundation**

December 21, 2007

**VIA FACSIMILE** — (703) 482-2144

Freedom of Information Act/Privacy Act Office
Office of the Director of National Intelligence
Washington, DC 20511

RE:    <u>Freedom of Information Act Request and Request for Expedited Processing</u>

Dear Sir or Madam:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Office of the Director of National Intelligence ("ODNI") on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 5, 2007, President Bush signed into law the Protect America Act, legislation which amended the Foreign Intelligence Surveillance Act ("FISA") to expand the government's power to intercept communications without warrants, as well as shield telecommunications companies from future liability for their role in such activity.

Since the passage of this law, the Administration has tried to convince Congress to amend FISA to make it impossible for courts to impose liability on telecommunications companies for participating in a massive and illegal warrantless spying operation conducted by the National Security Agency. *See* Signing Statement, *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007; James Risen, Bush Signs Law to Widen Reach for Wiretapping, *NY Times*, Aug, 6, 2007; Mark Hosenball and Michael Isikoff, Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About, *Newsweek*, updated Sept. 26, 2007, *available at* http://www.newsweek.com/id/41142; Eric Lichtblau, James Risen and Scott Shane, Wider Spying Fuels Aid Plan for Telecom Industry, *NY Times*, Dec. 16, 2007.

National Intelligence Director Mike McConnell has actively campaigned for telecom immunity. In one interview, he said:

> The issue that we did not address [in the Protect America Act], which has to be addressed is the liability protection for the private sector now is proscriptive, meaning going forward. We've got a retroactive problem. When I went through and briefed the various senators and congressmen, the issue was alright, look, we don't want to work that right now, it's too hard because we want to find out about some issues of the past. So what I recommended to the administration is, "Let's take that off the table for now and take it up when Congress reconvenes in September."

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 2

Chris Roberts, *Transcript: Debate on the Foreign Intelligence Surveillance Act*, El Paso Times, Aug. 22, 2007.

We are seeking all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Director McConnell or other ODNI officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies[1] concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities. This request includes, but is not limited to, all email, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information about which there is "[a]n urgency to inform the public about an actual or alleged Federal Government activity," and it is "made by a person primarily engaged in disseminating information." 32 C.F.R. § 1700.12(c)(2). The information we request easily satisfies this standard.

As an initial matter, it is worth noting that ODNI and the Department of Justice recently granted expedited processing for four FOIA requests nearly identical to this one (see ODNI and Justice Department letters granting expedited processing attached hereto).

The federal government activity at issue here — ODNI efforts to secure immunity for telecoms engaged in illegal surveillance — raises serious questions about ODNI's interests in revision of the FISA. Moreover, the Protect America Act includes a sunset provision requiring Congress to decide within weeks whether to reauthorize the legislation. This decisionmaking process has involved, and will continue to involve, congressional debate about whether to expand the law further, and if so, how much. Because Congress will imminently consider modifying FISA again, there is an urgency to inform the public about the lobbying forces pushing for reform of the law. The information we have requested will help the public and Congress fully participate in the

---

[1] The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies. According to *Newsweek*, these individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, Case Dismissed?, *Newsweek*, updated Sept. 26, 2007.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 3

current and ongoing debate over whether the government's authority to conduct electronic surveillance should be further expanded and facilitated by telecommunications companies.

The purpose of this request is to obtain information directly relevant to ODNI's communications with members of Congress and telecommunications carriers about updating FISA to grant companies retroactive immunity for illegal conduct. There is an urgency to inform the public about the information we seek. Therefore, this request clearly meets the standard for expedited processing set forth in ODNI regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 32 C.F.R. § 1700.2(h)(4). In requesting this classification, we note that the Department of Homeland Security and Department of State have recognized that EFF qualifies as a "news media" requester based upon the publication activities set forth below (see DHS stipulation and State Department letter attached hereto). In addition, the National Security Agency has previously determined that EFF is not only a "news media requester," but also "primarily engaged in disseminating information" for purposes of expedited processing (see attached EFF FOIA request and NSA response, in which EFF requested expedited processing because it sought information "urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity," and NSA granted the request). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Dec. 18, 2007).
[3] *Id.*

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 4

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's in July 2007.

Due to these extensive publication activities, EFF is a "representative of the news media" under the FOIA and agency regulations.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 32 C.F.R. § 1700.6(b)(2). To determine whether a request meets this standard, ODNI considers whether "[i]t

---

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 5

is in the public interest to provide responsive records because the disclosure is likely to contribute significantly to the public understanding of the operations or activities of the United States Government and is not primarily in the commercial interest of the requester." *Id.* This request clearly satisfies these criteria.

First, ODNI's relationship with telecommunications companies and ODNI's push to amend FISA unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will contribute to an understanding of government operations or activities. EFF has requested information that will shed light on how and why ODNI is lobbying to immunize telecommunications companies from liability for their role in conducting illegal surveillance.

Third, the requested material will contribute to public understanding of ODNI's efforts to modify FISA. This information will contribute not only to EFF's understanding of the reasons why and manner in which ODNI is lobbying for legal reform, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will contribute significantly to the public's knowledge and understanding of ODNI's push to amend FISA to protect telecommunications companies. Disclosure of the requested information will help inform the public about the Justice Department's efforts to reform the law and the interests behind them, as well as contribute to the public debate about whether FISA should be further modified.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Thank you for your consideration of this request. As applicable ODNI regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 6

Sincerely,

Marcia Hofmann
Staff Attorney

Enclosures

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00079

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received your facsimile dated 31 August 2007, wherein you requested under the Freedom of Information Act (FOIA) records concerning:

> "... ODNI's communications with telecommunications companies about updating FISA to provide them retroactive legal immunity for illegal activities."

We accept your request and have assigned it the reference number above. Please use this number when corresponding with us so that we can identify it easily. In addition, your request for expedited processing is granted and your request will be processed as soon as practicable.

If you have any questions you may contact the FOIA Requester Service Center at 571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
        1 - PIPD/DF-2007-00079 ACC

**FOIA\RFC 00079 DNI Hofmann ACC.doc**

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00080

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received
your facsimile dated 31 August 2007, wherein you requested under the Freedom of
Information Act (FOIA) records concerning:

> "...exchanges that Director McConnell or other ODNI
> officials have had with members of the Senate or House of
> Representatives concerning amendments to FISA ..."

We accept your request and have assigned it the reference number above. Please use this
number when corresponding with us so that we can identify it easily. In addition, your
request for expedited processing is granted and your request will be processed as soon as
practicable.

If you have any questions you may contact the FOIA Requester Service Center at
571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
        1 - PIPD/DF-2007-00080 ACC

**FOIA\RFC 00080 DNI Hofmann ACC.doc**

**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                              *Washington, D.C. 20530*

AUG 2 7 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation
Suite 650                                    Re:    OLA/07-R0909
1875 Connecticut Avenue, NW                          OLA/07-R0910
Washington, DC 20009                                 MLF:JNJ

Dear Ms. Hofmann:

    This is to acknowledge receipt of your two letters dated August 16, 2007, which were received in this Office on August 17, 2007, in which you requested all records of communications between the Department of Justice and Congress and between Justice and telecommunications companies from December 2005 to the present concerning amendments to the Foreign Intelligence Surveillance Act. This response is made on behalf of the Office of Legislative Affairs.

    I have determined that for purposes of these requests, it is appropriate to afford them expedited processing. At this time, your requests have been assigned to a FOIA Specialist in this Office and a records search has been initiated in the Office of Legislative Affairs.

    We have not yet made a decision on your requests for fee waivers. We will do so after we determine whether fees will be assessed for these requests.

    If you have any questions or wish to discuss the processing of your requests, you may contact Julie N. Johns, the analyst processing your requests, by telephone at the above number or you may write to her at the above address.

                       Sincerely,

                       Carmen L. Mallon
                       Chief of Staff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-1988 (ESH) |
| DEPARTMENT OF HOMELAND SECURITY, | ) ) ) | |
| Defendant. | ) ) | |

### STIPULATED DISMISSAL OF PLAINTIFF'S SECOND CAUSE OF ACTION

Plaintiff Electronic Frontier Foundation (EFF) and Defendant Department of Homeland

Security (DHS), by counsel, hereby stipulate and agree as follows:

1.    Defendant DHS has granted news media status to Plaintiff EFF based on the

representations contained in EFF's FOIA requests, which demonstrate that EFF is an "entity that

is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

Defendant DHS will continue to regard Plaintiff EFF as a "representative of the news media"

absent a change in circumstances that indicates that EFF is no longer an "entity that is organized

and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

2.    Accordingly, the parties herewith agree to the dismissal of Plaintiff EFF's Second

Cause of Action, related to EFF's status as a "representative of the news media."

3.    The parties further agree that each will pay its own fees and costs for work on the

dismissed claim.

SO STIPULATED AND AGREED this 27th day of February, 2007.

_/s/ David L. Sobel_____
DAVID L. SOBEL
D.C. Bar 360418

MARCIA HOFMANN
D.C. Bar 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue, N.W.
Suite 650
Washington, D.C. 20009
(202) 797-9009

_Counsel for Plaintiff_

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
D.C. Bar 418925
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

_/s/ John R. Coleman_____
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
(202) 514-4505

_Counsel for Defendant_

-2-



**United States Department of State**

*Washington, D.C. 20520*

May 1, 2007
Case Number: 200701765

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W., Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is in response to your Freedom of Information Act (FOIA) request, dated March 19, 2007 for copies of documents concerning copyright matters between the U.S. and Canada.

We will begin the processing of your request based upon the information provided in your communication.  We will notify you as soon as responsive material has been retrieved and reviewed.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame or the date the search is initiated.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

By making a FOIA request, you have agreed to pay all applicable fees up to $25.00 unless a fee waiver has been granted.  You may

Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

-2-

specify a willingness to pay a greater or lesser amount. If the estimated fees exceed this limit, you will be notified.

Based upon the information that you have provided, we have placed you in the "news media" requester category. This category requires us to assess:

- duplication costs after first 100 pages.(see 22 CFR 171, enclosed)

Therefore, without an agreement to pay fees please be advised that your request will be processed without cost up to the required duplication of the first 100 pages.

Please let us know if you are willing to pay the fees that will incurred in the processing of your request. You may set a limit of the maximum amount that you wish to pay.

Based upon the information provided in your letter, your request for a fee waiver has been denied. If you wish to appeal this decision, you may write to the Chief, Requester Liaison Division, at the address given on the bottom of this page. Your appeal should address the points listed in the enclosed sheet entitled "Requests for Fee Waivers." Your appeal must be sent to us within 30 days from the date that you receive this letter.

While we will make every effort to meet the time limits cited in the Freedom of Information Act (5 USC § 552), unusual circumstances

*Office of Information Programs and Services*
*U.S. Department of State SA-2*
*Washington, DC 20522-8100*
*Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email: FOIAStatus@state.gov*

-3-

may arise for extending the time limit (see enclosure). We appreciate your patience in this matter.

If you have any questions, please do not hesitate to contact us. We can provide faster service if you include the case number of your request in your communications with us.

We are pleased to be of service to you.

Sincerely,

*Katrina M. Wood*

Katrina M. Wood
Requester Communications Branch


Enclosure: As stated.


Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
    Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

January 23, 2007

**BY FACSIMILE — (301) 688-4762**

National Security Agency
ATTN: FOIA Office (DC34)
9800 Savage Road STE 6248
Ft. George G. Meade, MD 20755-6248

         RE:    Freedom of Information Act Request and
                    Request for Expedited Processing

Dear Sir or Madam:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the National Security Agency on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On January 9, 2007, the Washington Post reported:

> When Microsoft introduces its long-awaited Windows Vista operating system this month, it will have an unlikely partner to thank for making its flagship product safe and secure for millions of computer users across the world: the National Security Agency.

> For the first time, the giant software maker is acknowledging the help of the secretive agency, better known for eavesdropping on foreign officials and, more recently, U.S. citizens as part of the Bush administration's effort to combat terrorism. The agency said it has helped in the development of the security of Microsoft's new operating system -- the brains of a computer -- to protect it from worms, Trojan horses and other insidious computer attackers.

Alec Klein and Ellen Nakashima, "For Windows Vista Security, Microsoft Called in Pros," *Washington Post*, Jan. 9, 2007, at D01 (attached hereto).

We are seeking all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista").

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information that "is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." 32 CFR § 286.4(d)(3)(ii). According to DOD regulations, information is "urgently needed" when it "has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest." 32 CFR § 286.4(d)(3)(ii)(A). The information we request easily satisfies this standard.

The government activity at issue here — the NSA's involvement in the configuration of Microsoft's latest operating system — raises serious questions about the Department of Defense's interest in Vista's development. Indeed, the NSA's involvement in the system's configuration has already attracted substantial media interest since the publication of the *Washington Post* story. Specifically, a Google News search for "Vista and 'National Security Agency'" returned 67 results from news outlets throughout the world since January 9, 2007 (see first page of Google News search results attached hereto).

Furthermore, the *Washington Post* reported that Microsoft plans to make Vista available to consumers on January 30, 2007, and the system will likely be used by more than 600 million computer users by 2010. Thus, the information we request is unquestionably the subject of a breaking news story of general public interest particularly in the days leading to the product launch.

