1  Marcia Hofmann (SBN 250087)
   *marcia@eff.org*
2  ELECTRONIC FRONTIER FOUNDATION
   454 Shotwell Street
3  San Francisco, CA 94110
   Telephone: (415) 436-9333
4  Facsimile: (415) 436-9993

5  David L. Sobel *(pro hac vice)*
   *sobel@eff.org*
6  ELECTRONIC FRONTIER FOUNDATION
   1875 Connecticut Ave. NW
7  Suite 650
   Washington, DC  20009
8  Telephone: (202) 797-9009 x104
   Facsimile: (202) 707-9066

9
   Attorneys for Plaintiff
10 ELECTRONIC FRONTIER FOUNDATION

11

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN FRANCISCO DIVISION**

15 ELECTRONIC FRONTIER FOUNDATION,      )   NO. 3:08-1023 JSW
                                        )
16                         Plaintiff,   )   **DECLARATION OF MARCIA
                                        )   HOFMANN IN SUPPORT OF REPLY IN
17        v.                            )   SUPPORT OF MOTION FOR A
                                        )   PRELIMINARY INJUNCTION**
18 OFFICE OF THE DIRECTOR OF NATIONAL   )
   INTELLIGENCE                         )
19                                      )
                                        )   Judge:      The Hon. Jeffrey S. White
20    and                              )   Date:       April 4, 2008
                                        )   Time:       9:00 a.m.
21 DEPARTMENT OF JUSTICE,               )   Courtroom:  Courtroom 2, 17th Floor
                                        )
22                         Defendants.  )
                                        )
23

24

25

26

27

28

1.    I am an attorney of record for the plaintiff in this matter and a member in good standing of the California State Bar, and am admitted to practice before this Court.  I have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

2.    Attached hereto as Exhibit A is a true and correct copy of a letter from GayLa D. Sessoms, FOIA Coordinator, National Security Division, U.S. Department of Justice to Marcia Hofmann, Staff Attorney, Electronic Frontier Foundation dated March 21, 2008.

3.    Attached hereto as Exhibit B is a true and correct copy of a letter from Marcia Hofmann, Staff Attorney, Electronic Frontier Foundation to Andrew I. Warden, Trial Attorney, U.S. Department of Justice, dated March 24, 2008.

4.    Attached hereto as Exhibit C is a true and correct copy of a letter from Attorney General Michael B. Mukasey and Director of National Intelligence J.M. McConnell to the Honorable Silvestre Reyes, Chairman House Permanent Select Committee on Intelligence, dated February 22, 2008, available at http://www.lifeandliberty.gov/docs/ag-dni-letter-to-chairman-reyes.pdf.

5.    Attached hereto as Exhibit D is a true and correct copy of a presidential statement entitled President Bush Discusses FISA, March 13, 2008, available at http://www.whitehouse.gov/news/releases/2008/03/20080313.html.

6.    Attached hereto as Exhibit E is a true and correct copy a statement by White House Press Secretary Dana Perino entitled Statement by the Press Secretary, March 11, 2008 available at http://www.whitehouse.gov/news/releases/2008/03/20080311-7.html.

7.    Attached hereto as Exhibit F is a true and correct copy of a letter from Senators Patrick Leahy and Arlen Specter to Attorney General Alberto Gonzales, dated May 21, 2007, available at http://leahy.senate.gov/press/200705/5-21-07%20PJL%20AS%20ltr%20to%20AG.pdf.

8.    Attached hereto as Exhibit G is a true and correct copy of a letter from Senators Patrick Leahy and Arlen Specter to Fred Fielding, Counsel to the President, dated October 22, 2007, available at http://leahy.senate.gov/press/200710/10-22-07%20PJL-AS%20ltr%20to%20Fielding.pdf.

DECL. OF MARCIA HOFMANN
IN SUPPORT OF REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ.

1   I declare under penalty of perjury of the laws of the State of California that the foregoing is

2   true and correct to the best of my knowledge and belief.   Executed March 25, 2008 in San

3   Francisco, California.

4                                             */s/ Marcia Hofmann*
                                             Marcia Hofmann
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



**U.S. Department of Justice**

National Security Division

---

*Washington, D.C. 20530*

MAR 2 1 2008

Marcia Hofmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA. 94110

Re: FOIA #08-060

Dear Ms. Hofmann:

This is in further reference to your Freedom of Information Act (FOIA) request seeking access to "all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities."