The purpose of this request is to obtain information directly relevant to the NSA's involvement in Vista's development, which has attracted considerable interest from the press and public in the past several days. The information we request is the subject of a breaking news story of general public interest, and therefore clearly meets the standard for expedited processing set forth in DOD regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 32 C.F.R. § 286.28(e)(7). In requesting this classification, we note that the Department of Homeland Security has recognized that EFF qualifies as a "news media" requester, based upon the publication activities set forth below (see DHS letter, attached hereto). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

2



**NATIONAL SECURITY AGENCY**
**CENTRAL SECURITY SERVICE**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case: 52276
6 February 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, NW
Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is an initial response to your Freedom of Information Act (FOIA) request submitted via facsimile on 23 January 2007, which was received by this office on 24 January 2007, for all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista"). Your request has been assigned Case Number 52276.

As we began to process your request, we realized that the first page of the actual request was missing from your 18-page facsimile package. On 1 February 2007, a member of my staff contacted you to advise you of this fact. As a result, you submitted another facsimile of your original five-page request, which we received and have begun to process. There is certain information relating to this processing about which the FOIA and applicable Department of Defense (DoD) and NSA/CSS regulations require we inform you.

For purposes of this request and based on the information you provided in your letter, you are considered a representative of the media. Unless you qualify for a fee waiver or reduction, you must pay for duplication in excess of the first 100 pages. Your request for a fee waiver has been granted. In addition, please be advised your request for expedited treatment has been accepted. We are currently in the process of searching for responsive documents and will notify you of the status of your request as soon as that search has been completed.

Correspondence related to your request should include the case number assigned to your request, which is included in the first paragraph of this letter. Your letter should be addressed to National Security Agency, FOIA Office

FOIA Case: 52276

(DC34), 9800 Savage Road STE 6248, Ft. George G. Meade, MD  20755-6248 or may be sent by facsimile to 443-479-3612.  If sent by fax, it should be marked for the attention of the FOIA office.  The telephone number of the FOIA office is 301-688-6527.

Sincerely,

*Mariance Stupar*
*for*

PAMELA N. PHILLIPS
Chief
FOIA/PA Office

EXHIBIT L

 **Electronic Frontier Foundation**

December 21, 2007

**VIA FACSIMILE** — (202) 514-1009

Carmen L. Mallon
Chief of Staff
Office of Information and Privacy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, DC 20530-0001

**RE:    Freedom of Information Act Request and Request for Expedited Processing**

Dear Ms. Mallon:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice Office of the Attorney General on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 5, 2007, President Bush signed into law the Protect America Act, legislation which amended the Foreign Intelligence Surveillance Act ("FISA") to expand the government's power to intercept communications without warrants, as well as shield telecommunications companies from future liability for their role in such activity.

Since the passage of this law, the Administration has tried to convince Congress to amend FISA to make it impossible for courts to impose liability on telecommunications companies for participating in a massive and illegal warrantless spying operation conducted by the National Security Agency. *See* Signing Statement, *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007; James Risen, Bush Signs Law to Widen Reach for Wiretapping, *NY Times*, Aug, 6, 2007; Mark Hosenball and Michael Isikoff, Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About, *Newsweek*, updated Sept. 26, 2007, *available at* http://www.newsweek.com/id/41142; Eric Lichtblau, James Risen and Scott Shane, Wider Spying Fuels Aid Plan for Telecom Industry, *NY Times*, Dec. 16, 2007.

We are seeking all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications

**454 Shotwell Street, San Francisco, CA  94110 USA**
**+1 415 436 9333 (v) +1 415 436 9993 (f) www.eff.org**

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 2

companies[1] concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities.  This request includes, but is not limited to, all e-mail, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information about which there is "[a]n urgency to inform the public about an actual or alleged federal government activity," and it is "made by a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(1)(ii).  The information we request easily satisfies this standard.

As an initial matter, it is worth noting that the DOJ and Office of the Director of National Intelligence recently granted expedited processing for FOIA requests nearly identical to this one (see DOJ and ODNI letters granting expedited processing attached hereto).

The federal government activity at issue here — DOJ efforts to secure immunity for telecoms engaged in illegal surveillance — raises serious questions about the DOJ's interests in revision of the FISA. Moreover, the Protect America Act includes a sunset provision requiring Congress to decide within weeks whether to reauthorize the legislation. This decisionmaking process has involved, and will continue to involve, congressional debate about whether to expand the law further, and if so, how much. Because Congress will imminently consider modifying FISA again, there is an urgency to inform the public about the lobbying forces pushing for reform of the law. The information we have requested will help the public and Congress fully participate in the current and ongoing debate over whether the government's authority to conduct electronic surveillance should be further expanded and facilitated by telecommunications companies.

The purpose of this request is to obtain information directly relevant to the DOJ's communications with members of Congress and telecommunications carriers about updating FISA to grant the companies retroactive immunity for illegal activities. There is an urgency to inform the public about the information we seek. Therefore, this request clearly meets the

---

[1] The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies.  According to Newsweek, these individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, Case Dismissed?, *Newsweek*, updated Sept. 26, 2007.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 3

standard for expedited processing set forth in DOJ regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6). In requesting this classification, we note that the Department of Homeland Security and Department of State have recognized that EFF qualifies as a "news media" requester based upon the publication activities set forth below (see DHS stipulation and State Department letter attached hereto). In addition, the National Security Agency has previously determined that EFF is not only a "news media requester," but also "primarily engaged in disseminating information" for purposes of expedited processing (see attached EFF FOIA request and NSA response, in which EFF requested expedited processing because it sought information "urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity," and NSA granted the request). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/
pqShowGsReport.do?npoId=561625 (last visited Dec. 18, 2007).
[3] *Id.*

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 4

technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's in July 2007.

Due to these extensive publication activities, EFF is a "representative of the news media" under the FOIA and agency regulations.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, Department of Justice components determine whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the DOJ's relationship with telecommunications companies concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i). Furthermore, the DOJ's push to amend

---

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 5

FISA unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on how and why the DOJ is lobbying to immunize telecommunications companies from liability for their role in conducting illegal surveillance.

Third, the requested material will "contribute to public understanding" of the DOJ's efforts to modify FISA. 28 C.F.R. § 16.11(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the reasons why and manner in which the DOJ is lobbying for legal reform, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the DOJ's push to amend FISA to protect telecommunications companies. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Disclosure of the requested information will help inform the public about the Justice Department's efforts to reform the law and the interests behind them, as well as contribute to the public debate about whether FISA should be further modified.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Thank you for your consideration of this request. As applicable Department regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

Sincerely,

Marcia Hofmann
Staff Attorney

Enclosures

 **Electronic Frontier Foundation**

December 21, 2007

**VIA FACSIMILE** — (202) 514-1009

Carmen L. Mallon
Chief of Staff
Office of Information and Privacy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, DC 20530-0001

RE:     **Freedom of Information Act Request and Request for Expedited Processing**

Dear Ms. Mallon:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice Office of Legislative Affairs on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 5, 2007, President Bush signed into law the Protect America Act, legislation which amended the Foreign Intelligence Surveillance Act ("FISA") to expand the government's power to intercept communications without warrants, as well as shield telecommunications companies from future liability for their role in such activity.

Since the passage of this law, the Administration has tried to convince Congress to amend FISA to make it impossible for courts to impose liability on telecommunications companies for participating in a massive and illegal warrantless spying operation conducted by the National Security Agency. *See* Signing Statement, *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007; James Risen, Bush Signs Law to Widen Reach for Wiretapping, *NY Times*, Aug, 6, 2007; Mark Hosenball and Michael Isikoff, Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About, *Newsweek*, updated Sept. 26, 2007, *available at* http://www.newsweek.com/id/41142; Eric Lichtblau, James Risen and Scott Shane, Wider Spying Fuels Aid Plan for Telecom Industry, *NY Times*, Dec. 16, 2007.

We are seeking all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 2

companies[1] concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities.  This request includes, but is not limited to, all e-mail, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information about which there is "[a]n urgency to inform the public about an actual or alleged federal government activity," and it is "made by a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(1)(ii).  The information we request easily satisfies this standard.

As an initial matter, it is worth noting that OLA recently granted expedited processing for two FOIA requests nearly identical to this one (see EFF request letters seeking expedited processing and OLA letter granting expedited processing attached hereto).

The federal government activity at issue here — DOJ efforts to secure immunity for telecoms engaged in illegal surveillance — raises serious questions about the DOJ's interests in revision of the FISA. Moreover, the Protect America Act includes a sunset provision requiring Congress to decide within weeks whether to reauthorize the legislation. This decisionmaking process has involved, and will continue to involve, congressional debate about whether to expand the law further, and if so, how much. Because Congress will imminently consider modifying FISA again, there is an urgency to inform the public about the lobbying forces pushing for reform of the law. The information we have requested will help the public and Congress fully participate in the current and ongoing debate over whether the government's authority to conduct electronic surveillance should be further expanded and facilitated by telecommunications companies.

The purpose of this request is to obtain information directly relevant to the DOJ's communications with members of Congress and telecommunications carriers about updating FISA to grant the companies retroactive immunity for illegal activities. There is an urgency to inform the public about the information we seek. Therefore, this request clearly meets the

---

[1] The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies.  According to Newsweek, these individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, Case Dismissed?, *Newsweek*, updated Sept. 26, 2007.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 3

standard for expedited processing set forth in DOJ regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6). In requesting this classification, we note that the Department of Homeland Security and Department of State have recognized that EFF qualifies as a "news media" requester based upon the publication activities set forth below (see DHS stipulation and State Department letter attached hereto). In addition, the National Security Agency has previously determined that EFF is not only a "news media requester," but also "primarily engaged in disseminating information" for purposes of expedited processing (see attached EFF FOIA request and NSA response, in which EFF requested expedited processing because it sought information "urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity," and NSA granted the request). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Dec. 18, 2007).
[3] *Id.*

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 4

technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994)*,* first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's in July 2007.

Due to these extensive publication activities, EFF is a "representative of the news media" under the FOIA and agency regulations.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, Department of Justice components determine whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the DOJ's relationship with telecommunications companies concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i). Furthermore, the DOJ's push to amend

---

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 5


FISA unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on how and why the DOJ is lobbying to immunize telecommunications companies from liability for their role in conducting illegal surveillance.

Third, the requested material will "contribute to public understanding" of the DOJ's efforts to modify FISA. 28 C.F.R. § 16.11(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the reasons why and manner in which the DOJ is lobbying for legal reform, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the DOJ's push to amend FISA to protect telecommunications companies. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Disclosure of the requested information will help inform the public about the Justice Department's efforts to reform the law and the interests behind them, as well as contribute to the public debate about whether FISA should be further modified.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Thank you for your consideration of this request. As applicable Department regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

Sincerely,

Marcia Hofmann
Staff Attorney

Enclosures



**Electronic Frontier Foundation**

December 21, 2007

**VIA FACSIMILE** — (202) 514-1009

Carmen L. Mallon
Chief of Staff
Office of Information and Privacy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, DC 20530-0001

  **RE:** **Freedom of Information Act Request and Request for Expedited Processing**

Dear Ms. Mallon:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice Office of Legal Policy on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 5, 2007, President Bush signed into law the Protect America Act, legislation which amended the Foreign Intelligence Surveillance Act ("FISA") to expand the government's power to intercept communications without warrants, as well as shield telecommunications companies from future liability for their role in such activity.

Since the passage of this law, the Administration has tried to convince Congress to amend FISA to make it impossible for courts to impose liability on telecommunications companies for participating in a massive and illegal warrantless spying operation conducted by the National Security Agency. *See* Signing Statement, *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007; James Risen, Bush Signs Law to Widen Reach for Wiretapping, *NY Times*, Aug, 6, 2007; Mark Hosenball and Michael Isikoff, Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About, *Newsweek*, updated Sept. 26, 2007, *available at* http://www.newsweek.com/id/41142; Eric Lichtblau, James Risen and Scott Shane, Wider Spying Fuels Aid Plan for Telecom Industry, *NY Times*, Dec. 16, 2007.

We are seeking all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 2

companies[1] concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities.  This request includes, but is not limited to, all e-mail, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information about which there is "[a]n urgency to inform the public about an actual or alleged federal government activity," and it is "made by a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(1)(ii).  The information we request easily satisfies this standard.

As an initial matter, it is worth noting that the DOJ and Office of the Director of National Intelligence recently granted expedited processing for FOIA requests nearly identical to this one (see DOJ and ODNI letters granting expedited processing attached hereto).

The federal government activity at issue here — DOJ efforts to secure immunity for telecoms engaged in illegal surveillance — raises serious questions about the DOJ's interests in revision of the FISA. Moreover, the Protect America Act includes a sunset provision requiring Congress to decide within weeks whether to reauthorize the legislation. This decisionmaking process has involved, and will continue to involve, congressional debate about whether to expand the law further, and if so, how much. Because Congress will imminently consider modifying FISA again, there is an urgency to inform the public about the lobbying forces pushing for reform of the law. The information we have requested will help the public and Congress fully participate in the current and ongoing debate over whether the government's authority to conduct electronic surveillance should be further expanded and facilitated by telecommunications companies.