We have completed a search for records within the National Security Division offices reasonably likely to maintain records responsive to your request, including the Office of Intelligence Policy and Review, the Law and Policy Office and the Front Office. Twenty-five hundred pages of material have been identified and the review of these documents has been initiated. A significant volume of this material includes various *Statements* and *Written Testimony* by the Assistant Attorney General for National Security before Congress and the multiple drafts that were generated during the course of finalizing these statements. Please advise this office if you would like all of the draft *Statements* and *Written Testimony* reviewed in connection with your request. We will focus initially on the review of unclassified records as well as records that do not contain third agency equities, and provide an interim response to you no later than April 11, 2008. Feel free to contact me at 202-616-5460, if you have any questions.

Sincerely,

GayLa D. Sessoms
FOIA Coordinator

# EXHIBIT B



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

March 24, 2008

**BY EMAIL AND FIRST CLASS MAIL**

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530

> **Re:    *Electronic Frontier Foundation v. Office of the Director of National Intelligence et al.*, 08-1023 JSW (N.D. Cal. filed Feb. 20, 2008)**

Dear Mr. Warden:

I am writing in response to a March 21, 2008 letter from the Department of Justice National Security Division ("NSD") (attached hereto) concerning the Electronic Frontier Foundation's December 21, 2007 Freedom of Information Act ("FOIA") request, which seeks access to "all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities." As you know, this FOIA request is one of several at issue in *Electronic Frontier Foundation v. Office of the Director of National Intelligence et al.*, 08-1023 JSW (N.D. Cal. filed Feb. 20, 2008).

NSD reports that it has completed its search for records and has located 2,500 pages responsive to the request, which are currently under review. According to NSD, "[a] significant volume of this material includes various *Statements* and *Written Testimony* by the Assistant Attorney General for National Security before Congress and the multiple draft that were generated during the course of finalizing these documents. Please advise this office if you would like all of the draft *Statements* and *Written Testimony* reviewed in connection with your request." (Emphases in original).

The Electronic Frontier Foundation is willing to remove not only drafts of the various statements and written testimony from the scope of the request, but any finalized versions of these documents that are publicly available, provided that NSD is willing to let us know where we can access them.

We expect that this agreement will substantially decrease the number of pages that NSD will need to review, and therefore should drastically reduce the amount of time necessary for NSD to process the Electronic Frontier Foundation's December 21, 2007 request.

If you would like to discuss or have any questions or concerns, please do not hesitate to contact me at (415) 436-9333 x. 116.

Regards,

Marcia Hofmann
Staff Attorney

Enclosure

**U.S. Department of Justice**

National Security Division

---

*Washington, D.C. 20530*

MAR 2 1 2008

Marcia Hofmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA. 94110

Re: FOIA #08-060

Dear Ms. Hofmann:

This is in further reference to your Freedom of Information Act (FOIA) request seeking access to "all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that Justice Department officials have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities."

We have completed a search for records within the National Security Division offices reasonably likely to maintain records responsive to your request, including the Office of Intelligence Policy and Review, the Law and Policy Office and the Front Office. Twenty-five hundred pages of material have been identified and the review of these documents has been initiated. A significant volume of this material includes various *Statements* and *Written Testimony* by the Assistant Attorney General for National Security before Congress and the multiple drafts that were generated during the course of finalizing these statements. Please advise this office if you would like all of the draft *Statements* and *Written Testimony* reviewed in connection with your request. We will focus initially on the review of unclassified records as well as records that do not contain third agency equities, and provide an interim response to you no later than April 11, 2008. Feel free to contact me at 202-616-5460, if you have any questions.

Sincerely,

GayLa D. Sessoms
FOIA Coordinator

EXHIBIT C

February 22, 2008

The Honorable Silvestre Reyes
Chairman
House Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Reyes,

The President asked us to respond to your letter of February 14, 2008, concerning the urgent need to modernize the Foreign Intelligence Surveillance Act of 1978 (FISA). Your assertion that there is no harm in allowing the temporary authorities provided by the Protect America Act to expire without enacting the Senate's FISA reform bill is inaccurate and based on a number of misunderstandings concerning our intelligence capabilities. We address those misunderstandings below. We hope that you find this letter helpful and that you will reconsider your opposition to the bill passed last week by a strong bipartisan majority in the Senate and, when Congress returns from its recess, support immediately bringing the Senate bill to the floor, where it enjoys the support of a majority of your fellow members. It is critical to our national security that Congress acts as soon as possible to pass the Senate bill.