The purpose of this request is to obtain information directly relevant to the DOJ's communications with members of Congress and telecommunications carriers about updating FISA to grant the companies retroactive immunity for illegal activities. There is an urgency to inform the public about the information we seek. Therefore, this request clearly meets the

---

[1] The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies.  According to Newsweek, these individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, Case Dismissed?, *Newsweek*, updated Sept. 26, 2007.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 3

standard for expedited processing set forth in DOJ regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is
"primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a
"representative of the news media" pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6). In
requesting this classification, we note that the Department of Homeland Security and Department
of State have recognized that EFF qualifies as a "news media" requester based upon the
publication activities set forth below (see DHS stipulation and State Department letter attached
hereto). In addition, the National Security Agency has previously determined that EFF is not
only a "news media requester," but also "primarily engaged in disseminating information" for
purposes of expedited processing (see attached EFF FOIA request and NSA response, in which
EFF requested expedited processing because it sought information "urgently needed by an
individual primarily engaged in disseminating information in order to inform the public
concerning actual or alleged Federal Government activity," and NSA granted the request). We
further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different
agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d
300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280,
1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil
liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press,
policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF
routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received
46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest
developments and contains in-depth information about a variety of civil liberties and intellectual
property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector
currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at
http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet.
DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/
pqShowGsReport.do?npoId=561625 (last visited Dec. 18, 2007).
[3] *Id.*

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 4

technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994)*,* first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's in July 2007.

Due to these extensive publication activities, EFF is a "representative of the news media" under the FOIA and agency regulations.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, Department of Justice components determine whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the DOJ's relationship with telecommunications companies concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i). Furthermore, the DOJ's push to amend

---

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 5


FISA unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on how and why the DOJ is lobbying to immunize telecommunications companies from liability for their role in conducting illegal surveillance.

Third, the requested material will "contribute to public understanding" of the DOJ's efforts to modify FISA. 28 C.F.R. § 16.11(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the reasons why and manner in which the DOJ is lobbying for legal reform, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the DOJ's push to amend FISA to protect telecommunications companies. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Disclosure of the requested information will help inform the public about the Justice Department's efforts to reform the law and the interests behind them, as well as contribute to the public debate about whether FISA should be further modified.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Thank you for your consideration of this request. As applicable Department regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

Sincerely,

Marcia Hofmann
Staff Attorney

Enclosures

**U.S. Department of Justice**

Office of Information and Privacy

_____

_Telephone: (202) 514-3642_                     _Washington, D.C. 20530_

                                                        AUG 2 7 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation          Re:    OLA/07-R0909
Suite 650                                              OLA/07-R0910
1875 Connecticut Avenue, NW                  MLF:JNJ
Washington, DC 20009

Dear Ms. Hofmann:

        This is to acknowledge receipt of your two letters dated August 16, 2007, which were
received in this Office on August 17, 2007, in which you requested all records of
communications between the Department of Justice and Congress and between Justice and
telecommunications companies from December 2005 to the present concerning amendments to
the Foreign Intelligence Surveillance Act.  This response is made on behalf of the Office of
Legislative Affairs.

        I have determined that for purposes of these requests, it is appropriate to afford them
expedited processing.  At this time, your requests have been assigned to a FOIA Specialist in this
Office and a records search has been initiated in the Office of Legislative Affairs.

        We have not yet made a decision on your requests for fee waivers.  We will do so after
we determine whether fees will be assessed for these requests.

        If you have any questions or wish to discuss the processing of your requests, you may
contact Julie N. Johns, the analyst processing your requests, by telephone at the above number or
you may write to her at the above address.

                                        Sincerely,

                                        Carmen L. Mallon
                                        Chief of Staff

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00079

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received your facsimile dated 31 August 2007, wherein you requested under the Freedom of Information Act (FOIA) records concerning:

> **"... ODNI's communications with telecommunications companies about updating FISA to provide them retroactive legal immunity for illegal activities."**

We accept your request and have assigned it the reference number above. Please use this number when corresponding with us so that we can identify it easily. In addition, your request for expedited processing is granted and your request will be processed as soon as practicable.

If you have any questions you may contact the FOIA Requester Service Center at 571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
       1 - PIPD/DF-2007-00079 ACC

**FOIA\RFC 00079 DNI Hofmann ACC.doc**

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00080

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received
your facsimile dated 31 August 2007, wherein you requested under the Freedom of
Information Act (FOIA) records concerning:

**". . .exchanges that Director McConnell or other ODNI**
**officials have had with members of the Senate or House of**
**Representatives concerning amendments to FISA . . ."**

We accept your request and have assigned it the reference number above. Please use this
number when corresponding with us so that we can identify it easily. In addition, your
request for expedited processing is granted and your request will be processed as soon as
practicable.

If you have any questions you may contact the FOIA Requester Service Center at
571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
       1 - PIPD/DF-2007-00080 ACC

**FOIA\RFC 00080 DNI Hofmann ACC.doc**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELECTRONIC FRONTIER )
FOUNDATION )
)
Plaintiff, )
)
v. )    Civil Action No.  06-1988 (ESH)
)
DEPARTMENT OF HOMELAND )
SECURITY, )
)
Defendant. )
_____ )

## STIPULATED DISMISSAL OF PLAINTIFF'S SECOND CAUSE OF ACTION

Plaintiff Electronic Frontier Foundation (EFF) and Defendant Department of Homeland

Security (DHS), by counsel, hereby stipulate and agree as follows:

1.      Defendant DHS has granted news media status to Plaintiff EFF based on the

representations contained in EFF's FOIA requests, which demonstrate that EFF is an "entity that

is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

Defendant DHS will continue to regard Plaintiff EFF as a "representative of the news media"

absent a change in circumstances that indicates that EFF is no longer an "entity that is organized

and operated to publish or broadcast news to the public."  6 C.F.R. § 5.11(b)(6).

2.      Accordingly, the parties herewith agree to the dismissal of Plaintiff EFF's Second

Cause of Action, related to EFF's status as a "representative of the news media."

3.      The parties further agree that each will pay its own fees and costs for work on the

dismissed claim.

SO STIPULATED AND AGREED this 27th day of February, 2007.

*/s/ David L. Sobel* _____
DAVID L. SOBEL
D.C. Bar 360418

MARCIA HOFMANN
D.C. Bar 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue, N.W.
Suite 650
Washington, D.C. 20009
(202) 797-9009

*Counsel for Plaintiff*

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
D.C. Bar 418925
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

*/s/ John R. Coleman* _____
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
(202) 514-4505

*Counsel for Defendant*

-2-



**United States Department of State**

*Washington, D.C. 20520*

May 1, 2007
Case Number: 200701765

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W., Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is in response to your Freedom of Information Act (FOIA) request, dated March 19, 2007 for copies of documents concerning copyright matters between the U.S. and Canada.

We will begin the processing of your request based upon the information provided in your communication.  We will notify you as soon as responsive material has been retrieved and reviewed.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame or the date the search is initiated.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

By making a FOIA request, you have agreed to pay all applicable fees up to $25.00 unless a fee waiver has been granted.  You may

Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

-2-

specify a willingness to pay a greater or lesser amount.  If the estimated fees exceed this limit, you will be notified.

Based upon the information that you have provided, we have placed you in the "news media" requester category.  This category requires us to assess:

- duplication costs after first 100 pages.(see 22 CFR 171, enclosed)

Therefore, without an agreement to pay fees please be advised that your request will be processed without cost up to the required duplication of the first 100 pages.

Please let us know if you are willing to pay the fees that will incurred in the processing of your request. You may set a limit of the maximum amount that you wish to pay.

Based upon the information provided in your letter, your request for a fee waiver has been denied.  If you wish to appeal this decision, you may write to the Chief, Requester Liaison Division, at the address given on the bottom of this page.  Your appeal should address the points listed in the enclosed sheet entitled "Requests for Fee Waivers." Your appeal must be sent to us within 30 days from the date that you receive this letter.

While we will make every effort to meet the time limits cited in the Freedom of Information Act (5 USC § 552), unusual circumstances

Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

-3-

may arise for extending the time limit (see enclosure).  We appreciate your patience in this matter.

If you have any questions, please do not hesitate to contact us.  We can provide faster service if you include the case number of your request in your communications with us.

We are pleased to be of service to you.

Sincerely,

Katrina M. Wood
Requester Communications Branch

Enclosure: As stated.

Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

January 23, 2007

**BY FACSIMILE — (301) 688-4762**

National Security Agency
ATTN: FOIA Office (DC34)
9800 Savage Road STE 6248
Ft. George G. Meade, MD 20755-6248

> RE:    Freedom of Information Act Request and
>        Request for Expedited Processing

Dear Sir or Madam:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the National Security Agency on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On January 9, 2007, the Washington Post reported:

> When Microsoft introduces its long-awaited Windows Vista operating system this month, it will have an unlikely partner to thank for making its flagship product safe and secure for millions of computer users across the world: the National Security Agency.

> For the first time, the giant software maker is acknowledging the help of the secretive agency, better known for eavesdropping on foreign officials and, more recently, U.S. citizens as part of the Bush administration's effort to combat terrorism. The agency said it has helped in the development of the security of Microsoft's new operating system -- the brains of a computer -- to protect it from worms, Trojan horses and other insidious computer attackers.

Alec Klein and Ellen Nakashima, "For Windows Vista Security, Microsoft Called in Pros," *Washington Post*, Jan. 9, 2007, at D01 (attached hereto).

We are seeking all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista").

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information that "is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." 32 CFR § 286.4(d)(3)(ii). According to DOD regulations, information is "urgently needed" when it "has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest." 32 CFR § 286.4(d)(3)(ii)(A). The information we request easily satisfies this standard.

The government activity at issue here — the NSA's involvement in the configuration of Microsoft's latest operating system — raises serious questions about the Department of Defense's interest in Vista's development. Indeed, the NSA's involvement in the system's configuration has already attracted substantial media interest since the publication of the *Washington Post* story. Specifically, a Google News search for "Vista and 'National Security Agency'" returned 67 results from news outlets throughout the world since January 9, 2007 (see first page of Google News search results attached hereto).

Furthermore, the *Washington Post* reported that Microsoft plans to make Vista available to consumers on January 30, 2007, and the system will likely be used by more than 600 million computer users by 2010. Thus, the information we request is unquestionably the subject of a breaking news story of general public interest particularly in the days leading to the product launch.

The purpose of this request is to obtain information directly relevant to the NSA's involvement in Vista's development, which has attracted considerable interest from the press and public in the past several days. The information we request is the subject of a breaking news story of general public interest, and therefore clearly meets the standard for expedited processing set forth in DOD regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 32 C.F.R. § 286.28(e)(7). In requesting this classification, we note that the Department of Homeland Security has recognized that EFF qualifies as a "news media" requester, based upon the publication activities set forth below (see DHS letter, attached hereto). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).



**NATIONAL SECURITY AGENCY**
**CENTRAL SECURITY SERVICE**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case:  52276
6 February 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, NW
Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is an initial response to your Freedom of Information Act (FOIA) request submitted via facsimile on 23 January 2007, which was received by this office on 24 January 2007, for all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista"). Your request has been assigned Case Number 52276.

As we began to process your request, we realized that the first page of the actual request was missing from your 18-page facsimile package. On 1 February 2007, a member of my staff contacted you to advise you of this fact. As a result, you submitted another facsimile of your original five-page request, which we received and have begun to process. There is certain information relating to this processing about which the FOIA and applicable Department of Defense (DoD) and NSA/CSS regulations require we inform you.

For purposes of this request and based on the information you provided in your letter, you are considered a representative of the media. Unless you qualify for a fee waiver or reduction, you must pay for duplication in excess of the first 100 pages. Your request for a fee waiver has been granted. In addition, please be advised your request for expedited treatment has been accepted. We are currently in the process of searching for responsive documents and will notify you of the status of your request as soon as that search has been completed.

Correspondence related to your request should include the case number assigned to your request, which is included in the first paragraph of this letter. Your letter should be addressed to National Security Agency, FOIA Office

FOIA Case:  52276

(DC34), 9800 Savage Road STE 6248, Ft. George G. Meade, MD  20755-6248
or may be sent by facsimile to 443-479-3612.  If sent by fax, it should be
marked for the attention of the FOIA office.  The telephone number of the FOIA
office is 301-688-6527.

Sincerely,

*for* Marianne Stupar

PAMELA N. PHILLIPS
Chief
FOIA/PA Office

EXHIBIT M

**E|F| Electronic Frontier Foundation**

December 21, 2007

**VIA FACSIMILE** — (202) 514-0563

Bette Farris, Supervisory Paralegal
Office of Legal Counsel
Department of Justice
Room 5515
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

> RE:    **Freedom of Information Act Request and Request for Expedited Processing**

Dear Ms. Farris:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice Office of Legal Counsel on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 5, 2007, President Bush signed into law the Protect America Act, legislation which amended the Foreign Intelligence Surveillance Act ("FISA") to expand the government's power to intercept communications without warrants, as well as shield telecommunications companies from future liability for their role in such activity.