<u>Intelligence Collection</u>

Our experience since Congress allowed the Protect America Act to expire without passing the bipartisan Senate bill demonstrates why the Nation is now more vulnerable to terrorist attack and other foreign threats. In our letter to Senator Reid on February 5, 2008, we explained that: "the expiration of the authorities in the Protect America Act would plunge critical intelligence programs into a state of uncertainty which could cause us to delay the gathering of, or simply miss, critical foreign intelligence information." <u>That is exactly what has happened since the Protect America Act expired six days ago without enactment of the bipartisan Senate bill. We have lost intelligence information this past week as a direct result of the uncertainty created by Congress' failure to act.</u> Because of this uncertainty, some partners have reduced cooperation. In particular, they have delayed or refused compliance with our requests to initiate new surveillances of terrorist and other foreign intelligence targets under existing directives issued pursuant to the Protect America Act. Although most partners intend to cooperate for the time being, they have expressed deep misgivings about doing so in light of the uncertainty and have indicated that they may well cease to cooperate if the uncertainty persists. We are working to mitigate these problems and are hopeful that our efforts will be successful. Nevertheless, the broader uncertainty caused by the Act's expiration will persist unless and until the bipartisan Senate bill is passed. This uncertainty may well continue to cause us to miss information that we otherwise would be collecting.

Thus, although it is correct that we can continue to conduct certain activities authorized by the Protect America Act for a period of one year from the time they were first authorized, the Act's expiration has and may well continue to adversely affect such activities. Any adverse

The Honorable Silvestre Reyes
Page 2 of 6

effects will result in a weakening of critical tools necessary to protect the Nation.  As we explained in our letter to Senator Reid, expiration would create uncertainty concerning:

- The ability to modify certifications and procedures issued under the Protect America Act to reflect operational needs and the implementation of procedures to ensure that agencies are fully integrated protecting the Nation;

- The continuing validity of liability protection for those who assist us according to the procedures under the Protect America Act;

- The continuing validity of the judicial mechanism for compelling the assistance of private parties needed to protect our national security;

- The ability to cover intelligence gaps created by new communication paths or technologies.

Our experience in the past few days since the expiration of the Act demonstrates that these concerns are neither speculative nor theoretical: allowing the Act to expire without passing the bipartisan Senate bill has had real and negative consequences for our national security.  Indeed, this has led directly to a degraded intelligence capability.

It is imperative that our intelligence agencies retain the tools they need to collect vital intelligence information.  As we have explained before, the core authorities provided by the Protect America Act have helped us to obtain exactly the type of information we need to keep America safe, and it is essential that Congress reauthorize the Act's core authorities while also extending liability protection to those companies who assisted our Nation following the attacks of September 11, 2001.  Using the authorities provided in the Protect America Act, we have obtained information about efforts of an individual to become a suicide operative, efforts by terrorists to obtain guns and ammunition, and terrorists transferring money.  Other information obtained using the authorities provided by the Protect America Act has led to the disruption of planned terrorist attacks.  The bipartisan Senate bill would preserve these core authorities and improve on the Protect America Act in certain critical ways, including by providing liability protection to companies that assisted in defending the country after September 11.

In your letter, you assert that the Intelligence Community's ability to protect the Nation has not been weakened, because the Intelligence Community continues to have the ability to conduct surveillance abroad in accordance with Executive Order 12333.  We respectfully disagree.  Surveillance conducted under Executive Order 12333 in a manner that does not implicate FISA or the Protect America Act is not always as effective, efficient, or safe for our intelligence professionals as acquisitions conducted under the Protect America Act.  And, in any event, surveillance under the Protect America Act served as an essential adjunct to our other intelligence tools.  This is particularly true in light of the changes since 1978 in the manner in

The Honorable Silvestre Reyes
Page 3 of 6

which communications are transmitted.  As a result of these changes, the Government often has been required to obtain a FISA Court order prior to surveillance of foreign terrorists and other national security threats located outside the United States.  This hampered our intelligence collection targeting these individuals overseas in a way that Congress never intended, and it is what led to the dangerous intelligence gaps last summer.  Congress addressed this issue temporarily by passing the Protect America Act but long-term FISA reform is critical to the national security.