Since the passage of this law, the Administration has tried to convince Congress to amend FISA to make it impossible for courts to impose liability on telecommunications companies for participating in a massive and illegal warrantless spying operation conducted by the National Security Agency. *See* Signing Statement, *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007; James Risen, Bush Signs Law to Widen Reach for Wiretapping, *NY Times*, Aug, 6, 2007; Mark Hosenball and Michael Isikoff, Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About, *Newsweek*, updated Sept. 26, 2007, *available at* http://www.newsweek.com/id/41142; Eric Lichtblau, James Risen and Scott Shane, Wider Spying Fuels Aid Plan for Telecom Industry, *NY Times*, Dec. 16, 2007.

We are seeking all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies[1] concerning amendments to FISA, including any discussion of immunizing

---

[1] The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies. According to Newsweek, these

**454 Shotwell Street, San Francisco, CA 94110 USA**
**+1 415 436 9333 (v) +1 415 436 9993 (f) www.eff.org**

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 2

telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities. This request includes, but is not limited to, all e-mail, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information about which there is "[a]n urgency to inform the public about an actual or alleged federal government activity," and it is "made by a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(1)(ii). The information we request easily satisfies this standard.

As an initial matter, it is worth noting that OLA recently granted expedited processing for two FOIA requests nearly identical to this one (see EFF request letters seeking expedited processing and OLA letter granting expedited processing attached hereto).

The federal government activity at issue here — DOJ efforts to secure immunity for telecoms engaged in illegal surveillance — raises serious questions about the DOJ's interests in revision of the FISA. Moreover, the Protect America Act includes a sunset provision requiring Congress to decide within weeks whether to reauthorize the legislation. This decisionmaking process has involved, and will continue to involve, congressional debate about whether to expand the law further, and if so, how much. Because Congress will imminently consider modifying FISA again, there is an urgency to inform the public about the lobbying forces pushing for reform of the law. The information we have requested will help the public and Congress fully participate in the current and ongoing debate over whether the government's authority to conduct electronic surveillance should be further expanded and facilitated by telecommunications companies.

The purpose of this request is to obtain information directly relevant to the DOJ's communications with members of Congress and telecommunications carriers about updating FISA to grant the companies retroactive immunity for illegal activities. There is an urgency to inform the public about the information we seek. Therefore, this request clearly meets the standard for expedited processing set forth in DOJ regulations.

---

individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, Case Dismissed?, *Newsweek*, updated Sept. 26, 2007.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 3

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6). In requesting this classification, we note that the Department of Homeland Security and Department of State have recognized that EFF qualifies as a "news media" requester based upon the publication activities set forth below (see DHS stipulation and State Department letter attached hereto). In addition, the National Security Agency has previously determined that EFF is not only a "news media requester," but also "primarily engaged in disseminating information" for purposes of expedited processing (see attached EFF FOIA request and NSA response, in which EFF requested expedited processing because it sought information "urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity," and NSA granted the request). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Dec. 18, 2007).
[3] *Id.*

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 4

technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994)*,* first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's in July 2007.

Due to these extensive publication activities, EFF is a "representative of the news media" under the FOIA and agency regulations.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, Department of Justice components determine whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the DOJ's relationship with telecommunications companies concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i). Furthermore, the DOJ's push to amend

---

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 5

FISA unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on how and why the DOJ is lobbying to immunize telecommunications companies from liability for their role in conducting illegal surveillance.

Third, the requested material will "contribute to public understanding" of the DOJ's efforts to modify FISA. 28 C.F.R. § 16.11(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the reasons why and manner in which the DOJ is lobbying for legal reform, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the DOJ's push to amend FISA to protect telecommunications companies. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Disclosure of the requested information will help inform the public about the Justice Department's efforts to reform the law and the interests behind them, as well as contribute to the public debate about whether FISA should be further modified.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Thank you for your consideration of this request. As applicable Department regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

Sincerely,

Marcia Hofmann
Staff Attorney

Enclosures

**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

Ms. Marcia Hofmann                              AUG 2 7 2007
Electronic Frontier Foundation
Suite 650                                       Re:    OLA/07-R0909
1875 Connecticut Avenue, NW                            OLA/07-R0910
Washington, DC 20009                                   MLF:JNJ

Dear Ms. Hofmann:

    This is to acknowledge receipt of your two letters dated August 16, 2007, which were received in this Office on August 17, 2007, in which you requested all records of communications between the Department of Justice and Congress and between Justice and telecommunications companies from December 2005 to the present concerning amendments to the Foreign Intelligence Surveillance Act. This response is made on behalf of the Office of Legislative Affairs.

    I have determined that for purposes of these requests, it is appropriate to afford them expedited processing. At this time, your requests have been assigned to a FOIA Specialist in this Office and a records search has been initiated in the Office of Legislative Affairs.

    We have not yet made a decision on your requests for fee waivers. We will do so after we determine whether fees will be assessed for these requests.

    If you have any questions or wish to discuss the processing of your requests, you may contact Julie N. Johns, the analyst processing your requests, by telephone at the above number or you may write to her at the above address.

Sincerely,

Carmen L. Mallon
Chief of Staff

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00079

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received
your facsimile dated 31 August 2007, wherein you requested under the Freedom of
Information Act (FOIA) records concerning:

> **". . . ODNI's communications with telecommunications
> companies about updating FISA to provide them retroactive
> legal immunity for illegal activities."**

We accept your request and have assigned it the reference number above. Please use this
number when corresponding with us so that we can identify it easily. In addition, your
request for expedited processing is granted and your request will be processed as soon as
practicable.

If you have any questions you may contact the FOIA Requester Service Center at
571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
        1 - PIPD/DF-2007-00079 ACC

**FOIA\RFC 00079 DNI Hofmann ACC.doc**

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00080

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received your facsimile dated 31 August 2007, wherein you requested under the Freedom of Information Act (FOIA) records concerning:

"...exchanges that Director McConnell or other ODNI officials have had with members of the Senate or House of Representatives concerning amendments to FISA..."

We accept your request and have assigned it the reference number above. Please use this number when corresponding with us so that we can identify it easily. In addition, your request for expedited processing is granted and your request will be processed as soon as practicable.

If you have any questions you may contact the FOIA Requester Service Center at 571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
   Orig - Adse
     1 - PIPD/DF-2007-00080 ACC

**FOIA\RFC 00080 DNI Hofmann ACC.doc**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1988 (ESH) |
| | ) | |
| DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## STIPULATED DISMISSAL OF PLAINTIFF'S SECOND CAUSE OF ACTION

Plaintiff Electronic Frontier Foundation (EFF) and Defendant Department of Homeland Security (DHS), by counsel, hereby stipulate and agree as follows:

1.    Defendant DHS has granted news media status to Plaintiff EFF based on the representations contained in EFF's FOIA requests, which demonstrate that EFF is an "entity that is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6). Defendant DHS will continue to regard Plaintiff EFF as a "representative of the news media" absent a change in circumstances that indicates that EFF is no longer an "entity that is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

2.    Accordingly, the parties herewith agree to the dismissal of Plaintiff EFF's Second Cause of Action, related to EFF's status as a "representative of the news media."

3.    The parties further agree that each will pay its own fees and costs for work on the dismissed claim.

SO STIPULATED AND AGREED this 27th day of February, 2007.

   _/s/ David L. Sobel_____
DAVID L. SOBEL
D.C. Bar 360418

MARCIA HOFMANN
D.C. Bar 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue, N.W.
Suite 650
Washington, D.C. 20009
(202) 797-9009

*Counsel for Plaintiff*

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
D.C. Bar 418925
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

   _/s/ John R. Coleman_____
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
. (202) 514-4505

*Counsel for Defendant*

-2-



**United States Department of State**

*Washington, D.C. 20520*

May 1, 2007
Case Number: 200701765

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W., Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is in response to your Freedom of Information Act (FOIA) request, dated March 19, 2007 for copies of documents concerning copyright matters between the U.S. and Canada.

We will begin the processing of your request based upon the information provided in your communication.  We will notify you as soon as responsive material has been retrieved and reviewed.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame or the date the search is initiated.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

By making a FOIA request, you have agreed to pay all applicable fees up to $25.00 unless a fee waiver has been granted.  You may

Office of Information Programs and Services
U.S. Department of State, SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1-202-261-8484
FAX: 1-202-261-8579
email: FOIAStatus@state.gov

-2-

specify a willingness to pay a greater or lesser amount. If the estimated fees exceed this limit, you will be notified.

Based upon the information that you have provided, we have placed you in the "news media" requester category. This category requires us to assess:

- duplication costs after first 100 pages.(see 22 CFR 171, enclosed)

Therefore, without an agreement to pay fees please be advised that your request will be processed without cost up to the required duplication of the first 100 pages.

Please let us know if you are willing to pay the fees that will incurred in the processing of your request. You may set a limit of the maximum amount that you wish to pay.

Based upon the information provided in your letter, your request for a fee waiver has been denied. If you wish to appeal this decision, you may write to the Chief, Requester Liaison Division, at the address given on the bottom of this page. Your appeal should address the points listed in the enclosed sheet entitled "Requests for Fee Waivers." Your appeal must be sent to us within 30 days from the date that you receive this letter.

While we will make every effort to meet the time limits cited in the Freedom of Information Act (5 USC § 552), unusual circumstances

Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

-3-

may arise for extending the time limit (see enclosure).  We appreciate your patience in this matter.

If you have any questions, please do not hesitate to contact us.  We can provide faster service if you include the case number of your request in your communications with us.

We are pleased to be of service to you.

Sincerely,

Katrina M. Wood
Requester Communications Branch

Enclosure: As stated.

Office of Information Programs and Services
U.S. Department of State  SA-2
Washington, DC 20522-8100
        Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

January 23, 2007

**BY FACSIMILE — (301) 688-4762**

National Security Agency
ATTN: FOIA Office (DC34)
9800 Savage Road STE 6248
Ft. George G. Meade, MD 20755-6248

        RE:    <u>Freedom of Information Act Request and</u>
                <u>Request for Expedited Processing</u>

Dear Sir or Madam:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the National Security Agency on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On January 9, 2007, the Washington Post reported:

> When Microsoft introduces its long-awaited Windows Vista operating system this month, it will have an unlikely partner to thank for making its flagship product safe and secure for millions of computer users across the world: the National Security Agency.
>
> For the first time, the giant software maker is acknowledging the help of the secretive agency, better known for eavesdropping on foreign officials and, more recently, U.S. citizens as part of the Bush administration's effort to combat terrorism. The agency said it has helped in the development of the security of Microsoft's new operating system -- the brains of a computer -- to protect it from worms, Trojan horses and other insidious computer attackers.

Alec Klein and Ellen Nakashima, "For Windows Vista Security, Microsoft Called in Pros," *Washington Post*, Jan. 9, 2007, at D01 (attached hereto).

We are seeking all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista").

---

1875 Connecticut Ave., NW · Suite 650 · Washington, DC 20009
📞 202 797 9009   📠 202 797 9066   🌐 www.eff.org   ✉ information@eff.org

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information that "is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." 32 CFR § 286.4(d)(3)(ii). According to DOD regulations, information is "urgently needed" when it "has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest." 32 CFR § 286.4(d)(3)(ii)(A). The information we request easily satisfies this standard.

The government activity at issue here — the NSA's involvement in the configuration of Microsoft's latest operating system — raises serious questions about the Department of Defense's interest in Vista's development. Indeed, the NSA's involvement in the system's configuration has already attracted substantial media interest since the publication of the *Washington Post* story. Specifically, a Google News search for "Vista and 'National Security Agency'" returned 67 results from news outlets throughout the world since January 9, 2007 (see first page of Google News search results attached hereto).

Furthermore, the *Washington Post* reported that Microsoft plans to make Vista available to consumers on January 30, 2007, and the system will likely be used by more than 600 million computer users by 2010. Thus, the information we request is unquestionably the subject of a breaking news story of general public interest particularly in the days leading to the product launch.

The purpose of this request is to obtain information directly relevant to the NSA's involvement in Vista's development, which has attracted considerable interest from the press and public in the past several days. The information we request is the subject of a breaking news story of general public interest, and therefore clearly meets the standard for expedited processing set forth in DOD regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 32 C.F.R. § 286.28(e)(7). In requesting this classification, we note that the Department of Homeland Security has recognized that EFF qualifies as a "news media" requester, based upon the publication activities set forth below (see DHS letter, attached hereto). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

2



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case: 52276
6 February 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, NW
Suite 650
Washington, DC 20009

Dear Ms. Hofmann:

This is an initial response to your Freedom of Information Act (FOIA) request submitted via facsimile on 23 January 2007, which was received by this office on 24 January 2007, for all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista"). Your request has been assigned Case Number 52276.

As we began to process your request, we realized that the first page of the actual request was missing from your 18-page facsimile package. On 1 February 2007, a member of my staff contacted you to advise you of this fact. As a result, you submitted another facsimile of your original five-page request, which we received and have begun to process. There is certain information relating to this processing about which the FOIA and applicable Department of Defense (DoD) and NSA/CSS regulations require we inform you.