We have provided Congress with examples in which difficulties with collections under the Executive Order resulted in the Intelligence Community missing crucial information.  For instance, one of the September 11th hijackers communicated with a known overseas terrorist facility while he was living in the United States.  Because that collection was conducted under Executive Order 12333, the Intelligence Community could not identify the domestic end of the communication prior to September 11, 2001, when it could have stopped that attack.  The failure to collect such communications was one of the central criticisms of the Congressional Joint Inquiry that looked into intelligence failures associated with the attacks of September 11.  The bipartisan bill passed by the Senate would address such flaws in our capabilities that existed before the enactment of the Protect America Act and that are now resurfacing.  We have provided Congress with additional and detailed examples of how the Protect America Act temporarily fixed this problem and have demonstrated the operational need to provide a long-term legislative foundation for these authorities by passing the bipartisan Senate bill.

In your letter, you also posit that our intelligence capabilities have not been weakened, because the Government can employ the outdated provisions of FISA as they existed before the Protect America Act.  We respectfully disagree.  It was that very framework that created dangerous intelligence gaps in the past and that led Congress to pass the Protect America Act last summer.

As we have explained in letters, briefings and hearings, FISA's requirements, unlike those of the Protect America Act and the bipartisan Senate bill, impair our ability to collect information on foreign intelligence targets located overseas.  Most importantly, FISA was designed to govern foreign intelligence surveillance of persons in the United States and therefore requires a showing of "probable cause" before such surveillance can begin.  This standard makes sense in the context of targeting persons in the United States for surveillance, where the Fourth Amendment itself often requires probable cause and where the civil liberties of Americans are most implicated.  But it makes no sense to require a showing of probable cause for surveillance of overseas foreign targets who are not entitled to the Fourth Amendment protections guaranteed by our Constitution.  Put simply, imposing this requirement in the context of surveillance of foreign targets located overseas results in the loss of potentially vital intelligence by, for example, delaying intelligence collection and thereby losing some intelligence forever.  In addition, the requirement to make such a showing requires us to divert our linguists and analysts covering al-Qa'ida and other foreign threats from their core role—protecting the Nation—to the task of providing detailed facts for FISA Court applications related to surveillance of such foreign targets.  Our intelligence professionals need to be able to obtain foreign intelligence from

3

The Honorable Silvestre Reyes
Page 4 of 6

foreign targets with speed and agility. If we revert to a legal framework in which the Intelligence Community needs to make probable cause showings for foreign terrorists and other national security threats located overseas, we are certain to experience more intelligence gaps and miss collecting information.

You imply that the emergency authorization process under FISA is an adequate substitute for the legislative authorities that have lapsed. This assertion reflects a basic misunderstanding about FISA's emergency authorization provisions. Specifically, you assert that the National Security Agency (NSA) or the Federal Bureau of Investigation (FBI) "may begin surveillance immediately" in an emergency situation. FISA requires far more, and it would be illegal to proceed as you suggest. Before surveillance begins the Attorney General must determine that there is probable cause that the target of the surveillance is a foreign power or an agent of a foreign power and that FISA's other requirements are met. As explained above, the process of compiling the facts necessary for such a determination and preparing applications for emergency authorizations takes time and results in delays. Again, it makes no sense to impose this requirement in the context of foreign intelligence surveillance of targets located overseas. Because of the hurdles under FISA's emergency authorization provisions and the requirement to go to the FISA Court within 72 hours, our resource constraints limit our use of emergency authorizations to certain high-priority circumstances and cannot simply be employed for every foreign intelligence target.

It is also inaccurate to state that because Congress has amended FISA several times, there is no need to modernize FISA. This statement runs counter to the very basis for Congress's passage last August of the Protect America Act. It was not until the passage of this Act that Congress amended those provisions of FISA that had become outdated due to the communications revolution we have experienced since 1978. As we explained, those outdated provisions resulted in dangerous intelligence gaps by causing constitutional protections to be extended to foreign terrorists overseas. It is critical that Congress enact long-term FISA modernization to ensure that the Intelligence Community can collect effectively the foreign intelligence information it needs to protect the Nation. The bill passed by the Senate would achieve this goal, while safeguarding the privacy interests of Americans.

<u>Liability Protection</u>

Your assertion that the failure to provide liability protection for those private-sector firms that helped defend the Nation after the September 11 attacks does not affect our intelligence collection capability is inaccurate and contrary to the experience of intelligence professionals and to the conclusions the Senate Select Committee on Intelligence reached after careful study of the matter. It also ignores that providing liability protection to those companies sued for answering their country's call for assistance in the aftermath of September 11 is simply the right thing to do.