For purposes of this request and based on the information you provided in your letter, you are considered a representative of the media. Unless you qualify for a fee waiver or reduction, you must pay for duplication in excess of the first 100 pages. Your request for a fee waiver has been granted. In addition, please be advised your request for expedited treatment has been accepted. We are currently in the process of searching for responsive documents and will notify you of the status of your request as soon as that search has been completed.

Correspondence related to your request should include the case number assigned to your request, which is included in the first paragraph of this letter. Your letter should be addressed to National Security Agency, FOIA Office

FOIA Case:  52276

(DC34), 9800 Savage Road STE 6248, Ft. George G. Meade, MD  20755-6248
or may be sent by facsimile to 443-479-3612.  If sent by fax, it should be
marked for the attention of the FOIA office.  The telephone number of the FOIA
office is 301-688-6527.

Sincerely,

*for* Marianne Stupar

PAMELA N. PHILLIPS
Chief
FOIA/PA Office

# EXHIBIT N

**EFF** **Electronic Frontier Foundation**

December 21, 2007

**VIA FACSIMILE** — (202) 305-4211

GayLa D. Sessoms, FOIA Coordinator
National Security Division
Department of Justice
Room 6150, 950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

RE:    **Freedom of Information Act Request and Request for Expedited Processing**

Dear Ms. Sessoms:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice National Security Division on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 5, 2007, President Bush signed into law the Protect America Act, legislation which amended the Foreign Intelligence Surveillance Act ("FISA") to expand the government's power to intercept communications without warrants, as well as shield telecommunications companies from future liability for their role in such activity.

Since the passage of this law, the Administration has tried to convince Congress to amend FISA to make it impossible for courts to impose liability on telecommunications companies for participating in a massive and illegal warrantless spying operation conducted by the National Security Agency. *See* Signing Statement, *President Bush Commends Congress on Passage of Intelligence Legislation*, Aug. 6, 2007; James Risen, Bush Signs Law to Widen Reach for Wiretapping, *NY Times*, Aug, 6, 2007; Mark Hosenball and Michael Isikoff, Case Dismissed?: The Secret Lobbying Campaign Your Phone Company Doesn't Want You to Know About, *Newsweek*, updated Sept. 26, 2007, *available at* http://www.newsweek.com/id/41142; Eric Lichtblau, James Risen and Scott Shane, Wider Spying Fuels Aid Plan for Telecom Industry, *NY Times*, Dec. 16, 2007.

We are seeking all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies[1] concerning amendments to FISA, including any discussion of immunizing

---

[1] The phrase "representatives or agents of telecommunications companies" is intended to include lobbyists and lawyers acting on behalf of such companies. According to Newsweek, these individuals may include, but are not limited to, "powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and

**454 Shotwell Street, San Francisco, CA  94110 USA**
**+1 415 436 9333 (v) +1 415 436 9993 (f) www.eff.org**

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 2

telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities.  This request includes, but is not limited to, all e-mail, appointment calendars, telephone message slips, or other records indicating that such briefings, discussions, or other exchanges took place.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information about which there is "[a]n urgency to inform the public about an actual or alleged federal government activity," and it is "made by a person primarily engaged in disseminating information."  28 C.F.R. § 16.5(d)(1)(ii).  The information we request easily satisfies this standard.

As an initial matter, it is worth noting that OLA recently granted expedited processing for two FOIA requests nearly identical to this one (see EFF request letters seeking expedited processing and OLA letter granting expedited processing attached hereto).

The federal government activity at issue here — DOJ efforts to secure immunity for telecoms engaged in illegal surveillance — raises serious questions about the DOJ's interests in revision of the FISA. Moreover, the Protect America Act includes a sunset provision requiring Congress to decide within weeks whether to reauthorize the legislation. This decisionmaking process has involved, and will continue to involve, congressional debate about whether to expand the law further, and if so, how much. Because Congress will imminently consider modifying FISA again, there is an urgency to inform the public about the lobbying forces pushing for reform of the law. The information we have requested will help the public and Congress fully participate in the current and ongoing debate over whether the government's authority to conduct electronic surveillance should be further expanded and facilitated by telecommunications companies.

The purpose of this request is to obtain information directly relevant to the DOJ's communications with members of Congress and telecommunications carriers about updating FISA to grant the companies retroactive immunity for illegal activities. There is an urgency to inform the public about the information we seek. Therefore, this request clearly meets the standard for expedited processing set forth in DOJ regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

---

U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T." Mark Hosenball and Michael Isikoff, *Case Dismissed?, Newsweek*, updated Sept. 26, 2007.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 3


**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6). In requesting this classification, we note that the Department of Homeland Security and Department of State have recognized that EFF qualifies as a "news media" requester based upon the publication activities set forth below (see DHS stipulation and State Department letter attached hereto). In addition, the National Security Agency has previously determined that EFF is not only a "news media requester," but also "primarily engaged in disseminating information" for purposes of expedited processing (see attached EFF FOIA request and NSA response, in which EFF requested expedited processing because it sought information "urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity," and NSA granted the request). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[4]

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Dec. 18, 2007).
[3] *Id.*
[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 4

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's in July 2007.

Due to these extensive publication activities, EFF is a "representative of the news media" under the FOIA and agency regulations.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, Department of Justice components determine whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the DOJ's relationship with telecommunications companies concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i). Furthermore, the DOJ's push to amend FISA unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on how and why the DOJ is lobbying to immunize telecommunications companies from liability for their role in conducting

Freedom of Information Act Request and Request for Expedited Processing
December 21, 2007
Page 5


illegal surveillance.

Third, the requested material will "contribute to public understanding" of the DOJ's efforts to modify FISA. 28 C.F.R. § 16.11(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the reasons why and manner in which the DOJ is lobbying for legal reform, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the DOJ's push to amend FISA to protect telecommunications companies. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Disclosure of the requested information will help inform the public about the Justice Department's efforts to reform the law and the interests behind them, as well as contribute to the public debate about whether FISA should be further modified.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Thank you for your consideration of this request. As applicable Department regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

                                        Sincerely,

                                        Marcia Hofmann
                                        Staff Attorney

Enclosures

**U.S. Department of Justice**

Office of Information and Privacy

_____

*Telephone: (202) 514-3642*                              *Washington, D.C. 20530*

Ms. Marcia Hofmann                                    AUG 2 7 2007
Electronic Frontier Foundation
Suite 650                                        Re:    OLA/07-R0909
1875 Connecticut Avenue, NW                             OLA/07-R0910
Washington, DC 20009                                    MLF:JNJ

Dear Ms. Hofmann:

        This is to acknowledge receipt of your two letters dated August 16, 2007, which were
received in this Office on August 17, 2007, in which you requested all records of
communications between the Department of Justice and Congress and between Justice and
telecommunications companies from December 2005 to the present concerning amendments to
the Foreign Intelligence Surveillance Act.  This response is made on behalf of the Office of
Legislative Affairs.

        I have determined that for purposes of these requests, it is appropriate to afford them
expedited processing.  At this time, your requests have been assigned to a FOIA Specialist in this
Office and a records search has been initiated in the Office of Legislative Affairs.

        We have not yet made a decision on your requests for fee waivers.  We will do so after
we determine whether fees will be assessed for these requests.

        If you have any questions or wish to discuss the processing of your requests, you may
contact Julie N. Johns, the analyst processing your requests, by telephone at the above number or
you may write to her at the above address.

                                Sincerely,

                                Carmen L. Mallon
                                Chief of Staff

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00079

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received your facsimile dated 31 August 2007, wherein you requested under the Freedom of Information Act (FOIA) records concerning:

> **". . . ODNI's communications with telecommunications companies about updating FISA to provide them retroactive legal immunity for illegal activities."**

We accept your request and have assigned it the reference number above. Please use this number when corresponding with us so that we can identify it easily. In addition, your request for expedited processing is granted and your request will be processed as soon as practicable.

If you have any questions you may contact the FOIA Requester Service Center at 571-204-4774.

Sincerely,

*John F. Hackett*

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
        1 - PIPD/DF-2007-00079 ACC

**FOIA\RFC 00079 DNI Hofmann ACC.doc**

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20009

Reference: DF-2007-00080

Dear Ms. Hofmann:

On 4 September 2007 the Office of the Director of National Intelligence received your facsimile dated 31 August 2007, wherein you requested under the Freedom of Information Act (FOIA) records concerning:

**". . .exchanges that Director McConnell or other ODNI officials have had with members of the Senate or House of Representatives concerning amendments to FISA . . ."**

We accept your request and have assigned it the reference number above. Please use this number when corresponding with us so that we can identify it easily. In addition, your request for expedited processing is granted and your request will be processed as soon as practicable.

If you have any questions you may contact the FOIA Requester Service Center at 571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

IMS/IRRG/PIPD/carey/.../6 September 2007

Distribution:
    Orig - Adse
       1 - PIPD/DF-2007-00080 ACC

**FOIA\RFC 00080 DNI Hofmann ACC.doc**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELECTRONIC FRONTIER )
FOUNDATION )
)
Plaintiff, )
)
v. ) Civil Action No. 06-1988 (ESH)
)
DEPARTMENT OF HOMELAND )
SECURITY, )
)
Defendant. )
)
_____ )

## STIPULATED DISMISSAL OF PLAINTIFF'S SECOND CAUSE OF ACTION

Plaintiff Electronic Frontier Foundation (EFF) and Defendant Department of Homeland

Security (DHS), by counsel, hereby stipulate and agree as follows:

1.      Defendant DHS has granted news media status to Plaintiff EFF based on the

representations contained in EFF's FOIA requests, which demonstrate that EFF is an "entity that

is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

Defendant DHS will continue to regard Plaintiff EFF as a "representative of the news media"

absent a change in circumstances that indicates that EFF is no longer an "entity that is organized

and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

2.      Accordingly, the parties herewith agree to the dismissal of Plaintiff EFF's Second

Cause of Action, related to EFF's status as a "representative of the news media."

3.      The parties further agree that each will pay its own fees and costs for work on the

dismissed claim.

SO STIPULATED AND AGREED this 27th day of February, 2007.

___/s/ David L. Sobel_____
DAVID L. SOBEL
D.C. Bar 360418

MARCIA HOFMANN
D.C. Bar 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue, N.W.
Suite 650
Washington, D.C. 20009
(202) 797-9009

*Counsel for Plaintiff*

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
D.C. Bar 418925
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

___/s/ John R. Coleman_____
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
(202) 514-4505

*Counsel for Defendant*

-2-



**United States Department of State**

*Washington, D.C. 20520*

May 1, 2007
Case Number: 200701765

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W., Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is in response to your Freedom of Information Act (FOIA) request, dated March 19, 2007 for copies of documents concerning copyright matters between the U.S. and Canada.

We will begin the processing of your request based upon the information provided in your communication.  We will notify you as soon as responsive material has been retrieved and reviewed.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame or the date the search is initiated.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

By making a FOIA request, you have agreed to pay all applicable fees up to $25.00 unless a fee waiver has been granted.  You may

Office of Information Programs and Services
U.S. Department of State  SA-2
Washington, DC 20522-8100
        Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

-2-

specify a willingness to pay a greater or lesser amount. If the estimated fees exceed this limit, you will be notified.

Based upon the information that you have provided, we have placed you in the "news media" requester category. This category requires us to assess:

- duplication costs after first 100 pages.(see 22 CFR 171, enclosed)

Therefore, without an agreement to pay fees please be advised that your request will be processed without cost up to the required duplication of the first 100 pages.

Please let us know if you are willing to pay the fees that will incurred in the processing of your request. You may set a limit of the maximum amount that you wish to pay.

Based upon the information provided in your letter, your request for a fee waiver has been denied. If you wish to appeal this decision, you may write to the Chief, Requester Liaison Division, at the address given on the bottom of this page. Your appeal should address the points listed in the enclosed sheet entitled "Requests for Fee Waivers." Your appeal must be sent to us within 30 days from the date that you receive this letter.

While we will make every effort to meet the time limits cited in the Freedom of Information Act (5 USC § 552), unusual circumstances

Office of Information Programs and Services
U.S. Department of State SA- 2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

- 3 -

may arise for extending the time limit (see enclosure).  We appreciate your patience in this matter.

If you have any questions, please do not hesitate to contact us.  We can provide faster service if you include the case number of your request in your communications with us.

We are pleased to be of service to you.

Sincerely,

Katrina M. Wood
Requester Communications Branch

Enclosure: As stated.

Office of Information Programs and Services
U.S. Department of State SA-2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8484
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov


**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

January 23, 2007

**BY FACSIMILE — (301) 688-4762**

National Security Agency
ATTN: FOIA Office (DC34)
9800 Savage Road STE 6248
Ft. George G. Meade, MD 20755-6248

RE:  Freedom of Information Act Request and
Request for Expedited Processing

Dear Sir or Madam:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the National Security Agency on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On January 9, 2007, the Washington Post reported:

> When Microsoft introduces its long-awaited Windows Vista operating system this month, it will have an unlikely partner to thank for making its flagship product safe and secure for millions of computer users across the world: the National Security Agency.