The Honorable Silvestre Reyes
Page 5 of 6

Through briefings and documents, we have provided the members of your committee with access to the information that shows that immunity is the fair and just result.

Private party assistance is necessary and critical to ensuring that the Intelligence Community can collect the information needed to protect our country from attack. In its report on S. 2248, the Intelligence Committee stated that "the intelligence community cannot obtain the intelligence it needs without assistance" from electronic communication service providers. The Committee also concluded that "without retroactive immunity, the private sector might be unwilling to cooperate with lawful Government requests in the future without unnecessary court involvement and protracted litigation. The possible reduction in intelligence that might result from this delay is simply unacceptable for the safety of our Nation." Senior intelligence officials also have testified regarding the importance of providing liability protection to such companies for this very reason.

Even prior to the expiration of the Protect America Act, we experienced significant difficulties in working with the private sector because of the continued failure to provide liability protection for such companies. These difficulties have only grown since expiration of the Act without passage of the bipartisan Senate bill, which would provide fair and just liability protection. Exposing the private sector to the continued risk of billion-dollar class action suits for assisting in efforts to defend the country understandably makes the private sector much more reluctant to cooperate. Without their cooperation, our efforts to protect the country cannot succeed.

<u>Pending Legislation</u>

Finally, as you note, the House passed a bill in November to amend FISA, but we immediately made clear that the bill is unworkable and unacceptable. Over three months ago, the Administration issued a Statement of Administration Policy (SAP) that stated that the House bill "falls far short of providing the Intelligence Community with the tools it needs to collect effectively the foreign intelligence information vital for the security of the Nation" and that "the Director of National Intelligence and the President's other senior advisers would recommend that the President veto the bill." We adhere to that view today.

The House bill has several grave deficiencies. First, although numerous senior intelligence officials have testified regarding the importance of affording liability protection for companies that assisted the Government in the aftermath of September 11, the House bill does not address the critical issue of liability protection. Second, the House bill contains certain provisions and serious technical flaws that would fatally undermine our ability to collect effectively the intelligence needed to protect the Nation. In contrast, the Senate bill deals with the issue of liability protection in a way that is fair and that protects the national security. In addition, the Senate bill is carefully drafted and has been amended to avoid technical flaws similar to the ones in the House bill. We note that the privacy protections for Americans in the Senate bill exceed the protections contained in both the Protect America Act and the House bill.

The Honorable Silvestre Reyes
Page 6 of 6

 The Department of Justice and the Intelligence Community are taking the steps we can to try to keep the country safe during this current period of uncertainty.  These measures are remedial at best, however, and do not provide the tools our intelligence professionals need to protect the Nation or the certainty needed by our intelligence professionals and our private partners.  The Senate passed a strong and balanced bill by an overwhelming and bipartisan margin.  That bill would modernize FISA, ensure the future cooperation of the private sector, and guard the civil liberties we value.  We hope that you will support giving your fellow members the chance to vote on this bill.

Sincerely,

Michael B. Mukasey
Attorney General

J.M. McConnell
Director of National Intelligence

cc: The Honorable Peter Hoekstra
  Ranking Member, House Permanent Select
  Committee on Intelligence

  The Honorable John D. Rockefeller, IV
  Chairman, Senate Select Committee on Intelligence

  The Honorable Christopher S. Bond
  Vice Chairman, Senate Select Committee on Intelligence

6

EXHIBIT D



# THE WHITE HOUSE
PRESIDENT GEORGE W. BUSH

Home > News & Policies > March 2008

For Immediate Release
Office of the Press Secretary
March 13, 2008

## President Bush Discusses FISA
South Lawn

📖 Fact Sheet: Protect America Alert: House Foreign Surveillance Bill Undermines Our National Security

9:20 A.M. EST

THE PRESIDENT: Last month House leaders declared that they needed 21 additional days to pass legislation giving our intelligence professionals the tools they need to protect America. That deadline passed last Saturday without any action from the House.

This week House leaders are finally bringing legislation to the floor. Unfortunately, instead of holding a vote on the good bipartisan bill that passed the United States Senate, they introduced a partisan bill that would undermine America's security. This bill is unwise. The House leaders know that the Senate will not pass it. And even if the Senate did pass it, they know I will veto it.