> For the first time, the giant software maker is acknowledging the help of the secretive agency, better known for eavesdropping on foreign officials and, more recently, U.S. citizens as part of the Bush administration's effort to combat terrorism. The agency said it has helped in the development of the security of Microsoft's new operating system -- the brains of a computer -- to protect it from worms, Trojan horses and other insidious computer attackers.

Alec Klein and Ellen Nakashima, "For Windows Vista Security, Microsoft Called in Pros," *Washington Post*, Jan. 9, 2007, at D01 (attached hereto).

We are seeking all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista").

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information that "is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." 32 CFR § 286.4(d)(3)(ii). According to DOD regulations, information is "urgently needed" when it "has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest." 32 CFR § 286.4(d)(3)(ii)(A). The information we request easily satisfies this standard.

The government activity at issue here — the NSA's involvement in the configuration of Microsoft's latest operating system — raises serious questions about the Department of Defense's interest in Vista's development. Indeed, the NSA's involvement in the system's configuration has already attracted substantial media interest since the publication of the *Washington Post* story. Specifically, a Google News search for "Vista and 'National Security Agency'" returned 67 results from news outlets throughout the world since January 9, 2007 (see first page of Google News search results attached hereto).

Furthermore, the *Washington Post* reported that Microsoft plans to make Vista available to consumers on January 30, 2007, and the system will likely be used by more than 600 million computer users by 2010. Thus, the information we request is unquestionably the subject of a breaking news story of general public interest particularly in the days leading to the product launch.

The purpose of this request is to obtain information directly relevant to the NSA's involvement in Vista's development, which has attracted considerable interest from the press and public in the past several days. The information we request is the subject of a breaking news story of general public interest, and therefore clearly meets the standard for expedited processing set forth in DOD regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 32 C.F.R. § 286.28(e)(7). In requesting this classification, we note that the Department of Homeland Security has recognized that EFF qualifies as a "news media" requester, based upon the publication activities set forth below (see DHS letter, attached hereto). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

2



**NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case: 52276
6 February 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, NW
Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is an initial response to your Freedom of Information Act (FOIA) request submitted via facsimile on 23 January 2007, which was received by this office on 24 January 2007, for all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista"). Your request has been assigned Case Number 52276.

As we began to process your request, we realized that the first page of the actual request was missing from your 18-page facsimile package. On 1 February 2007, a member of my staff contacted you to advise you of this fact. As a result, you submitted another facsimile of your original five-page request, which we received and have begun to process. There is certain information relating to this processing about which the FOIA and applicable Department of Defense (DoD) and NSA/CSS regulations require we inform you.

For purposes of this request and based on the information you provided in your letter, you are considered a representative of the media. Unless you qualify for a fee waiver or reduction, you must pay for duplication in excess of the first 100 pages. Your request for a fee waiver has been granted. In addition, please be advised your request for expedited treatment has been accepted. We are currently in the process of searching for responsive documents and will notify you of the status of your request as soon as that search has been completed.

Correspondence related to your request should include the case number assigned to your request, which is included in the first paragraph of this letter. Your letter should be addressed to National Security Agency, FOIA Office

FOIA Case: 52276

(DC34), 9800 Savage Road STE 6248, Ft. George G. Meade, MD  20755-6248 or may be sent by facsimile to 443-479-3612.  If sent by fax, it should be marked for the attention of the FOIA office.  The telephone number of the FOIA office is 301-688-6527.

Sincerely,

*for* Marianne Stupar

PAMELA N. PHILLIPS
Chief
FOIA/PA Office

EXHIBIT O



**U.S. Department of Justice**

Office of Information and Privacy

_____

*Telephone: (202) 514-3642*                          *Washington, D.C. 20530*

DEC 28 2007

Ms. Marcia Hofmann                          Re:    OAG/08-R0183
Electronic Frontier Foundation                     OLA/08-R0184
454 Shotwell Street                                OLP/08-R0185
San Francisco, CA 94110                            MAP:NDD

Dear Ms. Hofmann:

    This is to acknowledge receipt of your three letters dated December 21, 2007, which were received in this Office on December 27, 2007, in which you requested all records concerning communications Department of Justice officials had with Congress and/or telecommunications companies from September 1, 2007, to the present regarding amendments to the Foreign Intelligence Surveillance Act. This response is made on behalf of the Offices of the Attorney General, Legislative Affairs and Legal Policy.

    With regard to your requests for expedited processing, I have determined that for purposes of these requests, it is appropriate to afford them expedited processing. At this time, your requests have been assigned to a FOIA Specialist in this Office and record searches have been initiated in the Offices of the Attorney General, Legislative Affairs and Legal Policy.

    We have not yet made a decision on your requests for fee waivers. We will do so after we determine whether fees will be assessed for these requests.

    If you have any questions or wish to discuss the processing of your requests, you may contact Julie N. Johns, the analyst processing your requests, by telephone at the above number or you may write to her at the above address.

                Sincerely,

                Melanie Ann Pustay
                Director

EXHIBIT P

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE INTELLIGENCE STAFF

Mr. John F. Hackett
Chief, Information Management Office
Office of the Director of National Intelligence
Washington, DC 20511

JAN 0 7 2008

Ms. Marcia Hofmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Reference: DF-2008-00017

Dear Ms. Hofmann:

On 26 December 2007 the Office of the Director of National Intelligence received your facsimile dated 21 December 2007, wherein you requested under the Freedom of Information Act (FOIA):

> "... records from September 1, 2007 to the present concerning exchanges that Director McConnell or other ODNI officials have had with 1) members of the Senate or House of Representatives and 2) representatives of telecommunications companies concerning amendments to FISA..."

We accept your request and have assigned it the reference number above. Please use this number when corresponding with us so that we can identify it easily. In addition, your request for expedited processing is granted and your request will be processed as soon as practicable.

If you have any questions you may contact the FOIA Requester Service Center at 571-204-4774.

Sincerely,

John F. Hackett
Director, Information Management Office

# EXHIBIT Q

**U.S. Department of Justice**

Office of Legal Counsel

_Washington, D.C. 20530_

January 9, 2008

Marcia Hofmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dear Ms. Hofmann:

This is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated December 21, 2007.

You have requested expedited processing of your request pursuant to the Department's standards permitting expedition for requests involving "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." _See_ 28 C.F.R. § 16.5(d)(1)(ii). Based on the information you have provided, I have determined that your request for expedited processing under these standards should be granted. Your request has been assigned to a FOIA Specialist and searches have been initiated.

In an effort to speed up our searches, you may wish to narrow the scope of your request to limit the number of potentially responsive records. If you have any questions or wish to discuss the processing of your request, you may contact Bette Farris at 202-514-2038.

Sincerely,

Bradley T. Smith
Attorney-Adviser

# EXHIBIT R



**U.S. Department of Justice**

National Security Division

_Washington, D.C. 20530_

DEC 27 2007

Marcia Hofmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Re: FOIA/PA # 08-060

Dear Ms. Hofmann:

This is to acknowledge receipt of your letter dated December 21, 2007, requesting access to ""all records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA," et al. Your Freedom of Information Act request was received by this office on December 27, 2007.

Our policy is to process FOIA requests on a first-in, first-out basis. However, you requested expedited processing of your FOIA request and you will be notified once a determination is made. If you have any questions concerning your request, feel free to contact me on (202) 353-3092. Thank you in advance for your continuing patience.

Sincerely,

Theresa Crosland
FOIA Public Liaison

EXHIBIT S

**U.S. Department of Justice**

National Security Division

---

*Washington, D.C. 20530*

JAN 29 2008

Marcia Hofmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Re: FOIA/PA # 08-060

Dear Ms. Hofmann:

This is in further reference to your Freedom of Information Act request for access to "all records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA," et al. You also requested expedited processing of your request, and it has been granted. We have initiated a search for responsive records within all components of the National Security Division, and will notify you once our search is completed. If you have any questions concerning your request, feel free to contact me on (202) 353-3092. Thank you in advance for your continuing patience.

Sincerely,

Theresa Crosland
FOIA Public Liaison

EXHIBIT T

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELEC. FRONTIER FOUND.,

      Plaintiff,

            v.                                      Civil Action No.  07-0656 (JDB)

DEP'T OF JUSTICE,

      Defendant.

## ORDER

Plaintiff Electronic Frontier Foundation ("EFF") seeks a preliminary injunction that would require defendant United States Department of Justice ("DOJ") to process plaintiff's Freedom of Information Act ("FOIA") request within twenty days and provide a Vaughn index ten days later.  The FOIA request, submitted on March 12, 2007, is for records relating to the use of National Security Letters ("NSLs") by the Federal Bureau of Investigation ("FBI").  Expedited processing of the request was sought, see 28 C.F.R. § 16.5(d)(1)(iv), and on March 30, 2007, the FBI informed plaintiff that expedited processing had been granted because of the exceptional media interest involving issues of government integrity relating to a report by the DOJ Inspector General on the FBI's use of NSLs.[*]

Dissatisfied with the pace of the expedited processing, plaintiff filed this action and its motion for a preliminary injunction on April 10, 2007.  After full briefing of the motion, the

---

[*]Indeed, recent news reports concerning an ongoing internal FBI investigation into NSL abuses confirms that there is a continuing high level of public interest in this issue.  See Pl.'s Suppl. Mem. in Support of Pl.'s Proposal for a FOIA Production Schedule.

Court held a conference with the parties on May 21, 2007, at which it was clear that although there remained some distance between the two sides, DOJ was expediting its processing of this request ahead of all but two other FOIA requests pending at the FBI, and EFF no longer realistically expected the degree of expedition originally sought in its motion for a preliminary injunction.  The Court therefore ordered the parties to meet and confer on scheduling and to submit a joint, if possible, scheduling proposal or, more likely, competing proposals -- which the Court has now received from each side.  The Court now resolves EFF's pending motion and sets a processing schedule in light of the parties' competing proposals.

     1.  Expedited processing is underway at the FBI, based on the statutory directive that agencies must "process <u>as soon as practicable</u> any request for records to which [they have] granted expedited processing."  5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added); <u>see also</u> 28 C.F.R. § 16.5(d)(4) ("If a request for expedited processing is granted, the request shall be given priority and should be processed as soon as practicable.").  The pace and status of that expedited processing of EFF's request is described in two detailed declarations from David M. Hardy, the responsible FOIA official at the FBI.  As he explains, the volume of potentially responsive material is extensive (estimated at well over 100,000 pages), and the FBI's expedited processing is extraordinary (at least ten full-time employees assigned exclusively to this request), but nonetheless the <u>search</u> for records will not even be completed until August 24, 2007.  <u>See</u> Apr. 24, 2007, Decl. of David M. Hardy ¶¶ 26-28; May 25, 2007, Second Decl. of David M. Hardy ¶¶ 7-12.  DOJ therefore proposes a rolling basis for processing under the following schedule: the first response/release 45 days from this scheduling order; further responses/releases at 30-day intervals; 2000 pages processed every 30 days; the search for records completed by August 24,

2007; a report to the Court regarding the completion of processing on August 24, 2007; and a

<u>Vaughn</u> index and briefing schedule delayed until after that time.  <u>See</u> Def.'s Notice of Filing of

Proposed Scheduling Order and Second Decl. of David M. Hardy at 2.  EFF counters with a

somewhat more expedited processing proposal, also on a rolling basis: the first response/release

20 days from this scheduling order; further responses/releases at 15-day intervals; 1500 pages

processed every 15 days; (presumably) a report to the Court when processing is complete; a

<u>Vaughn</u> index 15 days after processing is complete; and DOJ's motion for summary judgment 30

days thereafter.  <u>See</u> Notice of Filing of Pl.'s Proposal for a FOIA Production Schedule at 3-4.

    2.  Some courts have used the preliminary injunction vehicle to order expedition of the

processing of FOIA requests, most often where the agency has denied expedition.  <u>See</u> <u>Elec.

Privacy Info. Ctr. v. Dep't of Justice</u>, 416 F. Supp. 2d 30, 42 (D.D.C. 2006); <u>Am. Civil Liberties

Union v. Dep't of Defense</u>, 339 F. Supp. 2d 501, 503 (S.D.N.Y. 2004); <u>see also, e.g.</u>, <u>Aguilera v.

FBI</u>, 941 F. Supp. 144, 152-53 (D.D.C. 1996) (reviewing agency's decision to deny expedition);

<u>Cleaver v. Kelley</u>, 427 F. Supp. 80, 81-82 (D.D.C. 1976) (same).  Other courts have declined to

employ preliminary injunctions, finding them generally inappropriate in FOIA settings.  <u>See</u>

<u>Elec. Privacy Info. Ctr. v. Dep't of Justice</u>, No. 03-cv-2078, slip op. at 1-2 (D.D.C. Oct. 20,

2003), <u>vacated as moot</u>, 2004 WL 2713119 (D.C. Cir. 2004); <u>Judicial Watch v. Dep't of Justice</u>,

No. 00-cv-1396, slip op. at 1-2 (D.D.C. June 27, 2000); <u>see also, e.g.</u>, <u>Al-Fayed v. CIA</u>, No. 00-

cv-2092, 2000 WL 34342564, at *6 (D.D.C. Sept. 20, 2000) (denying preliminary injunction

filed after agency denied expedited processing); <u>Assassination Archives & Research Ctr., Inc. v.