Yesterday the Attorney General and the Director of National Intelligence sent a leader [sic] to the Speaker explaining why the bill is dangerous to our national security. They cited a number of serious flaws in the bill, including the following:



First, the House bill could reopen dangerous intelligence gaps by putting in place a cumbersome court approval process that would make it harder to collect intelligence on foreign terrorists. This is an approach that Congress explicitly rejected last August when bipartisan majorities in both houses passed the Protect America Act. And it is an approach the Senate rejected last month when it passed a new -- new legislation to extend and strengthen the Protect America Act by an overwhelming vote of 68 to 29.

Now House leaders are proposing to undermine this consensus. Their partisan legislation would extend protections we enjoy as Americans to foreign terrorists overseas. It would cause us to lose vital intelligence on terrorist threats, and it is a risk that our country cannot afford to take.

Second, the House bill fails to provide liability protection to companies believed to have assisted in protecting our nation after the 9/11 attacks. Instead, the House bill would make matters even worse by allowing litigation to continue for years. In fact, House leaders simply adopted the position that class action trial lawyers are taking in the multi-billion-dollar lawsuits they have filed. This litigation would undermine the private sector's willingness to cooperate with the intelligence community, cooperation that is absolutely essential to protecting our country from harm. This litigation would require the disclosure of state secrets that could lead to the public release of highly classified information that our enemies could use against us. And this litigation would be unfair, because any companies that assisted us after 9/11 were assured by our government that their cooperation was legal and necessary.

Companies that may have helped us save lives should be thanked for their patriotic service, not subjected to billion-dollar lawsuits that will make them less willing to help in the future. The House bill may be good for class action trial lawyers, but it would be terrible for the United States.

Third, the House bill would establish yet another commission to examine past intelligence activities. This would be a redundant and partisan exercise that would waste our intelligence officials' time and taxpayers' money.

The bipartisan House and Senate intelligence and judiciary committees have already held numerous oversight hearings on the government's intelligence activities. It seems that House leaders are more interested in investigating our intelligence professionals than in giving them the tools they need to protect us. Congress should stop playing politics with the past and focus on helping us prevent terrorist attacks in the future.

Members of the House should not be deceived into thinking that voting for this unacceptable legislation would somehow move the process along. Voting for this bill does not move the process along. Instead, voting for this bill would make our country less safe because it would move us further away from passing the good bipartisan Senate bill that is needed to protect America.

The American people understand the stakes in this struggle. They want their children to be safe from terror. Congress has done little in the three weeks since the last recess, and they should not leave for their Easter recess without getting the Senate bill to my desk.

Thank you.

END 9:25 A.M. EDT

# EXHIBIT E





For Immediate Release
Office of the Press Secretary
March 11, 2008

# Statement by the Press Secretary on FISA

House Democratic leaders are subverting the will of a bipartisan majority of House
members by failing to allow a vote on the Senate FISA bill - a bill which received
overwhelming bipartisan support by a vote of 68 to 29.



Now, after weeks of inaction, the House appears to be taking a step backward and plans to introduce a bill that will
deprive our intelligence professionals of the tools they need to protect the country from terrorist attack. If reports are
accurate, the House Democratic leadership's proposal has a number of serious flaws which would make it dead on
arrival.

The proposal intends to put in place a cumbersome court approval process that could delay collecting intelligence on
foreign terrorists, which could cause us to lose vital intelligence.

The authorities to conduct foreign surveillance - inadequate as they are - would sunset in less than two years. Our
intelligence professionals cannot do their jobs effectively if the tools they use are continuously expiring.

The bill also fails to provide liability protection to companies believed to have helped defend the country after 9/11.

As the bipartisan Senate Select Committee on Intelligence concluded, the failure to extend liability protection will
undermine the private sector's willingness to help the Intelligence Community do its job. Without the assistance of the
private sector, our intelligence agencies will be hobbled in their efforts to protect the country from attack.

It is clear that House Democratic leaders have once again bowed to the demands of class-action trial lawyers,
MoveOn.org, and Code Pink and put their ideological interests ahead of the national interest. The priorities of House
leaders are dangerously misplaced. Instead of providing liability protection to companies that did their patriotic duty,
House leaders would establish a commission to examine intelligence activities in the past that helped protect the
country from further attacks after 9/11.

We can draw only one conclusion from this - House leaders are more interested in playing politics with past efforts to
protect the country than they are in preventing terrorist attacks in the future.