CIA</u>, No. 88-cv-2600, 1988 U.S. Dist. LEXIS 18606, at *1 (D.D.C. Sept. 29, 1988) (same).

Certainly, the vehicle of a preliminary injunction motion is an imperfect means to address what

is, in essence, a scheduling issue.  Moreover, the possibility of overuse, or even abuse, of preliminary injunction requests in the FOIA scheduling context is obvious.  Nonetheless, where a plaintiff contends in good faith that an agency has failed to expedite processing of a FOIA request in accordance with statute or regulation -- as seems to be the case here -- the availability of an order that effectively is an injunction, preliminary or otherwise, should not be foreclosed.

3.  Here, the Court concludes that it need not grapple with and resolve issues of the propriety of a preliminary injunction under the traditional four-factor test.  The FBI has granted expedited processing, the parties have now proposed competing but parallel expedited processing schedules that are not dramatically different, and the Court's task boils down to assessing which proposed schedule better comports with the "as soon as practicable" statutory and regulatory standard under the circumstances reflected in the record.  Upon consideration of the parties' proposals, the Hardy declarations, and that standard, the Court concludes that a schedule that is more expedited than DOJ requests, but not quite as expedited as EFF's latest proposal, is warranted under the circumstances.

4.  Accordingly, plaintiff's motion is **GRANTED IN PART AND DENIED IN PART**, and the following schedule is **ORDERED** for processing EFF's March 12, 2007, request:

    a.    processing, and resulting responses and releases, shall be on a "rolling basis" as agreed by EFF and DOJ;

    b.    DOJ and the FBI shall provide the first response/release within 20 days from this Order -- i.e., by not later than July 5, 2007 -- in light of the time that has already passed since filing of the Second Hardy Declaration and the parties' scheduling proposals;

c.  subsequent responses/releases shall be provided every 30 days, given that the preparation of a response every 15 days (as suggested by EFF) would be inefficient and unduly burdensome;

d.  the FBI shall process 2500 pages every 30 days;

e.  the search for responsive records shall be completed by August 10, 2007, given the somewhat lower volume of potentially responsive records reflected in the representations to the Court since the first Hardy Declaration and the slightly faster pace of processing the Court is requiring;

f.  DOJ shall file a report regarding the completion of the search for responsive records and the status of the ongoing processing of records by not later than August 14, 2007;

g.  the parties shall, by not later than August 20, 2007, meet and confer regarding the completion of processing, the provision of a Vaughn index, and a summary-judgment briefing schedule; and

h.  the parties shall file a joint scheduling proposal, or competing proposals if they cannot agree, by not later than August 24, 2007.

**SO ORDERED.**

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated: June 15, 2007

EXHIBIT U

# Director of National Intelligence

## FREEDOM OF INFORMATION ACT ANNUAL REPORT

## FISCAL YEAR 2007

[This report contains information in the format specified in Department of Justice guidance to the EFOIA.  Text in *italics* is the information provided in response to specified headings.]

## I.  Basic Information Regarding Report

A.  Name, title, address, and telephone number of person to be contacted with questions about the report.

> *Mr. John F. Hackett*
> *Director, Information Management Office*
> *Office of the Director of National Intelligence*
> *Washington D.C.  20511*
> *(703) 482-3610*

B.  Electronic address for report on the World Wide Web.

> *An electronic copy of this report will be posted to www.dni.gov*

C.  How to obtain a copy of the report in paper form.

> *Write to the above address.*

## II.  How to Make a FOIA Request

> *Submit a written request to the mail address above.  Transmission via facsimile also is acceptable - (703) 482-2144.  FOIA requests may also be submitted electronically to FOIA@dni.gov.*

A.  Names, addresses, and telephone numbers of all individual agency components and offices that receive FOIA requests.

> *The mailing address in section I. A., above, is the single, central office which receives all FOIA requests for the Director of National Intelligence. However, FOIA requests received by components of the ODNI are referred to Mr. Hackett.*

B.  Brief description of the agency's response-time ranges.

*For those FOIA cases closed between 10/01/2006 – 09/30/2007, 80% were closed within 0.31 years; median response time was 0.11 years; average response time was 0.23 years.*

*For those Privacy Act cases between 10/01/2006 – 09/30/2007, 80 % were closed within 0.43 years; median response time was 0.27 years; average response time was 0.31 years.*

C.  Brief description of why some requests are not granted.

*ODNI consistently protects, among other things, classified national security information and information relating to intelligence sources and methods, from release under the FOIA.  In addition, ODNI frequently receives requests for records which can not be accepted and processed because they predate the creation of the ODNI in April, 2005.  When possible, ODNI advises the requester regarding where a request for such records should be directed.*

## III.  Definitions of Terms and Acronyms Used in the Report

A.  Agency-specific acronyms or other terms.

*ODNI:  Office of the Director of National Intelligence.*

B.  Basic terms, expressed in common terminology.

1.  FOIA/PA Request – Freedom of Information Act/Privacy Act request. A FOIA request is generally a request for access to records concerning a third party, an organization, or a particular topic of interest.  A Privacy Act request is a request for records concerning oneself; such requests are also treated as FOIA requests.  (All requests for access to records, regardless of which law is cited by the requester, are included in this report.)

2.  Initial Request – a request to a federal agency for access to records under the Freedom of Information Act.

3.  Appeal – a request to a federal agency asking that it review at a higher administrative level a full denial or partial denial of access to records under the Freedom of Information Act, or any other FOIA determination such as a matter pertaining to fees.

4.  Processed Request or Appeal – a request or appeal for which an agency has taken a final action on the request or the appeal in all respects.

5.  Multi-track Processing – a system in which simple requests requiring relatively minimal review are placed in one processing track and more voluminous and

complex requests are placed in one or more other tracks. Requests in each track are processed on a first-in/first-out basis. A requester who has an urgent need for records may request expedited processing (see below).

6.  Expedited Processing – an agency will process a FOIA request on an expedited basis when a requester has shown an exceptional need or urgency for the records which warrants prioritization of his or her request over other requests that were made earlier.

7.  Simple Request – a FOIA request that an agency using multi-track processing places in its fastest (non-expedited) track based on the volume and/or simplicity of records requested.

8.  Complex Request – a FOIA request that an agency using multi-track processing places in a slower track based on the volume and/or complexity of records requested.

9.  Grant – an agency decision to disclose all records in full in response to a FOIA request.

10.  Partial Grant – an agency decision to disclose a record in part in response to a FOIA request, deleting information determined to be exempt under one or more of the FOIA exemptions; or a decision to disclose some records in their entireties, but to withhold others in whole or in part.

11.  Denial – an agency decision not to release any part of a record or records in response to a FOIA request because all the information in the requested records is determined by the agency to be exempt under one or more of the FOIA's exemptions, or for some procedural reason (such as because no record is located in response to a FOIA request).

12.  Time Limits – the time period in the Freedom of Information Act for an agency to respond to a FOIA request (ordinarily 20 working days from proper receipt of a "perfected" FOIA request).

13.  "Perfected" Request – a FOIA request for records which adequately describes the records sought, which has been received by the FOIA office of the agency or agency component in possession of the records, and for which there is no remaining question about the payment of applicable fees.

14.  Exemption 3 Statute – a separate federal statute prohibiting the disclosure of a certain type of information and authorizing its withholding under FOIA subsection (b)(3).

15. Median Number – the middle, not average, number. For example, of 3, 7, and 14, the median number is 7.

16. Average Number – the number obtained by dividing the sum of a group of numbers by the quantity of numbers in the group.  For example, of 3, 7, and 14, the average number is 8.

## IV.  Exemption 3 Statutes

List of Exemption 3 Statutes relied on by agency during current fiscal year.

(1)  *Section 102A(i) of the National Security Act of 1947, as amended, codified at 50 U.S.C.A. § 403-1(i).*

1.  Brief description of type(s) of information withheld under each statute.

Information that would reveal intelligence sources and methods was withheld pursuant to the National Security Act of 1947.

2.  Statement of whether a court has upheld the use of each statute.  If so, cite example.

*Courts have upheld the use of the following statute:*

*CIA v. Sims, 471 U.S. 159 (1985), National Security Act of 1947.*

*See "U.S. Department of Justice Freedom of Information Act Guide and Privacy Act Overview" for additional examples.*

## V.  Initial FOIA/PA Access Requests

A.  Numbers of initial requests.

1.  Requests pending as of end of preceding year:  24

2.  Requests received during current fiscal year:  103

3.  Requests processed during current fiscal year:  77

4.  Requests pending as of end of current fiscal year:  50

B.  Disposition of initial requests.

1.  Number of total grants:  7

2.  Number of partial grants:  3

4

3.  Number of denials:  10

Number of times each FOIA exemption used (counting each exemption once per request):

(1) Exemption 1:  3

(2) Exemption 2:  2

(3) Exemption 3:  1

(4) Exemption 4:  1

(5) Exemption 5:  3

(6) Exemption 6:  4

(7) Exemption 7(a):  0

(8) Exemption 7(b):  0

(9) Exemption 7(c):  0

(10) Exemption 7(d):  0

(11) Exemption 7(e):  0

(12) Exemption 7(f):  0

(13) Exemption 8:  0

(14) Exemption 9:  0

4.  Other reasons for nondisclosure (total):

a.  no records:  17

b.  referrals:  18

c.  request withdrawn:   0

d.  fee-related reason:  *N/A*

e.  records not reasonably described:  0

     f.  not a proper FOIA request for some other reason:  0

     g.  not an agency record:  0

     h.  duplicate request:  0

     i.  other:  *Cancellations*:  22

## VI.  Appeals of Initial Denials of FOIA/PA Requests

    A.  Numbers of appeals.

        1.  Number of appeals received during fiscal year:  4

        2.  Number of appeals processed during fiscal year:  1

    B.  Disposition of appeals.

        1. Number completely upheld:  *0*

        2. Number partially reversed:  *0*

        3. Number completely reversed:  *0*

           Number of times each FOIA exemption used (counting each exemption once per appeal): 0

           (1) Exemption 1:  *N/A*

           (2) Exemption 2:  *N/A*

           (3) Exemption 3:  *N/A*

           (4) Exemption 4:  *N/A*

           (5) Exemption 5:  *N/A*

           (6) Exemption 6:  *N/A*

           (7) Exemption 7(A):  *N/A*

           (8) Exemption 7(B):  *N/A*

           (9) Exemption 7(C):  *N/A*

           (10) Exemption 7(D):  *N/A*

(11) Exemption 7(E):  *N/A*

(12) Exemption 7(F):  *N/A*

(13) Exemption 8:  *N/A*

(14) Exemption 9:  *N/A*

4.  Other reasons for nondisclosure (total): 1

    a.  no records:  *1*

    b.  referrals:  *N/A*

    c.  request withdrawn:  *N/A*

    d.  fee-related reason:  *N/A*

    e.  records not reasonably described:  *N/A*

    f.  not a proper FOIA request for some other reason:  *N/A*

    g.  not an agency record:  *N/A*

    h.  duplicate request:  *N/A*

    i.  other:  *N/A*

**VII.  Compliance With Time Limits/Status of Pending Requests**

*A.*  Median processing time for requests processed during the year.

1.  Simple requests.

    a.  number of requests processed:  *20*

    b.  median number of days to process:  *8*

2.  Complex request.

    a.  number of requests processed:  55

    b.  median number of days to process:  *81*

3.  Requests accorded expedited processing.  2

        a.  number of requests processed:  0

        b.  median number of days to process:  *N/A*

  B.  Status of pending requests.

      1.  Requests pending as of end of current fiscal year:  50

      2.  Median number of days that such requests were pending as of that date:  81

## VIII.  Comparisons With Previous Year(s)

  A.  Comparison of number of requests received:  *103 in FY'07 vs. 44 in FY'06*

  *B.*  Comparison of number of requests processed:  *77 in FY'076 vs. 20 in FY'06*

  C.  Comparison of median numbers of days requests were pending as of end of fiscal year:  *FOIA – 75;  PA - 82*

  D.  Other statistics significant to agency:  *N/A*

## IX.  Costs/FOIA Staffing

  A.  Staffing levels.

      1.  Number of full-time FOIA personnel:  .33

      2.  Number of personnel with part-time or occasional FOIA duties (estimated FTE):  *.46*

      3.  Total estimated number of personnel (FTE):  *.79*

  B.  Total estimated costs (including staff and all resources).

      1.  FOIA processing (including appeals):  $81,922

      2.  Litigation-related activities:  $0

      3.  Total estimated costs:  *$81,922*

  C.  Statement of additional resources needed for FOIA compliance (optional)

      1.  ODNI published its final FOIA Regulations to the Federal Register in

August 2007 and currently has a draft of its Privacy Act Regulations available for comment in the Federal Register.  Total estimated costs for the development of these publications was $7,505.