House Democratic leaders appear to have forgotten that the Administration has already briefed, among others, the
House Intelligence and Judiciary Committees on these intelligence activities and provided access to related documents.
There is no good reason for additional review by a commission.

House Democratic leaders know that this proposal is unacceptable to the Intelligence Community, the U.S. Senate, and
the Administration. It is time for House Democratic leaders to get serious about our national security, put aside these
partisan games, and bring the bipartisan Senate bill to a vote immediately.

# # #

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2008/03/20080311-7.html



EXHIBIT F

PATRICK J. LEARY, VERMONT, CHAIRMAN

EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, JR., DELAWARE
HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
BENJAMIN L. CARDIN, MARYLAND
SHELDON WHITEHOUSE, RHODE ISLAND

ARLEN SPECTER, PENNSYLVANIA
ORRIN G. HATCH, UTAH
CHARLES E. GRASSLEY, IOWA
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
SAM BROWNBACK, KANSAS
TOM COBURN, OKLAHOMA

BRUCE A. COHEN, *Chief Counsel and Staff Director*
MICHAEL O'NEILL, *Republican Chief Counsel and Staff Director*

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

May 21, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Gonzalez:

Last week we heard dramatic and deeply troubling testimony from former Deputy Attorney General Comey. He testified that in March 2004, when he was Acting Attorney General, he informed the White House that the Department of Justice had concluded an ongoing classified surveillance program had "no legal basis" and would not certify it. He then described how you, then Counsel to the President, and former White House Chief of Staff Andrew Card arrived at the hospital bedside of an extremely ill Attorney General Ashcroft and attempted to persuade him to certify the program. When you failed, because Mr. Ashcroft refused, Mr. Comey testified that the program was nonetheless certified over the objections of the Department of Justice. That apparently prompted a number of high-ranking Justice officials to consider resigning en masse.

This incident obviously raises very serious questions about your personal behavior and commitment to the rule of law. Mr. Comey's testimony also demonstrates vividly how essential it is that this Committee understands the legal underpinnings of the surveillance program that was the subject of that incident, and how the legal justification evolved over time. The stonewalling by you and the Administration must end. The Committee on the Judiciary is charged with overseeing and legislating on constitutional protections, civil and criminal justice, civil liberties, and the Judiciary, all subjects that this matter impacts. We intend to do our job.

This Committee has made no fewer than eight formal requests over the past 18 months – to the White House, the Attorney General, or other Department of Justice officials – seeking documents and information related to this surveillance program. These requests have sought the Executive Branch legal analysis of this program and documents reflecting its authorization by the President. You have rebuffed all requests for documents and your answers to our questions have been wholly inadequate and, at times, misleading.

The Honorable Alberto Gonzales
May 21, 2007
Page 2 of 3

We note also that the Administration has offered a legislative proposal that it contends seeks to "modernize" the Foreign Intelligence Surveillance Act (FISA). As you know, the Judiciary Committee has historically overseen changes to FISA and it is this Committee's responsibility to review the Administration's proposal with great care. The draft legislation would make dramatic and far-reaching changes to a critical national security authority. Before we can even begin to consider any such legislative proposal, we must be given appropriate access to the information necessary to carry out our oversight and legislative duties.

This Administration has asserted that it established its program of warrantless wiretapping by the NSA because it deemed FISA's requirements to be incompatible with the needs of the intelligence community in fighting terrorism. You testified in January that the warrantless wiretapping program had been terminated and that henceforth surveillance would be conducted pursuant to authorization from the FISA Court. To consider any changes to FISA, it is critical that this Committee understand how the Department and the FISA Court have interpreted FISA and the perceived flaws that led the Administration to operate a warrantless surveillance program outside of FISA's provisions for over five years.

Your consistent stonewalling and misdirection have prevented this Committee from carrying out its constitutional oversight and legislative duties for far too long. We understand that much of the information we seek may currently be classified, but that can be no excuse for failing to provide relevant information to all members of this Committee and select, cleared staff. We will, of course, handle it with the greatest care and consistent with security requirements.