**X.  Fees**

    A.  Total amount of fees collected by agency for processing requests:  *$0.00*

    B.  Percentage of total costs:  *N/A*

**XI.  FOIA Regulations (Including Fee Schedule)**

The ODNI began operations when Ambassador John D. Negroponte was confirmed as the first Director of National Intelligence and sworn in on 21 April 2005. Final FOIA Regulations were published in the Federal Register, 32 CFR, Chapter XVII, in August 2007.

**XII.  Report on FOIA Executive Order Implementation**

The Office of the Director of National Intelligence made significant progress improving its FOIA processes and procedures as required by EO 13392, *Improving Agency Disclosure of Information.* During FY07, the ODNI received a surge of FOIA and Privacy Act requests. Despite this increase, the FOIA office, with a small staff, was able to implement the planned improvements that were submitted in June 2006.

**A. Description of supplementation/modification of agency improvement plan (if applicable)**

Not applicable

**B. Report on the ODNI's implementation of its FOIA Improvement Plan**

The ODNI's FOIA Improvement Plan focused on three areas of improvement, *Affirmative and Proactive Disclosures; Overall FOIA Web Site Improvements; and the Centralization of the FOIA Process*. During the reporting period the Office was able to meet all of its milestones in its improvement areas.

*Affirmative and Proactive Disclosure*

 The ODNI met and completed all milestones in this improvement area including preliminary review of current materials to be posted on its public website and began routine posting of materials of interest to the public. Just as it did previously, during this reporting period, the Office increased content to its public website and to the websites of its components.

*Overall web site Improvements*

During this reporting period, standards for producing public website content were promulgated through the Office by the ODNI's Public Affairs staff.  The Office continues to work on internal final policies regarding technology standards for the creation, formatting, and maintenance of new ODNI websites.   We consistently review our FOIA website for formatting, fonts and navigation and have made changes as necessary to make the web page more customer-friendly. In addition, we have ensured that each of our component offices have a clear link to our FOIA web page for easy navigation.

*Centralization of the FOIA Process*

The ODNI has now met its milestones in the *Centralization of the FOIA Process* improvement area.  Final FOIA regulations were published in the Federal Register on August 16, 2007.  A FOIA Handbook was completed and posted to the ODNI website and an internal instruction on the FOIA and PA was finalized.

**C. Identification and discussion of any deficiency in meeting plan milestones**

At this time, ODNI has met its milestones as outlined in its FOIA Improvement Plan as required by EO 13392, *Improving Agency Disclosure of Information.*

*D. Other Executive Order Activities*

During the reporting period, the office witnessed a surge in FOIA requests due to the public's interest in the ODNI's work. To respond to requests as quickly as possible, the office acknowledged, clarified and responded to requests by telephone, e-mail, and fax in addition to US mail. The Office also posted items of high interest to its web site as quickly as possible, including DNI statements and speeches. The ODNI also continues to work with the CIA, the ODNI's outsource provider, to streamline processes and procedures to better provide service to the public.

*E. Concise Descriptions of FOIA Exemptions*

- (b)(1) exempts from disclosure material properly classified, pursuant to an Executive Order, because it is related to matters of national defense or foreign policy;

- (b)(2) exempts from disclosure information which pertains solely to the internal personnel rules and practices of the Agency;

- (b)(3) exempts from disclosure materials that another federal statute protects, provided that the other federal statute either requires that the matters be withheld, or establishes particular criteria for withholding or refers to particular types of matters to be withheld

- (b)(4) exempts from disclosure trade secrets and commercial or financial information obtained from a person that is  privileged or confidential ;

- (b)(5) exempts from disclosure inter-and intra-agency communications that are protected by certain legal privileges;

- (b)(6) exempts from disclosure material that would be an unwarranted invasion of the personal privacy of other individuals;

- (b)(7) exempts from disclosure law enforcement investigatory records that, if released, would either (A) interfere with enforcement proceedings, (B) deprive a person of the right to a fair trial; (C) be an unwarranted invasion of personal privacy; (D) identify a confidential source; (E) reveal investigative techniques and procedures; or (F) endanger someone's life or physical safety.

- (b)(8) exempts from disclosure information contained in reports or examinations of an agency responsible for regulating or supervising banks, savings and loans, or other financial institutions.

- (b)(9) exempts from disclosure information about wells.

**F. Additional Statistics:**

   **1. Ten Oldest Pending FOIA Requests**

| Calendar Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Requests | 0 | 0 | 0 | 0 | 0 | 0 | Feb 21 Apr 21 Jul13 Aug 10 Oct 2 Oct 2 Nov 11 Dec 13 | Jan 3 Jan 26 |

   **2. Consultations**

     a. <u>Number of Consultations Received, Processed, and Pending</u>

| Consultations Received From Other Agencies During FY07 | Consultations Received From Other Agencies That Were Processed by Your Agency During FY07 (includes those received prior to FY07) | Consultations Received From Other Agencies That Were Pending At Your Agency as of October 1, 2007 (includes those received prior to FY07) |
|---|---|---|
| 7 | 7 | 0 |

11

b.   <u>Ten Oldest Pending Consultations Received From Other Agencies</u>

| Calendar Year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|
| Consults Recieved | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**G.  Agency Improvement Plan**

A copy of the ODNI's FOIA Improvement Plan can be found at
www.DNI.gov/FOIA_Review.pdf.

# EXHIBIT V

## VII.  COMPLIANCE WITH TIME LIMITS/STATUS OF PENDING REQUESTS
### A.  Median Processing Time for Requests Processed During the Year

| | SIMPLE REQUESTS | | COMPLEX REQUESTS | | REQUESTS ACCORDED EXPEDITED PROCESSING | |
|---|---|---|---|---|---|---|
| | NUMBER OF REQUESTS PROCESSED | MEDIAN NUMBER OF DAYS TO PROCESS | NUMBER OF REQUESTS PROCESSED | MEDIAN NUMBER OF DAYS TO PROCESS | NUMBER OF REQUESTS PROCESSED | MEDIAN NUMBER OF DAYS TO PROCESS |
| Office of the AG | 210 | 49 | 45 | 717 | 12 | 179 |
| Office of the DAG | 99 | 90 | 33 | 819 | 8 | 193 |
| Office of the Assoc. AG | 35 | 34 | 6 | 483 | 2 | 288 |
| | | | | | | |
| Antitrust | 105 | 19 | 38 | 476 | 2 | 10 |
| ATF | 1,567 | 8 | n/a | n/a | n/a | n/a |
| BOP | 14,441 | 13 | 571 | 36 | 18 | 2 |
| Civil | n/a | n/a | 357 | 22 | 2 | 27 |
| Civil Rights | 565 | 5 | 6 | 59 | 0 | 0 |
| CRS | 13 | 10 | 0 | n/a | 0 | n/a |
| Criminal | n/a | n/a | 1,166 | 31 | 1 | 10 |
| DEA | n/a | n/a | 1,568 | 42 | n/a | n/a |
| ENRD | n/a | n/a | 136 | 43 | 0 | n/a |
| EOIR | 10,573 | 17 | 1,249 | 51 | 20 | 20 |
| EOUSA | 3,999 | 175 | n/a | n/a | 26 | 363 |
| EOUST | n/a | n/a | 31 | 31 | 0 | n/a |
| FBI | * | * | * | * | 27 | 64 |
| FCSC | 10 | 1 | 0 | 0 | 0 | 0 |
| JMD | 385 | n/a | 2 | 21 | 0 | 0 |
| NDIC | 40 | 19 | 0 | 0 | 0 | 0 |
| COPS | 45 | 7 | 0 | n/a | 0 | n/a |
| ODR | 12 | 2.5 | 0 | n/a | 0 | n/a |
| OFDT | 36 | 7 | 2 | 85 | 0 | n/a |
| OIP | 416 | 17 | 8 | 660 | 1 | 45 |
| OIG | 202 | 8.5 | n/a | n/a | n/a | n/a |
| NSD | 121 | 6 | 25 | 77 | 3 | 23 |
| OIPL | 11 | 52 | 1 | 39 | 0 | 0 |
| OJP | 336 | 12 | 113 | 45 | 0 | 0 |
| OLC | 50 | 10 | 16 | 60 | 0 | 0 |
| OLP | 108 | 58 | 8 | 483 | 2 | 159 |
| OLA | 41 | 131 | 11 | 289 | 8 | 88 |
| Pardon Attorney | 60 | 4 | 0 | 0 | 0 | 0 |
| OPR | 57 | 15 | 6 | 421 | 1 | 14 |
| Public Affairs | 23 | 26 | 4 | 633 | 2 | 167 |
| OSG | 105 | 60 | 0 | n/a | 40 | 10 |
| OVW | 33 | 17 | 0 | 0 | 0 | 0 |
| PRAO | 13 | 13 | 0 | n/a | 0 | n/a |
| Tax | 178 | 8 | 3 | 30 | 0 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| USMS | 1,073 | 7 | 11 | 63 | 7 | 3 |
| USNCB | 166 | 10 | 13 | 20 | 1 | 3 |
| USPC | 0 | 0 | 867 | 5 | 0 | 0 |
| | | | | | |
| Totals | 35,128 | n/a | 6,296 | n/a | 183 | n/a |

*The FBI maintains three tracks for requests:
Small requests/Median days -- 11,870/8;
Medium requests/Median days 360/268;
Large requests/Median days -- 52/484

## VII.  COMPLIANCE WITH TIME LIMITS/STATUS OF PENDING REQUESTS
### B.  Status of Pending Requests

| | SIMPLE REQUESTS | | COMPLEX REQUESTS | | REQUESTS ACCORDED EXPEDITED PROCESSING | |
|---|---|---|---|---|---|---|
| | NUMBER OF REQUESTS PENDING | MEDIAN NUMBER OF DAYS PENDING | NUMBER OF REQUESTS PENDING | MEDIAN NUMBER OF DAYS PENDING | NUMBER OF REQUESTS PENDING | MEDIAN NUMBER OF DAYS TO PROCESS |
| Office of the AG | 88 | 149 | 36 | 539 | 12 | 197 |
| Office of the DAG | 60 | 129 | 15 | 662 | 12 | 299 |
| Office of the Assoc. AG | 10 | 126 | 3 | 559 | 0 | 0 |
| | | | | | | |
| Antitrust | 3 | 4 | 45 | 409 | 0 | 0 |
| ATF | 66 | 39 | n/a | n/a | n/a | n/a |
| BOP | 959 | 7 | 58 | 23 | 0 | 0 |
| Civil | n/a | n/a | 9 | 25 | 0 | n/a |
| Civil Rights | 20 | 22 | 21 | 68 | 0 | 0 |
| CRS | 0 | n/a | 0 | n/a | 0 | n/a |
| Criminal | n/a | n/a | 832 | 737 | 0 | 0 |
| DEA | n/a | n/a | 383 | 77 | n/a | n/a |
| ENRD | n/a | n/a | 26 | 53.5 | 0 | n/a |
| EOIR | 834 | 31 | 126 | 59 | 2 | 12.5 |
| EOUSA | 1,684 | 496 | | | 28 | 791 |
| EOUST | n/a | n/a | 29 | 56 | n/a | n/a |
| FBI | * | * | * | * | 6 | 89 |
| FCSC | 0 | 0 | n/a | | n/a | |
| JMD | 33 | 74 | 0 | 0 | 0 | 0 |
| NDIC | 6 | 27 | 0 | 0 | 0 | 0 |
| COPS | 0 | | 0 | n/a | 0 | n/a |
| ODR | 0 | n/a | 0 | n/a | 0 | n/a |
| OFDT | 0 | | 2 | 61 | 0 | 0 |
| OIP | 25 | 127 | 2 | 73 | 0 | 0 |
| OIG | 17 | 48.5 | n/a | n/a | n/a | n/a |

| | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| NSD | 7 | 20 | 13 | 120 | 0 | 0 |
| OIPL | 2 | 40 | 1 | 581 | 0 | 0 |
| OJP | 3 | 57 | 14 | 105 | 0 | 0 |
| OLC | 6 | 20 | 5 | 60 | 1 | 60 |
| OLP | 27 | 12 | 5 | 590 | 2 | 119 |
| OLA | 34 | 103 | 8 | 206 | 7 | 197 |
| Pardon Attorney | 0 | 0 | 0 | 0 | 0 | 0 |
| OPR | 15 | 79 | 3 | 343 | 0 | 0 |
| Public Affairs | 4 | 173 | 1 | 461 | 0 | 0 |
| OSG | 5 | 30 | | | 0 | n/a |
| OVW | 1 | | 0 | 0 | 0 | 0 |
| PRAO | 1 | 1 | 0 | n/a | 0 | n/a |
| Tax | 3 | 4 | 6 | 63 | 0 | 0 |
| USMS | 26 | 22 | 2 | 151 | 0 | 0 |
| USNCB | 0 | 0 | 0 | 0 | 0 | 0 |
| USPC | | | 48 | 45 | 0 | |
| | | | | | | |
| Totals | 3,939 | n/a | 1,693 | n/a | 70 | n/a |

*The FBI maintains three tracks for requests:
Small requests/Median days -- 1,499/139;
Medium requests/Median days 369/249;
Large requests/Median days -- 79/252


Go to:  Table of Contents