Therefore, we reiterate our requests for the following documents and ask that you provide them to this Committee no later than June 5, 2007:

1) Please provide all documents that reflect the President's authorization and reauthorization of the warrantless electronic surveillance program that you have called the Terrorist Surveillance Program, including any predecessor programs, from 2001 to the present;

2) Please provide all memoranda or other documents containing analysis or opinions from the Department of Justice, the National Security Agency, the Department of Defense, the White House, or any other entity within the Executive Branch on legality of or legal basis for the warrantless electronic surveillance program, including documents that describe why the desired surveillance would not or could not take place consistent with the requirements and procedures of FISA from 2001 to the present;

The Honorable Alberto Gonzales
May 21, 2007
Page 3 of 3

3) Please provide all documents reflecting communications with the Foreign Intelligence Surveillance Court (FISC) about the warrantless electronic surveillance program or the types of surveillance that previously were conducted as part of that program, that contain legal analysis, arguments, or decisions concerning the interpretation of FISA, the Fourth Amendment, the Authorization for the Use of Military Force, or the President's authority under Article II of the Constitution, including the January 2007 FISC orders to which you refer in your January 17, 2007 letter to us and all other opinions or orders of the FISA court with respect to this surveillance;

4) If you do not consider the surveillance program that was the subject of discussion during the hospital visit and other events that former Deputy Attorney General James Comey described in his May 15, 2007 testimony before the Senate Judiciary Committee to be covered by the requests made above, please provide all documents described in those requests relevant to that program, as well.

We emphasize that we are seeking the legal justifications and analysis underlying these matters and not the specific operational details or information obtained by the surveillance.

Sincerely,

PATRICK LEAHY
Chairman

ARLEN SPECTER
Ranking Member

EXHIBIT G

EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, Jr., DELAWARE
HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
BENJAMIN L. CARDIN, MARYLAND
SHELDON WHITEHOUSE, RHODE ISLAND

ARLEN SPECTER, PENNSYLVANIA
ORRIN G. HATCH, UTAH
CHARLES E. GRASSLEY, IOWA
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
SAM BROWNBACK, KANSAS
TOM COBURN, OKLAHOMA

BRUCE A. COHEN, *Chief Counsel and Staff Director*
MICHAEL O'NEILL, *Republican Chief Counsel and Staff Director*

## United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

October 22, 2007

Mr. Fred Fielding
Counsel to the President
Office of the Counsel to the President
The White House
1600 Pennsylvania Avenue, NW
Washington, DC  20530

Dear Mr. Fielding:

Since the existence of the President's secret wiretapping program became public in December 2005, the Judiciary Committee has been seeking information on the legal justifications for conducting such surveillance outside the Foreign Intelligence Surveillance Act. We have done so through oral and written requests and by conducting oversight hearings. Former Attorney General Gonzales was asked about these matters. The lack of satisfaction with his responses led to further investigations, including the ongoing probe by the Justice Department's Inspector General. In light of the Administration's failure to respond fully, the Committee was prepared in November 2006 to consider subpoenas to telecommunication companies. Those subpoenas were not issued at that time, however.

After our repeated requests did not yield the information the Committee requested, the Committee proceeded in June to authorize subpoenas for documents related to the legal justification for the Administration's warrantless wiretapping program and to serve those subpoenas upon the Administration.

You have now had more than ample time to collect and process the relevant documents. Responsive information to those subpoenas is long overdue. You have made commitments to provide responsive information over the last several months and even recently, but no such information has yet been provided.

Instead, we read that a White House spokesperson has now conditioned the production of information on prior Senate agreement to provide retroactive immunity from liability for communications carriers. That is unacceptable and would turn the legislative process upside down. If the Administration wants our support for immunity, it should comply with the subpoenas, provide the information, and justify its request. As we have both said, it is wrongheaded to ask Senators to consider immunity without their being informed about the legal justifications purportedly excusing the conduct being immunized. Although the two of us have been briefed on certain aspects of the President's program, this cannot substitute for access to the documents and legal analysis needed to inform the legislative decisions of the Committee as a whole.

Mr. Fred Fielding
October 22, 2007
Page 2 of 2

By letter dated October 5, 2007, your office committed to assembling the documents
responsive to our subpoenas by today's date.  We expect the commitments of your office to
take priority over any White House comments to the media.  Accordingly, we urge your
compliance with the Committee subpoenas and other information requests without further
delay.  We can discuss precise arrangements for the production of and access to the
documents, but they should be provided in a manner that permits them to be reviewed and
considered by all Members of the Committee and appropriate Committee staff.

Sincerely,

PATRICK LEAHY                          ARLEN SPECTER
Chairman                                       Ranking Member